Nos. 14-1516, -1530

# United States Court of Appeals
# for the Federal Circuit

SYNOPSYS, INC.,

*Appellant,*

– v. –

MENTOR GRAPHICS CORPORATION,

*Cross-Appellant,*

– v. –

MICHELLE K. LEE, DEPUTY DIRECTOR,
U.S. PATENT & TRADEMARK OFFICE,

*Intervenor.*

———————————

ON APPEAL FROM THE PATENT AND TRADEMARK OFFICE,
PATENT TRIAL AND APPEAL BOARD, CASE NO. IPR2012-00042.

———————————

## OPENING BRIEF AND ADDENDUM OF APPELLANT SYNOPSYS, INC.

———————————

I. Neel Chatterjee
George L. Kanabe
Travis Jensen
Cam T. Phan
Orrick, Herrington &
  Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025-1015

William H. Wright
Orrick, Herrington &
  Sutcliffe LLP
777 S. Figueroa Street
Los Angeles, CA 90017-5855

Eric A. Shumsky
Orrick, Herrington &
  Sutcliffe LLP
Columbia Center
1152 15th Street, NW
Washington, DC 20005-1706
(202) 339-8400
eshumsky@orrick.com

Andrew D. Silverman
Orrick, Herrington &
  Sutcliffe LLP
51 W. 52nd Street
New York, NY 10019-6142

*Attorneys for Appellant Synopsys, Inc.*

## Claims 1 and 28

1.    A method comprising the steps of:

   a)  identifying at least one statement within a register transfer level (RTL) synthesizable source code; and

   b)  synthesizing the source code into a gate-level netlist including at least one instrumentation signal, wherein the instrumentation signal is indicative of an execution status of the at least one statement.

28.    A storage medium having stored therein processor executable instructions for generating a gate-level design from a register transfer level (RTL) synthesizable source code, wherein when executed the instructions enable the processor to synthesize the source code into a gate-level netlist including at least one instrumentation signal, wherein the instrumentation signal is indicative of an execution status of at least one synthesizable statement of the source code.

A126(15:2-8), A127(17:61-18:7) ('376 Patent).

# CERTIFICATE OF INTEREST

Counsel for Appellant Synopsys, Inc. certifies the following:

1.     We represent Synopsys, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented:  N/A

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented:  None.

4.     The names of all law firms and the partners or associates that appeared for party or amicus now represented in trial court or agency or are expected to appear in this court are:

ORRICK, HERRINGTON & SUTCLIFFE LLP
Adya Baker
I. Neel Chatterjee
Travis Jensen
George L. Kanabe
Robert M. Loeb
Cam T. Phan
Eric A. Shumsky
Andrew D. Silverman
William H. Wright

SIDLEY AUSTIN LLP
C. Frederick Beckner III
Peter D. Keisler
Erika Myers
M. Patricia Thayer

Date:  October 3, 2014            /s/ Eric A. Shumsky
                                  Eric A. Shumsky
                                  Orrick, Herrington & Sutcliffe LLP
                                  Columbia Center
                                  1152 15th Street, NW
                                  Washington, DC 20005-1706
                                  Telephone: (202) 339-8464
                                  Facsimile:  (202) 339-8500
                                  eshumsky@orrick.com

                                  *Counsel for Appellant Synopsys, Inc.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES .................................................................. v

TABLE OF ABBREVIATIONS ............................................................ xii

STATEMENT OF RELATED CASES ................................................. xiii

INTRODUCTION .............................................................................. 1

STATEMENT OF JURISDICTION ...................................................... 2

STATEMENT OF ISSUES .................................................................. 3

STATEMENT OF THE CASE .............................................................. 4

I.    DESIGNING INTEGRATED CIRCUITS AND VERIFYING
      THAT THEY OPERATE AS PLANNED ...................................... 6

      A.    Source Code Description ............................................... 6

      B.    Logic Synthesis ........................................................... 8

      C.    Verification ................................................................ 14

II.   SYNOPSYS' PRIOR ART AND MENTOR'S '376 PATENT ......... 16

      A.    Synopsys Develops A Method To Trace Elements
            Of A Circuit Back To The HDL Source Code
            Description. ................................................................ 16

      B.    Mentor Patents A Method For Marking And
            Instrumenting Hardware Description Code ................. 21

III.  PROCEDURAL BACKGROUND ............................................. 23

      A.    The Board Institutes *Inter Partes* Review Of The
            '376 Patent. ............................................................... 24

      B.    The Board Cancels Claims 5, 8, And 9. ..................... 26

SUMMARY OF ARGUMENT .............................................................. 29

STANDARD OF REVIEW .................................................................. 33

ARGUMENT ........................................................................ 34

I.  GREGORY ANTICIPATES CLAIMS 1 AND 28. ........................ 34

    A.  Gregory Discloses "Instrumentation Signal"
        Under Every Proposed Claim Construction. .............. 35

    B.  Gregory Discloses "Execution Status." ....................... 46

        1.  The Board erred in requiring an "explicit"
            disclosure. ........................................................... 47

        2.  Gregory discloses "execution status." ............... 50

            a.  Figures 16 and 18 of Gregory disclose
                "execution status." .................................... 51

            b.  Figures 8 and 9 disclose execution
                status. ....................................................... 58

II. THE BOARD ERRED AS A MATTER OF LAW BY
    FAILING TO ISSUE A FINAL WRITTEN DECISION
    WITH RESPECT TO EACH CLAIM CHALLENGED
    BY SYNOPSYS. ............................................................. 68

CONCLUSION .................................................................... 76

ADDENDUM

Final Written Decision, dated February 19, 2014 ........................ A42-A94

U.S. Patent No. 6,240,376, dated May 29, 2001 ......................... A95-A128

U.S. Patent No. 6,132,109, dated October 17, 2000 ............... A1103-1148

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*ACLU v. City of Las Vegas,*
  333 F.3d 1092 (9th Cir. 2003) ............................................................ 67

*Akzo N.V. v. Int'l Trade Comm'n,*
  808 F.2d 1471 (Fed. Cir. 1986) .......................................................... 47

*Am. Calcar, Inc. v. Am. Honda Motor Co.,*
  651 F.3d 1318 (Fed Cir. 2011) ..................................................... 34, 62

*Atl. Sugar, Ltd. v. United States,*
  744 F.2d 1556 (Fed. Cir. 1984) .......................................................... 70

*In re Bager,*
  47 F.2d 951 (CCPA 1931) ............................................................ 49, 50

*Barsebäck Kraft AB v. United States,*
  121 F.3d 1475 (Fed. Cir. 1997) .......................................................... 70

*BNP Paribas Energy Trading GP v. FERC,*
  743 F.3d 264 (D.C. Cir. 2014) ............................................................ 63

*In re Bond,*
  910 F.2d 831 (Fed. Cir. 1990) ............................................................ 47

*Burlington Truck Lines, Inc. v. United States,*
  371 U.S. 156 (1962) .................................................................... 50, 53

*ClearValue, Inc. v. Pearl River Polymers, Inc.,*
  668 F.3d 1340 (Fed. Cir. 2012) .......................................................... 33

*In re Cruciferous Sprout Litig.,*
  301 F.3d 1343 (Fed. Cir. 2002) ..................................................... 31, 48

*Darrell Andrews Trucking, Inc. v. Fed. Motor Carrier
  Safety Admin.,*
  296 F.3d 1120 (D.C. Cir. 2002) .......................................................... 53

*Ecolab, Inc. v. FMC Corp.*,
    569 F.3d 1335 (Fed. Cir. 2009) ........................................ 48

*Empire HealthChoice Assur., Inc. v. McVeigh*,
    547 U.S. 677 (2006) ............................................................ 72

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
    575 F.3d 1312 (Fed. Cir. 2009) ........................................ 48

*Gechter v. Davidson*,
    116 F.3d 1454 (Fed. Cir. 1997) ........................ 50, 53, 63, 64

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*,
    45 F.3d 1550 (Fed. Cir. 1995) .......................................... 48

*In re Gleave*,
    560 F.3d 1331 (Fed. Cir. 2009) .................................... 47, 50

*Hoover Group, Inc. v. Custom Metalcraft, Inc.*,
    66 F.3d 299 (Fed. Cir. 1995) ............................................ 49

*Institut Pasteur & Universite Pierre et Marie Curie v. Focarino*,
    738 F.3d 1337 (Fed. Cir. 2013) ........................................ 33

*Iowa v. FCC*,
    218 F.3d 756 (D.C. Cir. 2000) ...................................... 53, 63

*K/S HIMPP v. Hear-Wear Techs., LLC*,
    751 F.3d 1362 (Fed. Cir. 2014) ........................................ 33

*King Pharm., Inc. v. Eon Labs, Inc.*,
    616 F.3d 1267 (Fed. Cir. 2010) ........................................ 48

*In re Lee*,
    277 F.3d 1338 (Fed. Cir. 2002) .............................. 53, 63, 64

*Mentor Graphics Corp. v. Lee*,
    No. 1:13-cv-00518 CMH-TCB (E.D. Va.) ......................... xiii

*Meyer Intellect'l Props. Ltd. v. Bodum, Inc.*,
    690 F.3d 1354 (Fed. Cir. 2012) .................................... 31, 62

*Micron Tech., Inc. v. United States*,
   243 F.3d 1301 (Fed. Cir. 2001) ......................................................... 71

*Miller v. French*,
   530 U.S. 327 (2000) ......................................................................... 70

*In re Montgomery*,
   677 F.3d 1375 (Fed. Cir. 2012) ......................................................... 48

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mutual*
   *Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................... 53

*In re Mraz*,
   455 F.2d 1069 (CCPA 1972) .............................................................. 49

*Mullins v. Dep't of Energy*,
   50 F.3d 990 (Fed. Cir. 1995) ............................................................. 64

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007) ......................................................................... 70

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ......................................................... 33

*Novosteel SA v. United States*,
   284 F.3d 1261 (Fed. Cir. 2002) ......................................................... 67

*In re NTP, Inc.*,
   654 F.3d 1279 (Fed. Cir. 2011) ......................................................... 62

*PSEG Energy Resources & Trade LLC v. FERC*,
   360 F.3d 200 (D.C. Cir. 2004) ........................................................... 63

*Q.I. Press Controls, B.V. v. Lee*,
   752 F.3d 1371 (Fed. Cir. 2014) ......................................................... 52

*In re Rambus, Inc.*,
   753 F.3d 1253 (Fed. Cir. 2014) ......................................................... 33

*Schering Corp. v. Geneva Pharm., Inc.*,
   339 F.3d 1373 (Fed. Cir. 2003) .............................................. 48, 49, 50

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ............................................................... 64

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ............................................................. 50

*Sharp Elecs. Corp. v. McHugh*,
  707 F.3d 1367 (Fed. Cir. 2013) ......................................... 70

*Solvay S.A. v. Honeywell Int'l Inc.*,
  742 F.3d 998 (Fed. Cir. 2014) ........................................... 34

*Sony Computer Entm't Am. Inc. v. Dudas*,
  No. Civ. A. 1:05CV1447, 2006 U.S. Dist. LEXIS 36856
  (E.D. Va. May 22, 2006) ..................................................... 73

*St. Jude Medical v. Volcano Corp.*,
  749 F.3d 1373 (Fed. Cir. 2014) ......................................... 75

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
  953 F.2d 1360 (Fed. Cir. 1991) ................................... 48, 50

*Structural Rubber Prods. Co. v. Park Rubber Co.*,
  749 F.2d 707 (Fed. Cir. 1984) ........................................... 47

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  593 F.3d 1325 (Fed. Cir. 2010) ......................................... 49

*TNA Merchant Projects, Inc. v. FERC*,
  616 F.3d 588 (D.C. Cir. 2010) ........................................... 53

*United States v. Gonzales*,
  520 U.S. 1 (1997) ................................................................. 70

*United States v. Rosenwasser*,
  323 U.S. 360 (1945) ....................................................... 32, 70

*Versata Devel. Group, Inc. v. Lee*,
  No. 2014-1145 (Fed. Cir. 2014) .................................. xiii, 69

*In re Wagner*,
  63 F.2d 987 (CCPA 1933) ................................................... 49

## FEDERAL STATUTES

28 U.S.C. § 1295 ............................................................................... 3

35 U.S.C. § 6 ................................................................................... 62

35 U.S.C. § 102 ......................................................... 24, 34, 48, 49

35 U.S.C. § 102 (2010) ................................................................ 34

35 U.S.C. § 103 ............................................................................. 24

35 U.S.C. § 141 ......................................................................... 3, 75

35 U.S.C. § 311 ............................................................. 1, 2, 24, 74

35 U.S.C. §§ 311-319 ...................................................................... 1

35 U.S.C. § 312 ................................................................. 1, 62, 71

35 U.S.C. § 313 (2010) ................................................................ 73

35 U.S.C. § 314 .........................................1, 3, 24, 26, 71, 72, 74

35 U.S.C. § 315 ................................................................ 1, 25, 26, 74

35 U.S.C. § 316 ............................................................. 1, 25, 34, 69

35 U.S.C. § 318 .............................. xv, 1, 3, 25, 32, 69, 70, 71, 72, 75, 76

35 U.S.C. § 319 ................................................................ 1, 2, 3, 75

America Invents Act,
   Pub. L. No. 112-29, 125 Stat. 284 (2011) ............................. 24

## FEDERAL RULES AND REGULATIONS

37 C.F.R. pt. 42 ............................................................................. 25

37 C.F.R. § 42.23 .......................................................................... 67

37 C.F.R. § 42.100 ........................................................................ 36

37 C.F.R. § 42.108 ........................................................................ 72

37 C.F.R. § 90.3 ...................................................................... 3

Office Patent Trial Prac. Guide,
    77 Fed. Reg. 48,756  (Aug. 14, 2012) ................................. 36

LEGISLATIVE MATERIALS

153 Cong. Rec. H10280 (Sept. 7, 2007) .............................. 74

154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008) .................... 74

157 Cong. Rec. S1361 (daily ed. Mar. 8, 2011) ...................... 74

157 Cong. Rec. S1376 (daily ed. Mar. 8, 2011) ...................... 74

110 S. Rep. No. 259 (Jan. 25, 2008) .................................... 74

H.R. Rep. No. 112-98, pt. 1 (2011) ......................................... 1

FEDERAL CASE MATERIALS

Summary Judgment Dec., *Mentor Graphics Corp. v. EVE-USA,
    Inc.*, No. 3:10-cv-954 (D. Or. July 25, 2014), ECF No. 581. ............... 17

Order, *Mentor Graphics Corp. v. Lee*,
    No. 13-1669 (Fed. Cir. July 30, 2014), ECF No. 37 .......................... xiii

Defs.' Resp. to SSA Institute's Amicus Br., *Synopsys, Inc. v. Lee*,
    No. 14-674 (E.D. Va. Sept. 18, 2014), ECF No. 40 ........................... 69

PTO Br., *Versata Devel. Group, Inc. v. Lee*, No. 2014-1145 (Fed.
    Cir. Apr. 28, 2014), ECF No. 55 .......................................... 69

OTHER AUTHORITIES

Xinghao Chen & Nur A. Touba, *Electronic Design Automation:
    Synthesis, Verification, and Test* ch. 2,
    (Laung-Terng Wang et al., eds. 2009). ...................................... 5

1-3 *Chisum on Patents* § 3.01 (2014) ...................................... 49

Joe Matal, *A Guide to the Legislative History of the America Invents Act: Part II of II*, 21 Fed. Cir. Bar J. 540 (2012) .................. 62

Gordon E. Moore, *Cramming More Components Onto Integrated Circuits*, Electronics, April 19, 1965, *available at* http://tinyurl.com/lrj5sgg ................................................................. 5

Yuichi Nakamura et al., *A Fast Hardware/Software Co-Verification Method for System-On-a-Chip by Using a C/C++ Simulator and FPGA Emulator with Shared Register Communication*, ACM, Proc. of the 41st Ann. Design Automation Conf. (June 2004), *available at* http://tinyurl.com/pppkrlb ................................................ 15

Notice of Clarification of Office Policy to Exercise Discretion in Reexamining Fewer Than All the Patent Claims, 1311 Off. Gaz. Pat. Office 197 (2006) ............................................................ 73

PTO, *Manual of Patent Examining Procs.* § 2112, *available at* http://tinyurl.com/pdjq8uy ............................................... 48

Synopsys, Inc., 2013 Annual Form 10-K Report, *available at* http://tinyurl.com/mjcmgal ............................................... 17

USPTO's AIA Trial Roundtables, *available at* http://tinyurl.com/ownwbs4 ............................................... 72

Frank Vahid, *Digital Design, with RTL Design, VHDL, and Verilog* (2d ed. 2011) ......................................................... 4

John F. Wakerly, *Digital Design, Principles & Practices* (2d ed. 1994) ................................................................. 12

16AA Charles Alan Wright et al., *Federal Practice and Procedure* § 3974.3 (4th ed. 2008) .................................................. 67

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| Gregory '109 or "Gregory" | U.S. Patent No. 6,132,109, assigned to Synopsys, Inc. |
| '376 patent | U.S. Patent No. 6,240,376, the patent-at-issue, assigned to Mentor Graphics Corporation |
| APA | Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* |
| the Board | Patent Trial and Appeal Board |
| EVE, S.A. | Emulation and Verification Engineering, S.A. |
| HDL | Hardware Description Language |
| Mentor | Cross-Appellant Mentor Graphics Corporation |
| PTO | Patent & Trademark Office |
| RTL | Register Transfer Level |
| VHDL | Very High Speed Integrated Circuit Hardware Description Language |

## STATEMENT OF RELATED CASES

This appeal arises out of a final written decision of the Patent Trial and Appeal Board ("the Board") that granted in part and denied in part Synopsys, Inc.'s petition for *inter partes* review of U.S. Patent No. 6,240,376 ("the '376 patent"). That patent is assigned to Mentor Graphics Corporation. The following pending matters may affect or be affected by this Court's decision. *See* Fed. Cir. R. 47.5.

After the Board instituted proceedings, Mentor sued the Patent & Trademark Office ("PTO") in the Eastern District of Virginia under the Administrative Procedure Act ("APA"), challenging the Board's decision to institute *inter partes* review. *Mentor Graphics Corp. v. Lee*, No. 1:13-cv-00518 CMH-TCB (E.D. Va.). The district court granted motions to dismiss filed by the PTO and Synopsys (which had intervened). Mentor appealed the dismissal of its lawsuit to this Court, and that appeal has been stayed pending resolution of *Versata Development Group, Inc. v. Lee*, Fed. Cir. No. 2014-1145. *See* Order, *Mentor Graphics Corp. v. Lee*, No. 13-1669 (Fed. Cir. July 30, 2014), ECF No. 37.

There also is pending district court litigation between the parties. In 2010 and again in 2012, Mentor filed suit in the District of Oregon

against EVE-USA Inc. and Emulation and Verification Engineering, S.A. ("EVE, S.A."), companies that later were acquired by Synopsys. *Mentor Graphics Corp. v. EVE-USA, Inc.*, Nos. 3:10-cv-954-MO (LEAD), 3:12-cv-1500-MO (D. Or.).  That litigation involves different patents than the one at issue here.

In 2012, Synopsys, EVE, S.A., and EVE-USA Inc. sued Mentor for a declaratory judgment of non-infringement and invalidity in the Northern District of California in a case involving the '376 patent among others.  Mentor counter-claimed for infringement.  That case was transferred and consolidated with other cases pending in the District of Oregon.  *Synopsys, Inc. v. Mentor Graphics Corp.*, No. 3:13-cv-579-MO (D. Or.).  In that action, which remains pending, Synopsys and the EVE entities also alleged that Mentor infringes several Synopsys patents, including the patent that is the relevant prior art in this appeal:  U.S. Patent No. 6,132,109 ("'109 Patent" or "Gregory").

Finally, Synopsys has filed an APA suit in the Eastern District of Virginia.  In it, Synopsys challenges the Board's regulation, and its policy and practice, of failing to "issue a final written decision with respect to the patentability of *any* patent claim challenged by the

petitioner," 35 U.S.C. § 318(a) (emphasis added), as required by statute, and instead issuing final written decisions that address only certain of the challenged claims. The government has moved to dismiss the complaint; that motion remains pending. Mentor has intervened in the case. *See Synopsys, Inc. v. Lee*, No. 1:14-cv-00674-JCC-IDD (E.D. Va.).

## INTRODUCTION

When Congress enacted the America Invents Act, it created new post-grant review proceedings to combat the "growing sense that questionable patents are too easily obtained and are too difficult to challenge." H.R. Rep. No. 112-98, pt. 1, at 39 (2011). Appellee Mentor Graphics owns one such questionable patent (No. 6,240,376), which it has been wielding in litigation, *supra* at xiii-xiv—notwithstanding that that patent came after and is anticipated by one of Synopsys' own patents. Accordingly, Synopsys availed itself of the new *inter partes* review procedure. 35 U.S.C. §§ 311-319. The Board initiated review because it found "a reasonable likelihood that … at least 1 of the claims" was invalid. *Id.* § 314(a). Ultimately, the Board cancelled three claims (which are the subject of Mentor's cross-appeal).

The Board, however, did not go quite far enough. Two additional claims of the '376 patent (1 and 28) also are anticipated by the same prior-art reference (Gregory). Gregory and the '376 patent both teach a method of modifying source code in order to make it easier to correct errors in the design of a circuit. As to both challenged claims, the Board properly determined that Gregory discloses every limitation save one.

But, as to that purportedly missing limitation, the Board committed a number of errors—applying the wrong test for anticipation; and failing to address (or sometimes even to consider) arguments made by Synopsys. That aspect of the Board's decision therefore must be vacated.

Separately, the Board erred as a matter of law when—as has become its practice—it issued a final written decision that did not address all of the challenged claims. Not only does this practice contravene the statute's plain text; perhaps not coincidentally, it effectively shields those claims from appellate review. This portion of the Board's decision must be vacated and remanded with instructions to the Board to issue a final written decision that complies with the clear statutory requirement.

## STATEMENT OF JURISDICTION

Synopsys petitioned for *inter partes* review of claims 1-15 and 20-33 of the '376 patent. A135-99; *see* 35 U.S.C. § 311. The Board instituted proceedings as to claims 1-9, 11, and 28-29. A1-41. On February 19, 2014, the Board cancelled claims 5, 8, and 9. A42-94. On April 22, 2014, Synopsys timely filed its notice of appeal. A849-55; 35 U.S.C.

2

§§ 141(c), 319; 37 C.F.R. § 90.3(a)(1).  On May 2, 2014, Mentor filed its own notice of appeal.  A856-62.  This Court has jurisdiction.  28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF ISSUES

1.  Both the '376 patent and the prior-art Gregory patent disclose technology for finding errors in the design of a circuit.  Specifically, both disclose a method of modifying a circuit's source code to produce an output that indicates whether a particular portion of the code is active, thereby making it easier to find and correct errors in the circuit's design.

Did the Board err in concluding that claims 1 and 28 of the '376 patent are not anticipated by Gregory?

2.  The Board institutes *inter partes* review when "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."  35 U.S.C. § 314(a).  "If an inter partes review is instituted, … the Board *shall* issue a final written decision with respect to the patentability of *any patent claim challenged by the petitioner*."  35 U.S.C. § 318(a) (emphases added).

Did the Board err by instituting review but failing to issue a final written decision with respect to the patentability of each claim challenged by Synopsys?

## STATEMENT OF THE CASE

In the modern, wired economy, electronic circuits are everywhere. Tiny integrated circuits such as microchips are ubiquitous in computers, cell phones, microwave ovens, pacemakers—indeed, in virtually all electronic equipment. At the simplest level, a microchip is made up of tiny electronic components (like transistors, resistors, and capacitors) that are packed onto a fingernail-sized plate or chip typically made of silicon. *See* Frank Vahid, *Digital Design, with RTL Design, VHDL, and Verilog* 39-40 (2d ed. 2011). Among other things, these chips can process information and serve as an electronic device's internal memory.

As electronic devices increase in complexity, microchips must get smaller and smaller, while doing more and more. It's well known that the number of transistors packed into a microchip doubles approxi-

4

mately every two years.[1]  The very first microchip in the 1950s contained one transistor, three resistors, and one capacitor; today, the average microchip will contain *several hundred million* transistors and *miles* of wires.[2]  As microchips and other circuits have become smaller and more sophisticated, it has become especially important to ensure that circuits contain no design flaws (or "bugs").  That verification task once was performed by manually testing circuits.  Today, however, problems are identified, and the chip's design is tested, by advanced verification software ("simulators") and hardware ("emulators").  When bugs are identified, humans can go back to "debug" the design.  This case involves technology for tracing bugs found during verification back to the original source code that was used to create the circuit design, thereby making it easier for humans to find and fix the problems in the code.

---

[1] *See* Gordon E. Moore, *Cramming More Components Onto Integrated Circuits*, Electronics, April 19, 1965 at 114, *available at* http://tinyurl.com/lrj5sgg.

[2] *See* Xinghao Chen & Nur A. Touba, *Electronic Design Automation: Synthesis, Verification, and Test* ch. 2, 39 (Laung-Terng Wang et al., eds. 2009).

Before describing the invention claimed by Mentor, and the

Synopsys patent that preceded it, we begin with a brief background

about the process of designing microchips.

## I.    DESIGNING INTEGRATED CIRCUITS AND VERIFYING THAT THEY OPERATE AS PLANNED

### A.    Source Code Description

"[T]he design of a[] … chip[] can be an extremely complicated

task." A1596.  Even a decade ago, it was not uncommon for a single

chip to have more than a million components.  Because that level of

complexity goes far beyond what a human can process, modern chip

design typically begins with a high-level "description of what the chip is

supposed to do," called a specification.  *Id.*

The next step is to begin designing the chip itself, using a "formal

language[] similar to [a computer] programming language[]." *Id.*  Such

languages are known generally as hardware description languages

(HDLs), two of the most common of which are Verilog and VHDL (Very

High Speed Integrated Circuit Hardware Description Language).  *Id.*;

A119(1:16-31) ('376 patent).  By way of example, here is a small snippet

of HDL code written in VHDL:

6

```
if (C and B) then
        Z <= not(A or B);
else
        Z <= not B;
end if;
```

A1108 Fig. 4 (Gregory '109).  This code describes how the circuit should

behave, using a common "if-then-else" statement:  "[I]f" one condition is

satisfied, "then" follow one branch; otherwise ("else"), follow a different

branch.  Inputs in a digital circuit are always equal to either 1 or 0,

which are sometimes referred to as "high" or "true" (1), and "low" or

"false" (0).  That being so, this sample code provides a simple instruct-

ion:

- "If" inputs "(C and B)" both are true (i.e., both equal to 1),
  "then" the output ("Z") should be the opposite of inputs A or B
  ("not(A or B)").

- Otherwise ("else," which is to say if inputs "(C and B)" are *not*
  both equal to 1), the output ("Z") is the opposite of input B ("not
  B").

A1897 ¶ 57(Mentor's Expert's Decl.).

The output, Z, is the electronic value, or "signal," generated by the

circuit.  Like inputs, outputs equal either 1 or 0.  And, because an

output is the product of the logical operations that a circuit performs on

one or more inputs, an output's value can convey information about the circuit that produced it.

Millions upon millions of logical operations like this one are built into the design of a microchip. And, as described below, this functional description ultimately is translated into physical circuitry and carried out using transistors and other components that control the flow of electrons through the chip.

After the designer has described a desired function in HDL, it is common to "simulate" the circuit using a computer program in order "to determine whether the circuit produces correct values in response to inputs." A1139(4:41-52) (Gregory '109). As discussed below (at 15-16), simulation is repeated throughout the process of designing and fabricating circuits. If there is a problem, the designer can fix it by modifying the code. A1139(4:53-57). If not, the designer moves to the next step: logic synthesis.

**B.    Logic Synthesis**

The HDL code description is fed into a computer program that performs logic synthesis. First, a translator program takes a subset of the HDL code (which it recognizes as register transfer level (RTL)

source code)—like the snippet depicted above—and "synthesize[s]" or "translat[es]" it into a "gate-level netlist." A1140(5:4-8) (Gregory '109); A119(1:35-36) ('376 patent). This netlist is a text file that provides a textual description of the circuit, including components such as "logic gates" (more on those below, at 10-12) and the interconnections between them. Then, the program can "convert[]" the netlist into a schematic view of the circuit. A1138-39(2:59-3:3) (Gregory '109). In architectural terms, the netlist is akin to a detailed, textual description of the plan for a building, while the schematic is the blueprint. They simply provide the same information in different ways, and both the netlist and schematic "correspond directly with the statements in the source HDL." A1140(5:4-8) (Gregory '109).

For instance, the snippet of HDL code depicted above (at 7) would be synthesized into a gate-level netlist (describing the interconnection of various logic gates), then converted into the following corresponding schematic:



A1110 Fig. 6 (Gregory '109).  So, just as the netlist describes a circuit's

different components and their interconnections, a schematic graph-

ically depicts those components and the wires connecting them, which

together carry out the functions described by the HDL code.  In

particular, the schematic shows "logic gates" ("gates," for short), like

232 and 233 in this diagram, which are represented as geometric

shapes.  And although these components resemble hieroglyphics (the

Rosetta Stone for which appears below, at 11-12), they simply depict

graphically the same types of logical operations described in the code

above.  They take inputs, perform a logical operation required by the

code, and produce an output.  A1138(2:63-3:1) (Gregory '109), A1108

Fig. 4 (Gregory '109).

Before describing the next step in circuit design, it's worth

pausing to explain the symbols used in a circuit diagram like the one

above.

 This symbol (200, 201, and 202 in the diagram) represents an input (A, B, and C above).

 This symbol (220) represents an output (Z above).

 This symbol (232) is an "AND gate." It receives inputs (the lines on the left) and returns an output of 1 ("true") if *all* inputs are 1. Otherwise, the output will be 0. The "if" statement in the code depicted above ("if (C and B) then …"), contains an AND statement: That condition is satisfied only if all inputs (both C and B) equal 1.

 This symbol (which does not appear in the exemplary diagram) is an "OR gate." It returns an output of 1 if *any* input is 1.

 This symbol (230) is a "NOT gate" or "inverter." It receives a single input and generates an opposite output: If the input is 1, the output is 0, and vice versa.

 This symbol is a "NAND" gate. Its output is the opposite of an "AND" gate. Whereas an AND gate returns a 0 if not all its inputs are 1, a NAND gate returns a 1 if not all of its inputs are 1. Similarly, while an AND gate returns a 1 if all inputs are 1, a NAND gate returns a 0 if all inputs are 1.

 This symbol is a "NOR" gate.  It produces the opposite output of an OR gate.  Thus, while an OR gate returns an output of 1 if any input is 1, a NOR gate returns a 0 if any input is a 1.  A NOR gate only produces an output of 1 if all inputs are 0.[3]

*See* John F. Wakerly, *Digital Design, Principles & Practices* 76-77 (2d ed. 1994).

After translation comes "the optimization step of the synthesis process."  A1145(16:39-41) (Gregory '109).  As noted above, during translation, a computer program translates the HDL code written by a circuit designer into a netlist, which is then converted to a schematic that depicts the circuit graphically.  That translation is a literal one: The synthesis program "converts [the designer's] description into gates and other circuit structures that directly correspond statement by state-ment with the designer's description."  A1138-39(2:66-3:1) (Gregory '109).

Often, however, there is more than one way to achieve the de-signer's intended result—particularly when multiple logical operations

---

[3] The other component, labeled "MUX," is a "multiplexer."  This is a circuit component that, based on instructions it receives, selects one of several inputs to provide as the output (much like a railroad switch selects which incoming track to connect to a continuing track).

are being combined—and the designer may not have picked the best

one. Thus, after the HDL code has been *translated* into a netlist and

gate-level schematic, the circuit is then *optimized*, a process through

which software removes unnecessary components from the circuit.

Optimization results in a simpler and often more efficient design, which

can be simulated (tested) more quickly. For example, this schematic

shows an optimized version of the circuit depicted above (at 10) and in

Gregory Figure 6:



A1111 Fig. 7 (Gregory '109). This version of the circuit is much simpler

than the one in Figure 6, *cf. supra* at 10, but both are functionally

equivalent to the if-then-else statement in Figure 4. A1142(9:51-53) (Gregory '109), A1143(12:33-42) (Gregory '109).[4]

One potential disadvantage of optimization, however, is the loss of information and components (like inputs and outputs) that may be necessary to pinpoint the source of problems that are identified through the next step: verification.

## C.    Verification

A "circuit designer needs to ensure that the circuit performs the correct function." A1138(1:21-23) (Gregory '109). Accordingly, after a proposed circuit has been synthesized and optimized, its design will generally be simulated again to ensure that it functions as intended. Testing is done by entering various combinations of inputs to ensure correct outputs. Because "complex designs," such as microchips, often involve "millions or billions" of combinations of test inputs,

---

[4] For the truly initiated, this is because the output (Z) will always be the opposite of B. If "B" is 0, the condition "if (C and B)" necessarily results in 0, and the "else" statement, "Z <= not B" will be executed. If "B" is 1, then it doesn't matter whether "if (C and B)" is 0 or 1, because either Z is "not(A or B)" and the value of B as 1 necessarily results in a value of 0 for Z (the "then" statement) *or* Z is "not B" (the "else" statement). Either way, Z is the opposite of B. Because "Z" is determined independently of "C" and "A," they are irrelevant to the circuit's function and removed through optimization.

14

A120(4:58-60) ('376 patent), the "[d]ata volumes" of such tests are "beyond any limit that could be overseen [by human beings,]" and thus "powerful tools are needed for verification," A1603.

Two common tools for verifying circuits are software simulators and hardware emulators. In simulation, a computer program predicts the behavior of a circuit through software. A119(1:35-43) ('376 patent). Test inputs are entered, and the resulting outputs are checked against the expected outputs. Because simulations are run using computer programs, they are considered easy, accurate, flexible and low cost.

Emulators are large pieces of advanced, customizable hardware that can imitate the behavior of circuitry in order to test it. The hardware can be reconfigured to incorporate changes to the circuit's design. Emulators are typically much faster than simulators and have the further advantage that they produce physical, functional exemplar circuits. Emulators, however, are more expensive than simulators.[5]

---

[5] Yuichi Nakamura et al., *A Fast Hardware/Software Co-Verification Method for System-On-a-Chip by Using a C/C++ Simulator and FPGA Emulator with Shared Register Communication*, ACM, Proc. of the 41st Ann. Design Automation Conf. 299 (June 2004), *available at* http://tinyurl.com/pppkrlb.

Thus, simulators and emulators serve similar purposes—to test a circuit's design to ensure that it will function as expected. And, if errors are uncovered during verification, the designer can "go back to the HDL [source code description], where the function is specified and make adjustments there" to fix or debug the circuit. A1140(6:26-30) (Gregory '109).

Finally, once the circuit has been verified and debugged, the chip is ready to be manufactured. *Id.*(6:42-43).

* * *

This case involves technology for debugging a circuit design after the design has been synthesized and optimized. In particular, this technology permits a designer who has learned of a bug to locate the source of the problem in the HDL code, where it can be fixed.

## II.   SYNOPSYS' PRIOR ART AND MENTOR'S '376 PATENT

### A.   Synopsys Develops A Method To Trace Elements Of A Circuit Back To The HDL Source Code Description.

Synopsys was founded more than 25 years ago, when the internet wasn't what it is today, and integrated circuits weren't pervasive in cars, buildings, and appliances. As consumer and wireless products have proliferated, Synopsys has played an essential role in this

16

innovation.  Among its other advances, Synopsys supplies engineers with software that is used to design and test integrated circuits to make sure that they function as intended.[6]

One of Synopsys' innovations is embodied in a patent applied for by a group of Synopsys inventors (including Brent Gregory) in June 1994.  It ultimately issued as U.S. Patent No. 6,132,109 ("Gregory '109" or "Gregory"), and was assigned to Synopsys.  A1103-48.[7]  Gregory facilitates "debugging digital circuits constructed using logic or behavioral synthesis" by making it easier to trace problems in the circuit design back to their origin in the source code.  A1103(Abstract), 1138(1:12-15).  As discussed above, when HDL code is synthesized into a netlist and circuit diagram, the resulting draft circuit "is generally large and slow," and so it will be optimized to create "a functionally equivalent, yet improved structure."  A1139(3:4-8).  But optimization creates a difficulty of its own:  Simplifying the circuit modifies it, and

---

[6] *See* Synopsys, Inc., 2013 Annual Form 10-K Report at 2, *available at* http://tinyurl.com/mjcmgal.

[7] Claim 1 of Gregory was recently held indefinite in litigation that remains ongoing.  *See* Summary Judgment Dec., *Mentor Graphics Corp. v. EVE-USA, Inc.*, No. 3:10-cv-954 (D. Or. July 25, 2014), ECF No. 581.

thereby eliminates the "direct[] correspond[ence]" between the HDL code and the circuit diagram. A1138(2:67). "Prior to optimization, it is a straight-forward task to identify which circuit element of the initial circuit corresponds to what part of the HDL source code." A1140(5:14-17). But "because of the extensive manipulations performed during the optimization process, such identification after optimization becomes almost impossible." A1140(5:17-20). Thus, if there is an error in the now-modified circuit, it will be difficult to find the corresponding HDL code to "debug[]" it. A1139(3:12-26). This is problematic because "[i]deally, the designer would go back to the HDL [code] where the function is specified and make adjustments there." A1140(6:28-30). If a designer cannot modify the HDL code directly, she must make changes in the netlist or schematic. Because the fixes for those bugs will not be in the HDL code, the code no longer matches the circuit design, and the code cannot simply be resynthesized later when the designer is ready to fabricate the chip. A1139(3:23-32).

Gregory devised a novel solution to combine the benefits of optimization with the benefits of debugging at the HDL code level. A1141(7:64-66). In particular, Gregory "provid[es] a designer with the

18

ability to mark the synthesis [HDL] source code in the places that the

designer wants to be able to debug" by inserting "a particular text

phrase, such as 'probe', along with some additional optional informa-

tion." A1141(8:11-26). For instance, Gregory shows the same sample

code set forth above (at 7), modified to contain a "probe statement":

```
if (C and B) then
        Z <= not(A or B);    --Synopsys probe_statement
else
        Z <= not B;
end if;
```

A1112 Fig. 8 (highlighting added).

This modified code (known as "instrumented code," or code

containing "instrumentation") sends a signal to the software that is

responsible for synthesizing the code into a circuit and then optimizing

the circuit. Specifically, the modified code signals to the software that,

when the software produces a circuit, it should do so without removing

or replacing the circuit components associated with the instrumented

code. A1143(11:15-41). If necessary, the synthesizer or optimizer may

add circuitry in order to maintain the components associated with the

identified source code. A1141(8:14-42). In the language of Gregory, the

synthesizer and optimizer should "generate[] a circuit th[at] provides

the same function as it did without the 'probe' statement, but add[]

19

additional information or components to the initial circuit that indicate that certain components should not be replaced during optimization." A1141(8:26-30).

Gregory demonstrates the results of this graphically, by showing the synthesized and optimized circuits that will result from *non*-instrumented code, A1110-11 Figs. 6-7, and (for comparison purposes) the quite different synthesized and optimized circuits that would result from instrumenting the underlying code, A1113-14 Figs. 9-10. As this comparison demonstrates (*infra* at 38-40), the process of instrumentation protects the circuit components associated with the instrumented code. *See* A1143-44(12:33-13:20).

In short, Gregory teaches instrumenting HDL code to identify and mark particular source code, and to preserve or "add[] additional … components to the initial circuit." A1141(8:21-29). This ensures that the "components will not be replaced during optimization," and that, even after optimization, those circuit components will remain "directly and traceably related to those components in the initial circuit." A1141(8:21-42). That these components can be traced back to the

source code in turn "facilitates debugging" at the HDL code level.

A1141(8:31-42).[8]

## B.    Mentor Patents A Method For Marking And Instrumenting Hardware Description Code.

Four years after Synopsys applied for the Gregory patent, an application was filed that resulted in the '376 patent. That patent lists Mentor as the assignee. A95. Like Gregory before it, the '376 patent is aimed at making it easier to debug the HDL code for microchip designs by "instrumenting" the HDL code before it is synthesized. A119(2:25-29) ('376 patent).

The problem the patent sought to address is that during synthesis, "most of the high-level information from the RTL source code is lost," and without that "information, many of the debugging functionalities are unavailable." A119(2:1-4); *accord* A120(4:64-66). During

_____

[8] Gregory discloses that, in addition to protecting a single line of code (as in the example above), the same method can be used to protect blocks of code. Gregory explains that a "block probe" can mark "all signals entering or leaving the sequence of HDL code delineated by the begin block and end block statements." A1144(14:20-25). This allows a designer "to select many parts of the HDL source [code] for probing without typing a text statement probe command for each line of HDL." A1144(14:37-40). *Compare* A1116-18 Figs. 12 & 14 (non-instrumented code and resulting circuit schematic) *with* A1120-22 Figs. 16 & 18 (instrumented code and resulting circuit schematic).

typical gate-level simulation, it is "difficult, if not impossible" to "map[]"
output values (0 or 1) of corresponding circuit components "to particular
[HDL] source code lines." A119(2:7-9). To address this problem, the
'376 patent attempts to make it easier for a designer to preserve
information in the HDL source code that otherwise would be lost during
synthesis, and to determine the location of the source code that is
necessary for debugging.

Specifically, the patent teaches a method of adding instrument-
tation that identifies lines of source code and their components in the
circuit for later tracing, and collects information through simulation
that otherwise would be lost. A121-25(5:27-30, 5:38-40, 7:24-27,
8:60-64, 13:60-67). Through instrumentation, additional data are
produced that "identif[y] the RTL source code statements each instru-
mentation output signal is associated with." These are called the
"[i]nstrumentation data." A121(6:32-34).

At issue here is the patentability of claims 1 and 28 of the '376 patent.  Claim 1 recites:

> A method comprising the steps of
>   a) identifying at least one statement within a register transfer level (RTL) synthesizable source code; and
>   b) synthesizing the source code into a gate-level netlist including at least one instrumentation signal, wherein the instrumentation signal is indicative of an execution status of the at least one statement.

A126(15:2-9).  Similarly, claim 28 recites:

> A storage medium having stored therein processor executable instructions for generating a gate-level design from a register transfer level (RTL) synthesizable source code, wherein when executed the instructions enable the processor to synthesize the source code into a gate-level netlist including at least one instrumentation signal, wherein the instrumentation signal is indicative of an execution status of at least one synthesizable statement of the source code.

A127(17:61-18:7).

## III.   PROCEDURAL BACKGROUND

This proceeding is one of several involving Synopsys and Mentor, which compete in the field of verifying circuit designs.  In this dynamic field, the marketplace has changed rapidly in recent years.  Litigation also has been frequent, including patent litigation between Mentor and

Synopsys that has been ongoing since 2010. *Supra* at xiii-xiv. Among the patents being litigated is the '376 patent, on which Synopsys sought a declaratory judgment of non-infringement, and Mentor sued for infringement. *Id.* In 2012, prior to Synopsys' declaratory judgment action, Synopsys petitioned for *inter partes* review of the '376 patent. This appeal arises from that proceeding.

## A.     The Board Institutes *Inter Partes* Review Of The '376 Patent.

In 2011, Congress enacted the America Invents Act (AIA), Pub. L. No. 112-29, 125 Stat. 284 (2011), which created new methods for the Board (also newly created) to hear adversarial challenges to the patentability of issued patents. Relevant here is the *inter partes* review, which authorizes "a person who is not the owner of a patent" to ask the Board "to cancel as unpatentable 1 or more claims of a patent … on a ground that could be raised under [35 U.S.C. §] 102 or 103." 35 U.S.C. § 311(a)-(b).

*Inter partes* review is instituted when the PTO determines "that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." *Id.* § 314(a). Upon instituting review, the Board considers the patentability

of the challenged patent.  *See generally id.* § 316; 37 C.F.R. pt. 42.  The Board holds what is called a "trial" (in actuality, more akin to oral argument), after which "the Board shall issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner."  35 U.S.C. § 318(a).

Synopsys filed a petition for *inter partes* review that challenged claims 1-15 and 20-33, contending that they were anticipated and obvious in view of five prior-art references, including Gregory.  A145-51.  The Board instituted review of claims 1-9, 11, and 28-29, finding a reasonable likelihood that they were anticipated by Gregory.  A23-28.

As a threshold matter, the Board rejected Mentor's counterargument that review was precluded by 35 U.S.C. § 315(b).  A15-18.  Section 315(b) provides that "review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent."  Mentor argued that this bar applies because Mentor sued EVE on the '376 patent years earlier, and Synopsys acquired EVE shortly after filing its petition for *inter partes* review.  But, the Board explained, "the plain

language of § 315(b)" considers privity at the time the district court complaint is served, and there was no evidence that Synopsys and EVE were in privity at that time, or indeed even when the petition was filed. A15-16.

Thus, the Board went on to determine that there was "a reasonable likelihood" that "at least 1 of the claims challenged in the petition" was invalid, 35 U.S.C. § 314(a)—namely, claims 1-9, 11, and 28-29. A23-28.  The Board, however, "decline[d] to institute *inter partes* review on claims 10, 12-15, 20-27, and 30-33."  A14, 18-40.

### B.    The Board Cancels Claims 5, 8, And 9.

At the conclusion of its review, the Board issued a final written decision in which it canceled claims 5, 8, and 9, but not claims 1-4, 6-7, 11, and 28-29.  The Board reiterated its rejection of Mentor's argument that the "proceeding is barred" by § 315 and should not have been instituted.  A52-55.  It also rejected Mentor's contentions that Synopsys is not the real party-in-interest, and that assignor estoppel precludes *inter partes* review.  A55-58.

The Board next addressed claim construction.  The claims at issue in this appeal all use the phrase "instrumentation signal."

26

A126-27(15:2-8, 17:60-18:7) ('376 patent). As the Board explained, Mentor and Synopsys generally agreed that "instrumentation signal" means "an output … created during synthesis of RTL source code by inserting additional code into a program that indicates whether the corresponding RTL source code statement is active." A67-68. The parties disagreed, however, about whether the "output" can only result from an *increased number* of circuit components (as Mentor argued), or if instead (as Synopsys contended) the output also could result from *preserving already-existing* circuit components. A67.

The Board agreed with Synopsys that under "the broadest reasonable construction of 'instrumentation signal,'" the term can be satisfied either by increasing the number of circuit components *or* by "preserving already existing circuit components." A67. In rejecting Mentor's construction, the Board noted that the '376 patent discloses two primary embodiments—one in which "instrumentation results in generating a modified gate-level design," and another in which the "source code is analyzed … without modifying the gate-level design," A121(5:17-44)—and that Mentor's proposed construction is inconsistent with the latter embodiment, A63-65.

27

As to "execution status," the Board "determine[d] that the broadest reasonable construction of 'execution status' in light of the '376 patent specification is information regarding whether a particular HDL instruction has been performed."  A68.

Turning to invalidity, the Board concluded that claims 5, 8, and 9 are anticipated by Gregory.  A74-79, 81-82.  This is because Gregory, at a minimum, preserves circuit components during the optimization process.  "Gregory discloses all the limitations of claim 5 arranged as recited in the claim" by "disclos[ing]" a method where the "synthesis process[] injects information into the resulting netlist when a probe is encountered, which results in components of the final circuit that are traceably related to the source code."  A79; *accord* A81-82.  The Board also denied Mentor's contingent motion to amend claims 5, 8, and 9 because Mentor did not satisfy its burden of demonstrating the validity of its proposed amended claims.  A88-90.

As to claims 1 and 28, however, the Board found them not to be anticipated by Gregory.  Mentor argued that Gregory does not antici-pate because it does not teach adding circuit components, and the Board rejected that argument as based on the unduly narrow claim construc-

28

tion it had rejected.  A71.  But, the Board concluded that claim 1 is not anticipated because it believed Gregory does not disclose a method of instrumenting code that indicates the "execution status" of at least one of the instrumented source code statements.  A72-73.  The Board rejected Synopsys' explanations of how Gregory indicates the "execution status" of the instrumented code because, the Board said, those explanations were rooted in disclosures in Gregory itself rather than "expert testimony" or other "evidence."  A72, 74.  And, because claim 28 contains the same "execution status" limitation, the Board held that Gregory does not anticipate it either.  A74.

## SUMMARY OF ARGUMENT

**I.**    Gregory anticipates claims 1 and 28 of the '376 patent.  Only two claim limitations are at issue.  The Board correctly held that Gregory teaches "instrumentation signal," but erred in concluding that Gregory does not disclose "execution status."

**A.**    An "instrumentation signal" is produced either by adding components to the circuit or by "preserving already existing circuit components."  A67-68.  Mentor did not dispute that Gregory discloses a method that preserves circuit components so they are not removed

29

during optimization.  Nor could it.  Gregory graphically illustrates this through figures in which circuit components associated with instrumented source code are not optimized away, whereas those same components disappear when non-instrumented but otherwise identical source code is optimized.  *Infra* at 39.

Moreover, even under Mentor's erroneous construction (that an "instrumentation signal" can be created only by adding additional circuit components), Gregory teaches this limitation by "provid[ing] a method" that "artificially inject[s] primary inputs or outputs into the initial circuit," A1141(8:11-17), and "adds additional information or components to the initial circuit," A69-70 (citing A1141(8:26-30) (Gregory '109)).  This is evident from Gregory, which shows that additional circuit components are produced during the synthesis of instrumented code.  *Infra* at 42-46.

**B.**    The Board erred in concluding that Gregory does not disclose a method indicating whether a line of source code "has been performed"—i.e., "execution status."  A68.  Specifically, the pair of schematics in Gregory Figures 16 and 18 discloses execution status—they show that, by reviewing the temporary outputs that result from instru-

menting the circuit's source code, one can determine which portion of a logical statement was executed. Figures 8 and 9 show the same thing— and indeed, disclose execution status two different ways. In each of these sets of figures, inputs and outputs can be traced through the circuit schematic to determine which statement was executed. *Infra* at 54-61.

The Court need not undertake this analysis, however, because the Board's failure to find Gregory anticipatory was based on fundamental, underlying legal errors that themselves require vacatur and remand. The Board incorrectly adopted a requirement that the prior art must "explicitly" disclose a claim limitation, despite this Court's "well settled" law that "express" disclosures are not necessary to anticipate. *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349 (Fed. Cir. 2002); *infra* at 47-50. The Board also declined to consider whether Gregory's teachings disclose "execution status" because Synopsys did not present expert testimony along with the Gregory disclosure. But "there is no invariable requirement that a prior art reference [must] be accom- panied by expert testimony" to anticipate. *Meyer Intellect'l Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1374 (Fed. Cir. 2012) (quotation marks

and brackets omitted); *infra* at 62-63. And, the Board declined to consider portions of Synopsys' argument based on an erroneous waiver theory that these arguments were raised in Synopsys' reply brief, even though that was the first opportunity to respond to arguments raised by Mentor. *Infra* at 65-67.

For each of these reasons, the Board's determination that claims 1 and 28 of the '376 patent are not anticipated by Gregory and must be reversed or vacated.

**II.** The Board erred as a matter of law in issuing a final written decision that failed to address "the patentability of any patent claim challenged by" Synopsys. 35 U.S.C. § 318(a). The Supreme Court and this Court repeatedly have held that "any" means "all." *E.g.*, *United States v. Rosenwasser*, 323 U.S. 360, 363 (1945). The final written decision, however, did not address all challenged claims. This basic error requires that this aspect of the final written decision be vacated and remanded with instructions to the Board to issue a final written decision that complies with the clear statutory requirement.

## STANDARD OF REVIEW

This Court reviews the Board's "legal conclusions *de novo*, and [its] factual findings underlying those determinations for substantial evidence." *K/S HIMPP v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1364 (Fed. Cir. 2014).  Anticipation "is a question of fact … review[ed] for substantial evidence." *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012).  "Substantial evidence is more than a scintilla." *Nippon Steel Corp. v. United States,* 458 F.3d 1345, 1351 (Fed. Cir. 2006) (alteration and quotation marks omitted).  When reviewing for substantial evidence, the "court must consider the record as a whole, including that which fairly detracts from its weight, to determine whether there exists such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation marks omitted); *Institut Pasteur & Universite Pierre et Marie Curie v. Focarino*, 738 F.3d 1337 (Fed. Cir. 2013) (vacating PTO decision for lack of substantial evidence); *In re Rambus, Inc.*, 753 F.3d 1253, 1255-57 (Fed. Cir. 2014) (same).

# ARGUMENT

## I.  GREGORY ANTICIPATES CLAIMS 1 AND 28.

"In an inter partes review," a petitioner must prove "unpatenta-bility by a preponderance of the evidence."  35 U.S.C. § 316(e).  At issue here is anticipation.  A patent is anticipated if "the invention was described" in another "patent granted on an application … filed … before the invention by the applicant."  35 U.S.C. § 102(e) (2010).[9]  That condition is satisfied when an earlier patent "discloses all of the claim limitations" of the patent-at-issue.  *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1342 (Fed Cir. 2011).

Specifically at issue are claims 1 and 28 of Mentor's '376 patent.  Because Mentor's responses regarding anticipation were the same for both claims, *see, e.g.*, A277; A463, and because the Board treated the claims the same, A74, this brief treats claim 1 as representative.  It recites:

---

[9] Because the '376 patent was issued before the AIA's amend-ments to § 102, its "earlier version … govern[s]."  *Solvay S.A. v. Honey-well Int'l Inc.*, 742 F.3d 998, 1000 n.1 (Fed. Cir. 2014).

A method comprising the steps of

    a) identifying at least one statement within a register transfer level (RTL) synthesizable source code; and

    b) synthesizing the source code into a gate-level netlist including *at least one instrumentation signal*, wherein the instrumentation signal is indicative of an *execution status* of the at least one statement.

A126(15:2-8) (emphasis added to the limitations-at-issue).  It is undisputed that Gregory discloses the elements "identifying at least one statement within a register transfer level (RTL) synthesizable source code," and "synthesizing the source code into a gate-level netlist."  Thus, before the Board were two limitations—whether Gregory discloses "including at least one instrumentation signal," and whether that instrumentation signal "is indicative of an execution status."  The Board correctly determined that Gregory discloses an "instrumentation signal," *infra* Section I.A., but erred in concluding that that instrumentation signal is not "indicative of an execution status," *infra* Section I.B.

## A. Gregory Discloses "Instrumentation Signal" Under Every Proposed Claim Construction.

**1.** The Board correctly found that Gregory discloses an "instrumentation signal."  A71.  We begin with this claim term— notwithstanding that the Board's determination was correct—because

understanding this term is important to understanding the invention and because "instrumentation signal" relates closely to "execution status," about which the Board erred.  *See* A126(15:2-8) ('376 patent) (claim 1: "the *instrumentation signal* is indicative of an *execution status* of the at least one statement" (emphases added)).

In *inter partes* review, the Board interprets "claim terms … according to their broadest reasonable construction."  A58 (final written decision) (citing 37 C.F.R. § 42.100(b); Office Patent Trial Prac. Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012)).  Here, the Board determined that the "broadest reasonable construction" of this term "at least includes an output signal created during synthesis of RTL source code by inserting additional code into a program that indicates whether the corresponding RTL source code statement is active."  A67-68.  That is to say, an "instrumentation signal" is a signal or output that (a) indicates which line (or lines) of the "if-then-else" statements have been performed, and (b) is produced when additional commands are added to the circuit's source code specification before synthesis.  The Board explained that such an output could be achieved in two ways: by adding additional

components to the circuitry, or "by preserving already existing circuit components."  A67.

Under this construction, the Board held that Gregory discloses an "instrumentation signal," and Mentor did not argue otherwise.  A71-72 (final written decision) (rejecting Mentor's "instrumentation signal" arguments as based on its proposed and rejected construction; citing A444-49 (Mentor's Response Brief)).  This was with good reason: Gregory plainly discloses a method by which existing circuit components are preserved.  Specifically, Gregory discloses instrumenting source code in a way that tells the synthesizer and the optimizer not to remove or replace circuit components associated with the instrumented code.  In Gregory's own words, Gregory teaches a method of "mark[ing] the synthesis source code … such as [with a] 'probe', along with some additional optional information," A1141(8:21-26), so that, during the process of synthesis, "[w]hen the translator[10] encounters a probe

_____

[10] A translator is another name for the synthesizer or synthesizing software, which "converts" the "HDL[] description of a desired [circuit] function … into gates and other circuit structures that directly correspond statement by statement with the designer's description." A1138(2:59-3:3) (Gregory '109).

statement, the translator interjects information … to indicate to the optimizer that optimization should not proceed 'past' or 'through' that particular point." A1143(11:20-23). The effect is that when the circuit is optimized (i.e., when unnecessary circuit components are removed), the information marked by the probe will be preserved. A69-70 (final written decision).

That this process causes existing circuit components to be preserved is demonstrated graphically in Gregory Figures 6 and 7, and 9 and 10. All four figures depict circuit schematics resulting from synthesizing and optimizing the same underlying source code—or, more precisely, from what started as the same underlying source code, shown in Figure 4. A1142(9:48-59) (Gregory '109). One pair of diagrams shows what happens when that source code is synthesized (Figure 6) and optimized (Figure 7) *without* having been instrumented. A1142(9:49-54), A1143(12:1-42). The second set of diagrams shows what happens when the same underlying source code is instrumented through the addition of a probe statement (Figure 8), then synthesized (Figure 9), and optimized (Figure 10). A1143-44(12:43-13:15). The addition of the probe causes circuit components that were optimized

Case: 14-1516   Document: 33   Page: 56   Filed: 10/03/2014

away in Figure 7 to be preserved in Figure 10 (as reflected in the

highlighting below):

(Fig. 6: synthesized circuit *without* instrumentation)

(Fig. 9: synthesized circuit *with* instrumentation)





(Fig. 7: optimized circuit *without* instrumentation)

(Fig. 10: optimized circuit *with* instrumentation)





A1110-14 (instrumentation signals and preserved components

highlighted); *see* A1142(9:48-60) (Gregory '109); *compare* A1108, 1112

Figs. 4, 8 (non-instrumented and instrumented source code); *see also*

A69-70 (final written decision) (explaining that Gregory teaches a method that prevents "'certain [circuit] components'" associated with the instrumented code from "'be[ing] replaced during optimization'" (quoting A1141(8:26-30) (Gregory))).

One example of an "instrumentation signal" is the "tempout" in Figure 9.  A71, 79 (final written decision) ("'tempout' [in Gregory Figure 9] qualifies as an 'instrumentation signal[]'").  Gregory explains that "tempout" or "temporary output," A1144(13:1-3), is the signal produced by a logical operation in the circuit as a result of instrumenting the code, A1141(8:11-17).  The output is "temporary" not because it vanishes, but because it is not the final output ("Z") of the circuit. Accordingly, Figure 9, which depicts a circuit schematic that results when certain *instrumented* source code (set forth in Figure 8) is synthesized, contains a "tempout":



A1113 Fig. 9.  By comparison, Figure 6, which is the synthesized circuit of non-instrumented but otherwise identical source code, contains no such temporary output.  *See* A1110.  And, as illustrated in the comparison above—between Gregory Figures 9 and 10 (which contain "tempout"), and Figures 6 and 7 (which do not)—adding the "tempout" signal to the circuit preserves information and logic gates that would otherwise be optimized away.  "Tempout" is therefore an instrumentation signal, the Board explained, because it preserves information or logic in the circuitry, and is produced as a result of instrumenting the underlying source code with a probe statement.  A71, 79 (final written decision); *see also* A1142(9:48-57) (Gregory '109) (describing these figures).

The Board's conclusion that "tempout" in Gregory Figure 9 is an "instrumentation signal" is confirmed by Mentor's own patent.  In the '376 patent, Figure 10 adds four outputs, Sig_Trace1 through Sig_Trace4.  A107.  Sig_Trace1 and Sig_Trace2 are similar to "tempout" in Gregory in that they preserve logic gates and carry outputs.  They do so, as the Board explained, without adding any "additional logic gates," A63—and Mentor's own patent itself calls them "instrumentation

signals," A123(9:12-14). Thus, as described by the '376 patent itself, signals generated during synthesis as a result of instrumenting the circuit's source code are "instrumentation signals," even if those signals did not result from adding components to the circuitry. The Board was correct that "tempout" in Gregory is an "instrumentation signal." A63-64.

**2.**    Mentor does not dispute that Gregory discloses a method of instrumenting code to generate a signal by preserving circuit components. *See* A71 (final written decision) (describing Mentor's argument). Instead, Mentor has argued that Gregory is not anticipatory because it does not disclose a method for adding "additional logic [gates]" to the circuitry. *Id.* The Board rejected this argument as premised on a "narrower construction of the term 'instrumentation signal' than we have adopted," because it assumes that an "instrumentation signal" can only be created by adding—not by preserving—circuit components. A67-68, 71.

The Board rightly rejected Mentor's claim construction because it is inconsistent with the specification of the '376 patent, not least because it reads out one of that patent's primary embodiments. A59-68;

*supra* at 27.  But even if Mentor's claim construction were correct—such that an "instrumentation signal" required adding logic to the circuit—Gregory still meets this limitation because it discloses a method for generating instrumentation signals by adding circuit components.  As Gregory explains:  Its "invention provides a method for introducing additional points in the [circuit] design … by artificially injecting primary inputs or outputs into the initial circuit."  A1141(8:11-17).  By instrumenting the code, the synthesizer and optimizer produce what Gregory describes as "a new circuit subject to the[] constraints" that were added when the code was instrumented.  A1143(11:24-26); *accord* A1144(14:55-57).

For example, "tempout" in Gregory Figures 9 and 10 is a signal that is produced by instrumenting Gregory's source code—as demonstrated by the fact that this "tempout" signal does not exist in the circuits in Figures 6 and 7, which are produced from *non-instrumented* code.  A1110-14 Figs. 6-7, 9-10.  Adding this probe statement, the Board found, "adds additional information or components to the initial circuit."  A69-70 (citation omitted).  Thus, the Board explained, Gregory describes a method

> that "interjects information into the netlist" when
> [the synthesizer] encounters a probe statement
> and "generates a circuit that provides the same
> function as it did without the 'probe' statement,
> *but adds additional information or components to
> the initial circuit* that indicate that certain
> components should not be replaced during
> optimization." These components "are traceably
> related to the source HDL" and they "facilitate
> debugging."

*Id.* (emphasis added; brackets and citation omitted) (quoting A1141,

1143(8:26-41, 11:20-24) (Gregory '109)).

That this element is disclosed even under Mentor's erroneous

claim construction is further evident from the example in Gregory

Figures 14-18. *See* A79 (Board finding that "temp_out" in Gregory

Figure 18, like "tempout" in Gregory Figure 9, adds "information" to the

circuit design). As discussed above (at 19-21 & n.8), the source code

synthesized into Gregory Figures 9 and 10 is instrumented by adding a

single probe statement that identifies a single line of code. The same is

evident by comparing Gregory Figures 14 and 18. Figure 14 depicts a

schematic of a circuit that has been optimized from certain non-instru-

mented source code, A1142(9:64-10:2):



A1118 Fig. 14. The circuit in Figure 18 is optimized from source code that would be the same, A1142(9:64-10:11), except that it was instrumented:



A1122 Fig. 18. Because the code was instrumented, Figure 18 has two more logic gates after optimization than Figure 14. *See* A812-13 (Synopsys trial presentation; discussing A781 (demonstrative exhibit)); *compare* A1118, 1122 Figs. 14, 18 (Gregory '109); *see also* A1410-14 ¶¶ 25, 31-36 (Synopsys' Expert's Decl.) (explaining in the context of Mentor's motion to amend that Figure 18 has two more gates than Figure 14). Thus, Figure 18 depicts two instrumentation signals

("temp_out[0]" and "temp_out[1]"), which, along with the added circuit components, are generated as a result of instrumenting the underlying source code.

Under any construction of "instrumentation signal," Gregory discloses this element.

### B.    Gregory Discloses "Execution Status."

The limitation of the '376 patent erroneously resolved by the Board was "execution status."  Recall that the '376 patent claims a method of identifying at least one "statement" in the source code, then "synthesizing the source code into a gate-level netlist including at least one instrumentation signal, *wherein the instrumentation signal is indicative of an execution status*" of the identified statement.  A126(15:2-8) ('376 patent) (emphasis added).  We have just explained why the Board was correct to find that Gregory teaches adding at least one "instrumentation signal."  The question, then, is whether Gregory's instrumentation signals are "indicative of an execution status" of the identified statement.  *Id.*  The answer is clearly yes.

The Board construed "execution status" to mean "information regarding whether a particular HDL instruction has been performed."

A68.  In other words, "execution status" is information about whether the identified "statement" (i.e., an instruction line) of source code has been performed in the circuit.  The Board determined that Gregory does not disclose this limitation.  In so doing, it committed a series of legal errors that require vacatur at the threshold, in addition to erring about what Gregory discloses.

### 1.    The Board erred in requiring an "explicit" disclosure.

The Board erred as a matter of law in its analysis, and that legal error requires vacatur and remand.  According to the Board, Gregory does not disclose "execution status" because it "does not *state explicitly*" that any particular element "indicates an 'execution status.'"  A73 (emphasis added).  But Gregory did not need to utter the magic words "execution status" to be anticipatory.  This Court has made clear that a prior-art "reference need not satisfy an *ipsissimis verbis* test," *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009)—i.e., requiring "the same terminology [to be] in the prior art in order to find anticipation," *Akzo N.V. v. ITC*, 808 F.2d 1471, 1479 n.11 (Fed. Cir. 1986); *see also In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990); *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984).

On the contrary, it is "well settled that a prior art reference may anticipate when the claim limitations [are] not expressly found in that [prior-art] reference." *Cruciferous Sprout Litig.*, 301 F.3d at 1349. For instance, "[a]nticipation can occur when a claimed limitation is 'inherent' or otherwise implicit in the relevant [prior-art] reference." *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1369 (Fed. Cir. 1991); *accord Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995); PTO, *Manual of Patent Examining Procs.* § 2112, *available at* http://tinyurl.com/pdjq8uy ("The express, implicit, and inherent disclosures of a prior art reference may be relied upon in the rejection of claims under 35 U.S.C. § 102 ....").[11]

---

[11] *See also, e.g.*, *King Pharm., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1274 (Fed. Cir. 2010) (affirming invalidity based on anticipation due to inherent components of the prior art); *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377-80 (Fed. Cir. 2003) (finding inherent anticipation even though "the prior art supplie[d] no express description of any part of the claimed subject matter"); *In re Montgomery*, 677 F.3d 1375, 1379-83 (Fed. Cir. 2012) (affirming that a patent was anticipated based on prior art's inherent teaching). This Court has repeatedly overturned jury verdicts based on not-explicit teachings in prior art. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1318-20 (Fed. Cir. 2009); *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1345-48 (Fed. Cir. 2009).

Similarly, and of particular relevance here, this Court has held for more than 80 years that illustrations can be anticipatory teachings even when the written description is otherwise silent. *See In re Bager*, 47 F.2d 951, 953 (CCPA 1931) ("Description for the purposes of anticipation can be by [prior art] drawings alone as well as by words" (internal quotation marks omitted)); *In re Wagner*, 63 F.2d 987, 988 (CCPA 1933) (holding the figures in the prior art "sufficient" to demonstrate anticipation); *accord In re Mraz*, 455 F.2d 1069, 1072 (CCPA 1972); *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1334-36 (Fed. Cir. 2010) (finding obviousness based on figures in the prior art).

The rationale for this rule is simple, and derives from a core requirement for patentability:  The novelty requirement of § 102 means that a patent can only be issued for a new invention. *See Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 66 F.3d 299, 302 (Fed. Cir. 1995); 1-3 *Chisum on Patents* § 3.01 (2014).  Regardless of the terminology used—and whether the disclosure is "express," "explicit," "inherent," or "implicit"—so long as a claimed invention has already been disclosed, its "subject matter [is] in the public domain" and is not "new." *Schering*

*Corp.*, 339 F.3d at 1379; *see also Standard Havens*, 953 F.2d at 1369;

*Gleave*, 560 F.3d at 1334; *Bager*, 47 F.2d at 953.

By departing from this Court's settled authority, the Board applied the wrong legal standard, and that error requires vacatur and remand for reconsideration under a proper legal standard. "'[A] simple but fundamental rule of administrative law is that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency,'" because "'[i]f those grounds are inadequate or improper, the court is powerless to affirm the administrative actions.'" *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962) (alterations omitted) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). That basic principle of course applies equally to the PTO. *Gechter v. Davidson*, 116 F.3d 1454, 1457-60 (Fed. Cir. 1997). The Board's decision therefore must be vacated.

## 2.    Gregory discloses "execution status."

Not only did the Board use an erroneous legal standard; it also erred because Gregory indeed discloses a method that "indicates an 'execution status' of an HDL instruction." A73. Gregory does so in at

least two different ways.  Two sets of figures (8-10 and 16-18) separately illustrate how Gregory's method of instrumenting source code indicates the "execution status" of the identified source code statement. The Board failed to address one of these disclosures and erred in its treatment of the other.

### a.    Figures 16 and 18 of Gregory disclose "execution status."

Gregory teaches how to instrument a line of code using a probe statement and a block of code.  *Supra* at 21 n.8.  Using a block probe, a circuit designer can mark "all" of the lines of code within an identified "sequence of HDL code."  A1144(14:20-25); *see* A1120 Fig. 16.  Just as in the '376 patent, Gregory's invention tells "[t]he translator [to] create temporary inputs … and temporary outputs," thereby preserving the logical operations described in the instrumented source code. A1144(14:26-29).  The designer then can examine the temporary outputs (i.e., look at the signals that flow from the circuit) and, based on that information, know which portion of a logical statement ("then" or "else") was executed.  Thus, the invention provides "information regarding whether a particular HDL instruction has been performed." *See* A68 (final written decision).

i.   We explain below (at 54-58) how Figures 16 through 18 demonstrate "execution status," but the Court need not even reach that issue.  The Board's decision must be vacated for the simple reason that, when the Board assessed execution status in its final written decision, it failed to address Synopsys' argument.  Synopsys raised Figures 16 through 18 in its petition for *inter partes* review regarding claim 28 to demonstrate Gregory's anticipatory teaching of "execution status," A180-81, and as discussed above (at 34-35), the parties and the Board treated claims 1 and 28 in tandem throughout the proceedings below. The Board did consider Figures 16 and 18 when it invalidated claims 5, 8, and 9 of the '376 patent, yet it failed to do so for claim 1, a form of inconsistent treatment that gives rise to a risk of inconsistent decisions. A75-79, 81-82.

The Board's failure to address this argument was error.  *See generally Q.I. Press Controls, B.V. v. Lee*, 752 F.3d 1371, 1383-84 (Fed. Cir.  2014) (vacating the Board's decision of non-obviousness because the Board failed to consider a prior-art reference cited as to certain claims when that reference was relevant to other claims containing only "minor differences").  Consistent with the fundamental administrative-

law principle discussed above (at 50, 52-53), when, as here, an agency fails to consider a party's argument, the reviewing court can only vacate and remand. *Burlington Truck Lines*, 371 U.S. at 168-69 ("an agency's discretionary order [may] be upheld, if at all, [only] on the same basis articulated in the order by the agency itself"); *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 48-50 (1983) (a "sufficient" basis to reject an agency's decision is that it "submitted no reason[] at all" in response to a party's argument); *Gechter*, 116 F.3d at 1457-60 (collecting cases; vacating and remanding a PTO decision because an agency decision "must contain sufficient findings and reasoning to permit meaningful appellate scrutiny"); *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) (an agency "must set forth its findings and the grounds thereof, as supported by the agency record, and explain its application of the law to the found facts").[12]

---

[12] *Accord Iowa v. FCC*, 218 F.3d 756, 759 (D.C. Cir. 2000) ("the Commission's failure to address Iowa's argument requires that we remand this matter for the Commission's further consideration"); *TNA Merchant Projects, Inc. v. FERC*, 616 F.3d 588, 592-93 (D.C. Cir. 2010); *Darrell Andrews Trucking, Inc. v. Fed. Motor Carrier Safety Admin.*, 296 F.3d 1120, 1134-35 (D.C. Cir. 2002).

**ii.**    Gregory indeed discloses a method of instrumenting code to create instrumentation signals that indicate "execution status"—i.e., whether particular HDL instructions have been executed.  This is clear from Gregory Figure 16, which discloses the following instrumented source code:

```
--Synopsys block_probe_begin
decode: process(new_request)
begin
  if(new_request(3) = '1') then
    new_level <= "11";
  elsif(new_request(2) = '1') then
    new_level <= "10";
  elsif(new_request(1) = '1') then
    new_level <= "01";
  else
    new_level <= "00";
  end if;
end process:
--Synopsys block_probe_end
```

A1120 Fig. 16.  This code is much like the if-then-else condition set forth elsewhere in Gregory and described above (at 18-20), just with additional levels of instructions.  At each step, "if" the input equals "1," "then" certain temporary outputs will result and the process ends; otherwise, the operation proceeds to the next line.  Those temporary outputs are represented by a two-digit number in double quotation

marks.  For each two-digit number, the first digit refers to temp_out[1], and the second refers to temp_out[0], in Figure 18.

Each of the four inputs is associated with a *unique* temporary output: 11, 10, 01, or 00.  This means that by looking at the output signals, one can know with certainty which statement was executed.  To verify that this is so, each input can be traced through the logic of the circuit (using the basic logical analysis described above, *supra* at 11-12); and conversely, the temporary outputs can be used to backtrack through the schematic to determine which statement in the code was executed—i.e., to identify execution status.  Gregory therefore discloses execution status.

The circuit schematic confirms it.  So, for instance, the first line of code in Figure 16 directs that if the input titled new_request[3] equals 1, then temp_out[1] and temp_out[0] both will equal 1.  Tracing the inputs through the Figure 18 schematic confirms this, as demonstrated below through the red numerals that we have added to show the logical operations of each gate.  The logic gates ND2 are NAND gates:  If either input is a 0, then the output is a 1.  *Supra* at 11.  Similarly, retracing the outputs back through the circuit (i.e., going from right to left), if the

outputs of ND2 are 11, then there must have been an input of 1 for new_request[3]:



Next, according to the code in Figure 16, if new_request[3] does *not* equal 1 ("else"), but new_request[2] does equal 1, then temp_out[1] equals 1 and temp_out[0] equals 0. Again, the circuit bears this out:



If new_request[3] and new_request[2] both do not equal 1 ("else"), but new_request[1] equals 1, then temp_out[1] equals 0 and temp_out[0] equals 1:



And finally, according to Figure 16, if none of the new_requests equals 1, then temp_out[1] and temp_out[0] both equal 0. Again, the schematic confirms as much:



Therefore, by examining the only four possible (and unique) results of the temporary outputs in Figure 16 (as well as Figure 18), the designer knows which line in the if-then-else statement was executed. If both temporary outputs are 1, then the first instruction line of source code was executed. If only temp_out[1] is 1, then the second instruction was executed. If only temp_out[0] is 1, then the third instruction was executed. If neither temporary output is 1, then the fourth instruction line was executed.

In short, the values of the temporary output signals—which were created by instrumenting the source code using Gregory's method— indicate which of the "if-then" or "else" statements was performed and, therefore, the "execution status" of "at least one" of the source code

"statements" identified and instrumented.  Because the Board failed to address this argument—and given that these figures in Gregory plainly are an anticipatory disclosure—the final written decision must be vacated and remanded.

### b.    Figures 8 and 9 disclose execution status.

Gregory also discloses "execution status" through Figures 8 and 9. As discussed above (at 6-8, 18-20), they disclose a straightforward "if-then-else" statement with instrumentation in the form of a probe statement.



A1112 Fig. 8.  Figure 9 represents that same source code graphically:



A1113.  In two different ways, these figures demonstrate that Gregory discloses "execution status" by providing "information regarding whether a particular HDL instruction has been performed." A68 (final written decision).  As to each of these disclosures, the Board erred in its treatment of the reference, and also erred more fundamentally and as a matter of law in the fashion in which it undertook its analysis.

   **i.**    Analyzing the value of "tempout 221" (which equates to "not(A or B)" in the source code) can enable a designer to determine a broad range of information: the value of B; whether the condition "if (C and B)" is satisfied; which instruction line ("then" or "else") in the source code was followed; and the value of the output (Z).  In short, tempout 221 gives an output value that can indicate which statement was executed, and thereby disclose execution status.

To explain, if "tempout" equals 1, then A and B must both have a value of 0.[13]  Knowing that A and B both have a value of 0, the designer also knows that the condition "if (C and B)" is not satisfied.[14]  Because "if (C and B)" is not satisfied, the code specifies that it is the "else" branch of the source code that is active.  As a result, the output (Z) must be 1 (because, under the "else" branch, Z is "not B," and B equals 0).

The Board, however, determined that Gregory does not teach "execution status."  It reasoned that "tempout" in Figures 8 and 9 does not disclose execution status because (according to Mentor's expert) "tempout" in Figure 9 only "reflects the result of [the logical operation] 'not(A or B),'" but "does not indicate" "whether the 'if' condition [if (C and B)] is true."  A72 (discussing A1905 ¶¶ 73-74(Mentor's Expert's Decl.), which asserts that "[k]nowing just the state of 'not(A or B)' provides *no information* as to whether the statement is executed because the condition '(C and B)' was true" (emphasis added)).  That may

---

[13] This is because 233 is a NOR gate, and if either of its inputs has a value of 1, the output will be 0.  Since the output (tempout) is 1, inputs A and B must be 0.  *Supra* at 12.

[14] This is because B has a value of 0, whereas B and C must both equal 1 for "if (C and B)" to be satisfied.

be in the circumstance where "tempout" has a value of 0.[15]  But the

Board's broad conclusion—that "tempout" "does not indicate" "whether

the 'if' condition [if (C and B)] is true"—is simply and flatly mistaken.

As explained immediately above, if the value of "tempout" is 1, then the

value of B must be 0.  Knowing that the value of "tempout" is 1, and

that the value of B therefore is 0, "reflects" far more information than

merely "the result of 'not(A or B)'" in gate 233, A72—and Mentor has not

argued otherwise.  Knowing that the value of B is 0 means knowing

that the condition "if (C and B)" is not true, that the "else" line in the

source code of Figure 8 would execute, and that Z equals 1 because "Z

<= not(B)."  Therefore, by the Board's own terms, "tempout" indicates

the code's "execution status" by demonstrating "whether the 'if' condit-

ion is true or not."  A72.  Gregory therefore anticipates.

    The Board refused to accept this explanation because

"Synopsys … d[id] not point to any expert testimony" explaining how

Gregory discloses "execution status."  *Id*.  This error in approach

––––––––––––––––––––

    [15] In that circumstance, the designer would not necessarily know
the value of B because an output of 0 for a NOR gate (such as 233) could
be the result of either input (A or B) having a value of 1, so the designer
cannot know with certainty the value of B.

requires that the Board decision be vacated. Contrary to the Board's insistence on expert testimony, "there is no invariable requirement that a prior art reference be accompanied by expert testimony" in order to anticipate. *Meyer Intellect'l Props.*, 690 F.3d at 1374 (quotation marks and brackets omitted); *In re NTP, Inc.*, 654 F.3d 1279, 1301 (Fed. Cir. 2011) (a prior-art "reference itself provides the necessary evidence" to demonstrate anticipation); *Am. Calcar*, 651 F.3d at 1342 (same). The Board is comprised of judges with technical training, 35 U.S.C. § 6, and is constituted to evaluate technical arguments about technical material. *See* Joe Matal, *A Guide to the Legislative History of the America Invents Act: Part II of II*, 21 Fed. Cir. Bar J. 540, 601 (2012) (post-grant reviews conducted within the PTO because it provides "a cost-effective and technically sophisticated environment" to "mak[e] validity determinations" (quotation marks omitted)). The Board's job is to assess the prior art and to determine who has the better arguments, not to count who has more experts. This is especially so given the highly streamlined nature of *inter partes* review, which does not require expert testimony. *See* 35 U.S.C. § 312(a)(3)(B) (contemplating expert affidavits or declarations only "if the petitioner relies on expert opinions").

If the Board had engaged our arguments on their merits, that would be one thing. But by simply parroting the testimony of Mentor's expert and calling Synopsys' argument "unsupported" because it did "not point to any expert testimony," A72-73, the Board failed to adequately address and respond to Synopsys' arguments. This was error. *See Iowa*, 218 F.3d at 759; *BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 269-70 (D.C. Cir. 2014) ("opaque" and "out-of-hand" "dismissal" of arguments "falls well short" of an agency's obligation to "provide an adequate explanation" of its decisions (quotation marks omitted)); *PSEG Energy Resources & Trade LLC v. FERC*, 360 F.3d 200, 204 (D.C. Cir. 2004) ("two sentence[]" agency response to an argument is "wholly inadequate").

The Board's duty to adequately address the arguments presented to it derives from an agency's fundamental obligation to make "[n]ecessary findings … expressed with sufficient particularity to enable our court, without resort to speculation, to understand the reasoning of the Board, and to determine whether it applied the law correctly and whether the evidence supported the underlying and ultimate fact findings." *Gechter*, 116 F.3d at 1457; *accord Lee*, 277 F.3d at 1342; *see*

*also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted by are clearly disclosed and adequately sustained").  And here, through its cursory rejection of Synopsys' arguments for want of expert opinion, the Board failed to demonstrate that "the evidence supported" its decision.  *Gechter*, 116 F.3d at 1457.  This "'is grounds for striking down [its] action.'" *Lee*, 277 F.3d at 1344 (quoting *Mullins v. Dep't of Energy*, 50 F.3d 990, 992 (Fed. Cir. 1995)).

**ii.**    We said there are two ways that Gregory Figures 8 and 9 disclose "execution status."  The first was the value of "tempout" in Figure 9 discussed above.  In addition, execution status is disclosed through the output of the AND gate (232), which is highlighted below:



A1113 Fig. 9 (Gregory '109).  As the schematic shows, AND Gate 232 receives inputs B and C, and it therefore represents the "if" condition in the statement "if (C and B) then…."  One can look at the output of this gate to determine which statement was executed.  If the output of that gate is 1, that means (by definition) that the condition "(C and B)" is true, and the "if" condition therefore was satisfied.  If instead the output of gate 232 is 0, then "(C and B)" is false, and the "if" condition was not satisfied.  This is sufficient to show "execution status" under the Board's own reasoning, because knowing "whether the 'if' condition is true or not" indicates the "execution status of the HDL statement."  A72 (final written decision).

The Board did not address this argument on its merits, and its decision not to do so requires vacatur and remand so that this argument may be considered by the Board in the first instance.  According to the Board, "the argument is presented for the first time in Synopsys's reply and is not responsive to arguments made in Mentor Graphics's response."  A74 (citation omitted).  On the contrary, Synopsys fully preserved its argument concerning Figures 8 and 9 by making this

argument at the first moment it made sense to do so, in direct response to Mentor's proposed claim construction.

When Synopsys petitioned for review, it relied upon Figures 8 and 9 in arguing that Gregory is anticipatory. *See, e.g.*, A169-70, 180-81. Mentor's response to Synopsys' petition (called the "preliminary response") did not contest that Gregory discloses "execution status." A271-73, 277 (discussing claims 1 and 28). The Board then instituted proceedings.

Thereafter, in its next paper, Mentor *for the first time* addressed whether Gregory teaches "execution status"; proposed a construction of "execution status"; and argued that Figure 9 does not disclose "execution status" under its proposed construction because, Mentor claimed, Figure 9 does not indicate whether the condition "if (C and B)" has been satisfied.[16] *In response*, Synopsys explained that it is unnecessary to determine whether the "C and B condition" is met to determine execution status, but that "[e]ven if it were necessary" to do so in order "to

---

[16] *See* A440, 450-52 (Patent Owner Response) (citing A1887, 1905 ¶¶ 41, 74(Mentor's Expert's Decl.), and arguing that "'tempout' … does not depend on the condition (C and B)" and "is not indicative of execution status … because it lacks information about the condition")).

satisfy the 'execution status' requirement"—i.e., even if Mentor's claim construction were correct—Gregory still anticipates because of "[t]he output of AND gate 232 in Fig. 9."  A562-63 (Synopsys Reply).

In short, Synopsys did precisely what the PTO's rules contemplate—when Mentor made new arguments in its Patent Owner Response, Synopsys addressed them in its Reply.  *See* 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the corresponding opposition or patent owner response"); *see Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("reply briefs *reply* to arguments made in the response brief"); *accord ACLU v. City of Las Vegas*, 333 F.3d 1092, 1106 n.14 (9th Cir. 2003) (considering reply arguments that were "reasonable response[s] to points made in the … answering brief"); 16AA Charles Alan Wright et al., *Federal Practice and Procedure* § 3974.3 (4th ed. 2008) ("in a reply brief," a party may "respond to arguments raised for the first time in the [opposing party's response] brief").  Synopsys' argument in its reply brief was not "new," and the Board erred in refusing to address it.

* * *

67

Gregory discloses a method of "synthesizing the source code into a gate-level netlist including at least one instrumentation signal … indicative of an execution status of the at least one statement." A126(15:2-8) ('376 patent).  Accordingly, Gregory anticipates claims 1 and 28 of the '376 patent.  In the alternative and at a minimum, the Board erred by applying the wrong law regarding anticipatory teachings and in refusing to consider key evidence and arguments offered by Synopsys based on an erroneous belief that expert testimony is required and a misplaced theory of waiver.  The Board's determination must be vacated and remanded for a complete analysis.

## II.    THE BOARD ERRED AS A MATTER OF LAW BY FAILING TO ISSUE A FINAL WRITTEN DECISION WITH RESPECT TO EACH CLAIM CHALLENGED BY SYNOPSYS.

Synopsys petitioned for *inter partes* review of claims 1-15 and 20-33 of the '376 Patent.  *Supra* at 24-25.  The Board determined that the conditions for instituting proceedings were met, A1-41, and ultimately issued a final written decision, A42-94.  That final written decision, however, covered only certain of the challenged claims— specifically, claims 1-9, 11, and 28-29—and did not address the patentability of the other challenged claims.  *Id.*  The Board's failure to include

its disposition of the other claims in its final written decision directly contravenes the clear requirements of 35 U.S.C. § 318(a), and the final written decision therefore must be vacated in relevant part and remanded.[17]

Section 318(a) is plain on its face: "If an inter partes review is instituted and not dismissed under this chapter, the Patent Trial and Appeal Board *shall* issue a final written decision with respect to the patentability of *any patent claim challenged by the petitioner* and any new claim added under section 316(d)" (emphases added). This provision is mandatory and expansive, and it does not authorize the

---

[17] Synopsys also has initiated suit under the APA in the Eastern District of Virginia to challenge the Board's regulation, policy, and practice of granting *inter partes* petitions in part and then declining to deal with each challenged claim when it issues final written decisions. *Supra* at xiv-xv. The government has moved to dismiss, arguing that this Court has exclusive jurisdiction over challenges to the Board's final written decisions. At the same time, however, the government has suggested that this Court also may lack jurisdiction. *See* Defs.' Resp. to SSA Institute's Amicus Br. at 3 n.1, *Synopsys, Inc. v. Lee*, No. 14-674 (E.D. Va. Sept. 18, 2014), ECF No. 40. Synopsys believes that this issue is appropriately reviewed in district court under the APA. But, given the government's position—and because the government's views on questions of appellate review under the AIA have sometimes shifted, *see, e.g.*, PTO Br. at 16 n.2, *Versata Devel. Group, Inc. v. Lee*, No. 2014-1145 (Fed. Cir. Apr. 28, 2014), ECF No. 55. Synopsys is proceeding in both forums until the question is resolved.

Board to pick and choose which claims to address in the final written decision. The ordinary meaning of "shall" is "must"—if the condition is satisfied, the Board must act. *See, e.g.*, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661 (2007); *Miller v. French*, 530 U.S. 327, 337 (2000); *Sharp Elecs. Corp. v. McHugh*, 707 F.3d 1367, 1373 (Fed. Cir. 2013) ("'Shall' is 'mandatory' language"); *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1560 (Fed. Cir. 1984).

What the Board must do is equally plain: "issue a final written decision with respect to" not just selected claims, but "*any* patent claim challenged by the petitioner." 35 U.S.C. § 318(a) (emphasis added). Simply put, "[t]he word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive." *Barsebäck Kraft AB v. United States*, 121 F.3d 1475, 1481 (Fed. Cir. 1997) (internal quotation marks omitted); *accord United States v. Gonzales,* 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning: … 'one or some indiscriminately of whatever kind'" (citing cases and quoting Webster's Third New International Dictionary 97 (1976))); *United States v. Rosenwasser*, 323 U.S. 360, 363 (1945) ("The use of the words 'each' and 'any' to modify 'employee,' … leaves no doubt as to the Congressional

intention to include all employees within the scope of the [Fair Labor Standards] Act unless specifically excluded.").

Thus, "the word 'any' necessarily includes 'all,'" and the only question that remains is "'all of what'?" *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1308 (Fed. Cir. 2001). And, on that score too, the statute is clear: The final written decision must address "any patent *claim challenged by the petitioner*." 35 U.S.C. § 318(a) (emphasis added). A "claim challenged by the petitioner" is one—as these terms plainly suggest—that the petitioner challenged, which is to say included in the petition seeking *inter partes* review. Indeed, this same phrase is used to define what a petitioner must include in the petition: The petition must "identif[y], in writing and with particularity, each *claim challenged*, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim." *Id.* § 312(a)(3) (emphasis added). Similarly, the Director may institute *inter partes* review if "the information presented in the petition … and any response filed … shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the *claims challenged in the petition*." *Id.* § 314(a) (emphasis added). The PTO

itself uses the term "claims challenged" to mean the claims that were asserted in the petition, not those on which proceedings were instituted. *See* USPTO's AIA Trial Roundtables at 9 (distinguishing between "claims challenged" and "claims instituted"), *available at* http://tinyurl.com/ownwbs4; *see also id.* at 13, 25, 46.[18]

Here, however, the final written decision did not address each of the challenged claims. Instead, the final written decision addressed only a subset of the challenged claims—those as to which the Board instituted *inter partes* review.[19] If Congress had wanted the Board to limit the final written decision to that subset of the claims, "it would have been easy enough for Congress to say so." *Empire HealthChoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 696 (2006). For instance, it could have said that the Board "shall issue a final written decision with respect to the patentability of any patent claim for which the Director

---

[18] For this same reason, the Board's regulation authorizing "review to proceed on … *some* of the challenged claims," 37 C.F.R. § 42.108 (emphasis added), violates the express mandate of §§ 314(a) and 318(a), and is contrary to law.

[19] *See* A44 ("Synopsys has shown that claims 5, 8, and 9 are unpatentable. Synopsys, however, has not met its burden to show by a preponderance of the evidence that claims 1-4, 6, 7, 11, 28, and 29 are unpatentable"); A93 (same).

determined to institute *inter partes* review under section 314(a)."
Instead, it unequivocally required the Board to address all of the
challenged claims in the final written decision.[20]

Nor is there any practical impediment to the Board following the
clear statutory command. The Board already opines on each "chal-
lenged claim" when it decides whether to grant a petition. Here, it
issued a 40-page decision doing just that. *See generally* A1-41. At a
minimum, therefore, it could incorporate that reasoning into the final
written decision. If the PTO determines that such a process creates
duplicative effort, then rather than frontload the analysis prior to insti-
tution, the Board could grant review upon determining that one claim

---

[20] Indeed, the prior statute included language that the AIA does
not, which the PTO relied on in that context to justify considering only
certain claims. 35 U.S.C. § 313 (2010) (if "the Director finds that a
substantial new question of patentability affecting a claim of a patent is
raised," the Director shall order "inter partes reexamination of the
patent *for resolution of the question*" (emphasis added)); Notice of
Clarification of Office Policy to Exercise Discretion in Reexamining
Fewer Than All the Patent Claims, 1311 Off. Gaz. Pat. Office 197
(2006); *see Sony Computer Entm't Am. Inc. v. Dudas*, No. Civ. A.
1:05CV1447, 2006 U.S. Dist. LEXIS 36856, *27 (E.D. Va. May 22, 2006)
("Had Congress intended reexamination to extend to all claims under
the patent, it would have left out the final phrase 'resolution of the
question.'").

meets the threshold requirement.  That is fully consistent with the statute, which authorizes the Board to institute review "*of the patent*," 35 U.S.C. § 311(a), so long as "there is a reasonable likelihood that the petitioner would prevail with respect to *at least 1 of the claims challenged in the petition*," *id.* § 314(a) (emphases added).

Such a procedure has much to recommend it.  Because estoppel only applies to claims that "result[] in a final written decision," *id.* § 315(e)(2), a final written decision that fails to address all "claims challenged" will have limited estoppel effect.  But Congress's goal was "to force a party to bring all of [its] claims in one forum … and therefore to eliminate the need to press any claims in other fora."  154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl).[21]

---

[21] *See also* 157 Cong. Rec. S1376 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl) ("if an inter partes review is instituted while litigation is pending, that review will completely substitute for at least the patents-and-printed publication portion of the civil litigation"); *accord id.* at S1361; *see also* 110 S. Rep. No. 259 at 71 (Jan. 25, 2008) (intending to "limit unnecessary and counterproductive litigation costs" by "tak[ing] issues off the table that cannot be resurrected in subsequent litigation"); 153 Cong. Rec. H10280 (Sept. 7, 2007) (statement of Rep. Jackson-Lee) ("[T]he bill establishes a single opportunity for challeng[ing]" the patent and "prohibits a party from reasserting claims in court that it raised in post-grant review").

Issuing a final written decision as to all claims challenged also will minimize inconsistent results. Under its current practice, the Board often construes claim language during its initial evaluation whether to institute review but then may change its construction in the course of issuing its final written decision. The Board did just that here. *Compare* A6-10 (construing "instrumentation signal" in institution decision) *with* A59-68 (re-construing term in final written decision).

But, whatever procedures the Board ultimately may adopt, what remains clear is that the Board's treatment of each "challenged claim" must be incorporated into its final written decision. This clear statutory requirement enables meaningful appellate review of the Board's decisions on patentability. That is because it is the final written decision that gives rise to review in this Court. *See* 35 U.S.C. § 319 ("A party dissatisfied with the final written decision of the Patent Trial and Appeal Board under section 318(a) may appeal the decision …."); *id.* § 141(c)*; see St. Jude Medical v. Volcano Corp.*, 749 F.3d 1373, 1375-76 (Fed. Cir. 2014). Accordingly, the Board's failure to comply with § 318(a)—that is, its failure to address the patentability of

all challenged claims in the final written decision—effectively shields

significant aspects of its decisionmaking from appellate review.

The decision of the Board should be vacated in relevant part, and

the case remanded with instructions to comply with § 318(a).

## CONCLUSION

For the foregoing reasons, the judgment of the Board upholding

claims 1 and 28 of the '376 patent should be reversed or vacated; the

Board's judgment upholding claims 2-4, 6-7, 10-15, 20-27, and 29-33

should be vacated; and the matter remanded for further proceedings.

Respectfully submitted,

/s/ Eric A. Shumsky
Eric A. Shumsky
Orrick, Herrington & Sutcliffe LLP
1152 15th Street, NW
Washington, DC 20005-1706
Telephone:  (202) 339-8400
Facsimile:  (202) 339-8500
eshumsky@orrick.com

*Counsel for Appellant Synopsys, Inc.*

## **ADDENDUM**

Final Written Decision, dated February 19, 2014........................A42-A94

U.S. Patent No. 6,240,376, dated May 29, 2001.........................A95-A128

U.S. Patent No. 6,132,109, dated October 17, 2000 ............... A1103-1148

**Final Written Decision**

**Dated February 19, 2014**

Trials@uspto.gov                                    Paper 60
571-272-7822                                         Entered:  February 19, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————————

SYNOPSYS, INC.
Petitioner

v.

MENTOR GRAPHICS CORPORATION
Patent Owner

————————————

Case IPR2012-00042
Patent 6,240,376 B1

————————————

Before HOWARD B. BLANKENSHIP, SALLY C. MEDLEY, and
JENNIFER S. BISK, *Administrative Patent Judges*.

BISK, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Case IPR2012-00042
Patent 6,240,376 B1

## I. INTRODUCTION

### A. *Background*

Petitioner, Synopsys, Inc. ("Synopsys"), filed a petition on

September 26, 2012, for *inter partes* review of claims 1-15 and 20-33 of

U.S. Patent No. 6,240,376 B1 ("the '376 Patent") pursuant to 35 U.S.C. §§

311-319.  Paper 1 ("Pet.").  Patent Owner, Mentor Graphics Corporation

("Mentor Graphics"), filed a preliminary response on December 28, 2012.

Paper 15 ("Prelim. Resp.").  On February 22, 2013, the Board denied the

petition as to claims 10, 12-15, 20-27, and 30-33, and instituted trial for

claims 1-9, 11, 28, and 29, on one ground of unpatentability, anticipation by

U.S. Patent No. 6,132,109 ("Gregory") (Ex. 1007).  Paper 16 ("Decision to

Institute").

After institution of trial, Mentor Graphics filed a patent owner

response.  Paper 28 ("PO Resp.").  Mentor Graphics also filed a substitute

motion to amend claims by submitting proposed new claims 34-43 for

claims 1, 5, 28, 2, 3, 6, 8, 9, 11, and 29, respectively.  Paper 31 ("Mot. to

Amend").  Synopsys filed a reply to the patent owner response (Paper 36;

"Reply"), and also an opposition to Mentor Graphics's motion to amend

(Paper 35; "Opp.").  Mentor Graphics then filed a reply in support of its

motion to amend.  Paper 39 ("Reply Mot. to Amend").

In preparation for oral hearing, both parties filed and fully briefed

motions to exclude.  Paper 42 ("Mentor Graphics's Motion to Exclude");

Paper 44 ("Synopsys's Motion to Exclude").  Oral hearing was held

November 14, 2013.  Paper 59 ("Transcript").

The Board has jurisdiction under 35 U.S.C. § 6(c).  This final written

decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Case IPR2012-00042
Patent 6,240,376 B1

Synopsys has shown that claims 5, 8, and 9 are unpatentable. Synopsys, however, has not met its burden to show by a preponderance of the evidence that claims 1-4, 6, 7, 11, 28, and 29 are unpatentable.

Mentor Graphics's motion to amend claims is *denied*.

B.  *The '376 Patent*

The '376 patent generally relates to the fields of simulation and prototyping of integrated circuits.  Ex. 1001, col. 1, ll. 10-11.  In particular, the patent describes "debugging synthesizable code at the register transfer level during gate-level simulation."  *Id.* at ll. 11-13.

As described in the Background of the Invention, integrated circuit design begins with a description of the behavior desired in a hardware description language ("HDL") such as Very High Speed Integrated Circuit Description Language ("VHDL").  *Id.* at ll. 14-25.  A subset of HDL source code is referred to as Register Transfer Level ("RTL") source code.  *Id.* at ll. 28-30.  This RTL source code can be simulated using software, which typically offers robust debugging functionality for analyzing and verifying the design, including navigating the design hierarchy, viewing the RTL source code, setting breakpoints on a statement of RTL source code to stop the simulation, and viewing and tracing variables and signal values.  *Id.* at ll. 44-54.  However, although flexible, software RTL simulators are slow compared with hardware emulation.  *Id.* at ll. 55-63.  Thus, it often is desirable to use gate-level simulation to verify complex designs.  *Id.*

The RTL description of a circuit can be used by synthesis tools to generate a "gate-level netlist," which, in turn, can be converted to a format suitable for programming a hardware emulator.  *Id.* at ll. 35-42.  A gate-level netlist represents the circuit to be simulated and ultimately is comprised of

3

combinatorial or sequential logic gates (e.g. AND, NAND, and NOR gates, or flip-flops and latches) and a description of their interconnections using signals (signals are also referred to as nets). *Id.* at col. 4, ll. 5-17. As discussed, gate-level simulation is useful for validation of a circuit design. *Id.* at col. 1, ll. 55-67. However, one disadvantage of gate-level simulation is that much of the high-level information from the RTL source code is lost during synthesis, resulting in debugging functionality that is limited severely in comparison with that available in software RTL simulation. *Id.* at col. 2, ll. 1-23.

The '376 patent describes a method of synthesizing RTL source code such that the resulting gate-level simulation can support the traditional debugging tools of setting breakpoints, mapping signal values to particular source code lines, and stepping through the source code to trace variable values. *Id.* at ll. 1-30. The Summary of the Invention describes facilitating debugging during gate-level simulation by: (1) generating "instrumentation logic indicative of the execution status of at least one synthesizable statement within the RTL source code"; (2) generating a gate-level netlist from the RTL source code; and (3) during simulation, evaluating the instrumentation logic of the gate-level netlist to enable RTL debugging. *Id.* at ll. 26-39.

The '376 patent describes two main embodiments for implementing this method. The first embodiment modifies the gate-level netlist to provide instrumentation signals "implementing the instrumentation logic and corresponding to synthesizable statements within the RTL source code." *Id.* at ll. 40-43. This modification of the gate-level netlist can be done either by modifying the RTL source code directly or by generating the modified gate-

4

Case IPR2012-00042
Patent 6,240,376 B1

level netlist during synthesis. *Id.* at ll. 43-46. The second embodiment ("the cross-reference embodiment") describes storing the instrumentation signals in a cross-reference database instead of modifying the gate-level netlist. *Id.* at ll. 47-52.

Figure 2 of the '376 patent, reproduced below, illustrates "one embodiment of the instrumentation process in which instrumentation is integrated with the synthesis process." *Id.* at col. 5, ll. 9-11.



Figure 2, above, shows that RTL source code 210 is provided to synthesis process 220, which includes instrumentation step 234 followed by synthesis step 240. *Id.* at ll. 11-16. In the first embodiment, in which the gate level netlist is modified to include instrumentation signals, the resulting gate-level design 250 "contains additional logic to create the additional instrumentation output signals referenced in instrumentation data 238." *Id.* at ll. 17-30.

5

Instrumentation data 238 is implemented as gates that can then be simulated. *Id.* at col. 6, ll. 32-37.

In the cross-reference embodiment, "the RTL source code is analyzed to generate a cross-reference database as instrumentation data 238 without modifying the gate-level design." *Id.* at col. 5, ll. 31-33. In this embodiment, "[t]he instrumentation data 238 is likely to contain considerably more complex logic to evaluate during simulation." *Id.* at ll. 42-45.

The '376 patent describes tradeoffs between the two main embodiments. *Id.* at l. 45. For example, the first embodiment reduces the complexity of the logic to be evaluated during simulation, resulting in faster simulation time. *Id.* at ll. 46-64. However, because the gate-level design used during simulation is modified to accommodate the debugging logic, the design actually used for production will differ from that used during simulation, and, thus, the simulation may not reproduce accurately the production behavior of the circuit. *Id.* On the other hand, the cross-reference embodiment typically results in greater complexity of instrumentation logic to evaluate during simulation, resulting in longer simulation time. *Id.* at ll. 65-67. In addition, some of the evaluation may be performed by software, instead of hardware, eliminating direct verification of the target system through in-situ verification. *Id.* at col. 5, l. 65 – col. 6, l. 11. However, the technique does not affect the original gate-level design, and the instrumentation data can be eliminated after testing without disrupting the gate-level design. *Id.* Because of these various tradeoffs, the '376 patent mentions generally, but does not describe in detail, alternate

6

Case IPR2012-00042
Patent 6,240,376 B1

embodiments that combine the two main embodiments "in order to trade off simulation speed, density, and verification accuracy." *Id.* at col. 6, ll. 17-22.

The '376 patent subsequently describes (in Figures 3, 12, and 17 and the related text) three methods of modifying the gate-level netlist. *Id.* at col. 13, ll. 38-40. As described when discussing the first embodiment above, the '376 patent discloses that these three methods can be applied either by modifying the RTL source code directly by applying the method to the source code before it is synthesized independently of the synthesis process (*id.* at ll. 55-59), as shown in Figures 3, 12, and 17, or they can be integrated into the synthesis tool so that actual modification of the RTL source code is not required (*id.* at ll. 60-67).

Figure 3, reproduced below, illustrates a method of modifying RTL source code for sequential statements that depend only on the value of the inputs and can be synthesized to logic networks of combinatorial gates and latches ("level-sensitive RTL source code"). *Id.* at col. 7, ll. 13-22, 40-43.

**FIG. 3**



Figure 3, above, shows a method in which a unique local variable is created for each list of adjacent sequential statements in step 310, each of

Case IPR2012-00042
Patent 6,240,376 B1

these variables is initialized to zero in step 320, and one unique variable

assignment statement is inserted into each list of adjacent sequential

statements corresponding to an executable branch in step 330. *Id.* at ll. 40-

50. At the end of the process, all the unique local variables are assigned to

global signals in step 340. *Id.* at ll. 50-54.

Figure 12, reproduced below, illustrates a method of modifying RTL

source code having references to signal events, typically used to describe

edge-sensitive devices such as flip-flops. *Id.* at col. 9, ll. 27-32, 63-64.



**FIG. 12**

The method shown in Figure 12, above, begins with step 1210, in

which every signal whose state transition serves as the basis for the

determination of another signal is sampled. *Id.* at ll. 63-67. An

instrumentation signal event is generated in step 1220, and every process

that references a signal event is duplicated in step 1230. *Id.* at col. 9, l. 67 –

Case IPR2012-00042
Patent 6,240,376 B1

col. 10, l. 7. In step 1240 each list of sequential statements within the duplicate version of the code is replaced by a unique local variable assignment. In step 1250, each time a signal event is referenced in the duplicated version of the code, it is replaced by the sampled signal event computed in step 1210. *Id.* at col. 10, ll. 7-12. Finally, the RTL source code is synthesized, in step 1260, to generate gate-level logic, including the instrumentation signals. *Id.* at ll. 12-14.

Figure 17, reproduced below, illustrates a method of modifying RTL source code for processes themselves for subsequent determination of whether the process is active during gate-level simulation. *Id.* at col. 11, ll. 43-46.



Figure 17, above, shows a method in which the sensitivity list of a process is identified in step 1710, logic is generated to compare the signals in the sensitivity list between consecutive simulation cycles in step 1720, and during gate-level simulation in step 1730, a determination is made as to whether an event has occurred on any of the sensitivity list signals. *Id.* at

9

Case IPR2012-00042
Patent 6,240,376 B1

ll. 48-53.  If the signal indicates a difference during a simulation cycle, as indicated by step 1740, the process is active; otherwise, the process is inactive, as indicated by step 1750.  *Id.* at ll. 53-58.

  *C.  Illustrative Claims*

  Three of the claims involved in this proceeding, claims 1, 5, and 28, are independent.  All three are reproduced below:

  1. A method comprising the steps of:

   a)  identifying at least one statement within a register transfer level (RTL) synthesizable source code; and

   b)  synthesizing the source code into a gate-level netlist including at least one instrumentation signal, wherein the instrumentation signal is indicative of an execution status of the at least one statement.

  5. A method of generating a gate level design, comprising the steps of:

   a)  creating an instrumentation signal associated with at least one synthesizable statement contained in a register transfer level (RTL) synthesizable source code; and

   b)  synthesizing the source code into a gate-level design having the instrumentation signal.

  28. A storage medium having stored therein processor executable instructions for generating a gate-level design from a register transfer level (RTL) synthesizable source code, wherein when executed the instructions enable the processor to synthesize the source code into a gate-level netlist including at least one instrumentation signal, wherein the instrumentation signal is indicative of an execution status of at least one synthesizable statement of the source code.

Case IPR2012-00042
Patent 6,240,376 B1

II. ANALYSIS

   A. *35 U.S.C. § 315(b)*

   As a threshold issue, Mentor Graphics argues that this proceeding is barred by virtue of the relationship between Synopsys and the companies of Synopsys Emulation and Verification, S.A. and EVE-USA, Inc. (collectively "EVE").  PO Resp. 2-22.  Mentor Graphics bases these arguments on the following facts.

   Luc Burgun, a named inventor of the '376 patent, was, at one time, a Mentor Graphics employee.  PO Resp. 3 (citing Ex. 2028: Ex. 5 at 1-4.[1] Burgun assigned all rights in the invention claimed in the '376 patent to Mentor Graphics.  *Id.* (citing Ex. 2029: Ex. 2 at 3).  Subsequently, Burgun left Mentor Graphics and went to work for EVE.  *Id.*  In 2006, Mentor Graphics filed suit against EVE in the United States District Court for the District of Oregon, alleging that EVE's ZeBu emulators infringed the '376 patent.  *Id.* at 4 (citing Ex. 2001); *Mentor Graphics Corp. v. EVE-USA, Inc.,* 06-341-AA (D. Or. 2006).  That case was dismissed with prejudice pursuant to a settlement agreement.  Ex. 2003.  Shortly after filing the petition in the present case, EVE and Synopsys jointly filed a declaratory judgment action in the United States District Court for the Northern District of California, seeking a ruling of non-infringement and invalidity of the '376 patent.  Ex. 2004.  The complaint states that "[o]n September 27, 2012, Synopsys, Inc. entered into an agreement to acquire the business of EVE," which acquisition "is expected to close in the immediate future."  *Id.* at ¶ 13.

---

[1] Exhibits 2028 and 2029 are large exhibits, not paginated consecutively, including many non-sequentially numbered Exhibits.  Throughout this Decision, citations to these exhibits will be of the form "Ex. 202[8 or 9]: [Ex. # within Ex. 202X at page number of that Ex. #]."

Case IPR2012-00042
Patent 6,240,376 B1

Mentor Graphics contends that the acquisition took place on October 4, 2012. PO Resp. 4-5 (citing Ex. 2029: Ex. 34 at 20).

### 1. Privity

Mentor Graphics argues that this *inter partes* review is barred because Synopsys and EVE were in privity at the time of the Decision to Institute. *Id.* at 6-7. Mentor Graphics asserts that based on this relationship the complaint served on EVE in the May 2006 case should trigger § 315(b). *Id.* at 6. We disagree with Mentor Graphics's contentions.

35 U.S.C. § 315(b) states as follows:

> An inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent. The time limitation set forth in the preceding sentence shall not apply to a request for joinder under subsection (c).

The Office promulgated a rule interpreting § 315(b), 37 C.F.R. § 42.101(b), which states that:

> A person who is not the owner of a patent may file with the Office a petition to institute an inter partes review of the patent unless:
> . . .
> (b) The petition requesting the proceeding is filed more than one year after the date on which the petitioner, the petitioner's real party-in-interest, or a privy of the petitioner is served with a complaint alleging infringement of the patent.

This rule makes clear that it is only privity relationships up until the time a petition is filed that matter; any later-acquired privies are irrelevant.

Furthermore, privity is a "flexible and equitable" doctrine rooted in common law. Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756,

Case IPR2012-00042
Patent 6,240,376 B1

48,759 (Aug. 14, 2012). Consistent with this doctrine, we also take into
consideration the nature of the relationship between the parties at the time
that the statutorily-referenced complaint was served. *See, e.g.*, *Taylor v.
Sturgell*, 553 U.S. 880, 892 (2008) ("A person who was not a party to a suit
generally has not had a 'full and fair opportunity to litigate' the claims and
issues settled in that suit."); *Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*,
58 F.3d 616, 619 (Fed. Cir. 1995) (applying res judicata to parent
corporation because it controlled wholly-owned subsidiary during prior
litigation). Mentor Graphics has not alleged that Synopsys was a privy of
EVE in 2006 when EVE was served with a complaint alleging infringement
of the '376 patent. Thus, there is no contention that Synopsys had any
control of this previous suit or even had notice of it, along with an
opportunity to participate while it was still pending. *See Richards v.
Jefferson Cnty., Ala.*, 517 U.S. 793 (1996) (holding no estoppel where
subsequent plaintiffs were not provided notice of first suit nor adequately
represented in it). Thus, this lack of relationship between Synopsys and
EVE in the 2006 litigation is another reason to conclude that there was no
privity relationship between Synopsys and EVE sufficient to trigger
§ 315(b)'s prohibitions.

Moreover, no record evidence suggests that Synopsys's petition for
review was timed to inject delay into an already-pending litigation and, thus,
this case does not implicate the concerns that this statute appears designed to
address. H.R. REP. NO. 112-98, at 45 (2011) (explaining § 315(b) as "*Time
limits during litigation*. Parties who want to use inter partes review during
litigation are required to seek a proceeding within 12 months of being served
with a complaint alleging infringement of the patent."); 157 CONG. REC.

13

Case IPR2012-00042
Patent 6,240,376 B1

S1326 (daily ed. Mar. 7, 2011) (statement of Sen. Sessions) ("The bill also includes many protections that were long sought by inventors and patent owners . . . . It imposes time limits on starting an inter partes or post-grant review *when litigation is pending* . . . . All of these reforms will help to ensure that post-grant review operates fairly and is not used for purposes of harassment or delay." (emphasis added)).

Thus, we conclude that there was no privity relationship between Synopsys and EVE sufficient to trigger § 315(b)'s prohibitions, and we decline to dismiss the *inter partes* review on this basis.

## 2. *Real Party-in-interest*

Mentor Graphics argues that this *inter partes* review is barred because EVE is a real party-in-interest to this *inter partes* review. PO Resp. 7-14. Mentor Graphics asserts that, therefore, the complaint served on EVE in the May 2006 case should trigger § 315(b). *Id*. at 6. Mentor Graphics admits that "on the date the petition for this [*inter partes* review] was filed, Synopsys had not yet acquired EVE and therefore had at best merely a prospective interest in the ZeBu products." *Id.* at 9. Mentor Graphics, however, asserts that because Synopsys had a prospective interest in invalidating the '376 patent when the petition was filed, "Synopsys was acting as an agent for the benefit of EVE." *Id.* at 10. Thus, according to Mentor Graphics, at the time of filing, Synopsys was a third-party beneficiary for whose benefit the action was brought and, therefore, a real party-in-interest. *Id.* at 7-10.

Mentor Graphics also contends that Synopsys allowed EVE to direct or control content of the petition for this *inter partes* review because Synopsys (1) specifically acquired EVE because of its expertise in the

Case IPR2012-00042
Patent 6,240,376 B1

technology field to which the '376 patent is directed; (2) jointly asserted with EVE the same non-infringement and invalidity claims and defenses with respect to the '376 patent, using the same counsel, in the jointly-filed declaratory judgment litigation; and (3) planned and coordinated the timing of the filing of the petition in this case and the declaratory judgment complaint with EVE. PO Resp. 12-13. Based on these contentions, Mentor Graphics asserts that Synopsys and EVE "conspired together to conceal EVE's status as a 'real party-in-interest' to circumvent and thwart the statutory estoppel provisions." *Id.* at 14.

As discussed above, 37 C.F.R. § 42.101(b) makes clear that it is only relationships up until the time a petition is filed that matter. Mentor Graphics does not point to persuasive evidence to support its assertions that Synopsys allowed EVE to direct or control content of the petition filed in this case or any other evidence that EVE was a real party-in-interest prior to the filing of the petition. Although Mentor Graphics filed a Motion for Additional Discovery on the topic of real party-in-interest (Paper 21), this motion was denied because it did not articulate clearly why such discovery was "necessary in the interest of justice" as required by 35 U.S.C. § 316(a)(5) (Paper 24). In fact, the entirety of Mentor Graphics's explanation of why it needed additional discovery on the subject of real party-in-interest was the following:

> Thus, while the request interest of justice, [sic] as required by 37 C.F.R. § 42.51(b)(2), in order to allow the Patent Owner an opportunity to show the applicability of a § 315(b) bar under the legal standard adopted by the Board. This includes the opportunity to show further (1) . . . (4) the status of EVE as a real party-in-interest to this IPR.

Paper 21 at 2-3.

15

A56

Case IPR2012-00042
Patent 6,240,376 B1

Thus, because Mentor Graphics has not supported sufficiently its assertions that EVE was a real party-in-interest at the time the petition in this case was filed, we decline to dismiss the *inter partes* review on this basis.

### B. Assignor Estoppel

Mentor Graphics argues that Synopsys is barred from challenging the validity of the '376 patent by assignor estoppel. PO Resp. 14-22. The Board has determined previously, and we agree, that assignor estoppel is not a basis for denying a petition requesting *inter partes* review:

> Under the AIA, "a person *who is not the owner of a patent* may file with the Office a petition to institute an inter partes review of the patent." 35 U.S.C. § 311(a) (emphasis added). Consequently, under the statute, an assignor of a patent, who is no longer an owner of the patent at the time of filing, may file a petition requesting *inter partes* review. This statute presents a clear expression of Congress's broad grant of the ability to challenge the patentability of patents through *inter partes* review.

*Athena Automation Ltd. v. Husky Injection Molding Sys. Ltd.*, IPR2013-00290, slip op. at 12-13 (PTAB Oct. 25, 2013), Paper No. 18; *see also Palo Alto Networks, Inc. v. Juniper Networks, Inc.*, IPR2013-00369, slip op. at 11-14 (PTAB Dec. 19, 2013), Paper No. 16.

Mentor Graphics further asserts that even if Synopsys is not barred from requesting *inter partes* review, the Board should exercise its discretion to dismiss this *inter partes* review because of the relationship between Mr. Burgun and Synopsys.[2] PO Resp. 16-19. Mentor Graphics further argues,

---

[2] This case does not require us to reach the issue of whether Mr. Burgun is in privity with Synopsys, as asserted by Mentor Graphics (PO Resp. 16-19), because we conclude that even if Mentor Graphics established such a relationship, Mentor Graphics has not shown a sufficient basis to bar

16

Case: 14-1516    Document: 33    Page: 112    Filed: 10/03/2014

Case IPR2012-00042
Patent 6,240,376 B1

more generally, that equitable considerations weigh against granting the petition, including that Synopsys is in privity with EVE and shares personnel with EVE, including Mr. Burgun. *Id.* at 19. Moreover, according to Mentor Graphics, "[i]t would be wholly against the principles of assignor estoppel to allow Synopsys to receive the benefit of the acquisition of EVE, but avoid EVE's equitable obligations." *Id.* at 22.

We are not persuaded, however, that the equitable doctrine of assignor estoppel provides an exception to the statutory mandate that any person who is not the owner of a patent may file a petition for *inter partes* review. Accordingly, we decline to dismiss the *inter partes* review based on Mentor Graphics's estoppel arguments.

### C. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012). Claim terms are also given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

If an inventor acts as his or her own lexicographer, the definition must be set forth in the specification with reasonable clarity, deliberateness, and precision. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). The construction that stays true to the claim language

---

Synopsys from further participation in, or dismissal of, this *inter partes* review.

17

A58

Case IPR2012-00042
Patent 6,240,376 B1

and most naturally aligns with the inventor's description is likely the correct interpretation.  *Id.* at 1250.

### 1. *"Instrumentation Signal"*

Construction of the term "instrumentation signal," required by each of the claims at issue in this proceeding, is central to the patentability determination.  *See* PO Resp. 29-37; Reply 2-8.  For example, claims 1 and 28 recite "including at least one instrumentation signal, wherein the instrumentation signal is indicative of an execution status."  Claim 5, the third, and final, challenged independent claim, recites "creating an instrumentation signal associated with at least one synthesizable statement contained in a register transfer level (RTL) synthesizable source code."

### a. *Construction Adopted in the Decision to Institute*

Although neither the petition nor the preliminary response set forth a specific construction for "instrumentation signal," the Board adopted, for purposes of the Decision to Institute, an interpretation that "the claimed instrumentation signal at least encompasses an output signal created during synthesis of RTL source code by inserting additional logic, preserved from the source code, that indicates whether the corresponding RTL source code statement is active."  Decision to Institute 10.

Mentor Graphics argues that this construction is only partially correct. PO Resp. 30.  Specifically, Mentor Graphics agrees that "instrumentation signals" encompass "inserting additional logic."  *Id.*  According to Mentor Graphics, however, the requirement that the "additional logic is preserved from the source code" is contrary to how one of ordinary skill in the art would understand the term in light of the specification.  *Id.* at 35 (citing Ex. 2027 ¶¶ 38-39).  Mentor Graphics points to language in the '376 patent

Case IPR2012-00042
Patent 6,240,376 B1

specification stating that "[i]nstrumentation is the process of preserving high-level information through the synthesis process." PO Resp. 35-36 (quoting Ex. 1001, col. 5, ll. 3-4). Mentor Graphics's expert, Dr. Majid Sarrafzadeh, states that preserving information here refers to permitting relation back from the execution of the gate level netlist to the corresponding statements in the RTL source code, not the preservation of *logic* itself from the source code. Ex. 2027 ¶ 40.

We find this argument, along with the supporting evidence, persuasive. The language of the '376 patent also supports this conclusion. For example, immediately following the language quoted above, the '376 specification states that "[i]nstrumentation permits simulation of a gatelevel netlist at the level of abstraction of RTL simulation by *preserving some of the information* available at the source code level through the synthesis process." Ex. 1001, col. 5, ll. 4-8 (emphasis added).

### b. Definition of "Instrumentation"

In proposing an alternative construction for "instrumentation signal," Mentor Graphics initially asserts that the customary meaning of the term "instrumentation" to those of skill in the art is "additional code inserted into a program to monitor and/or collect information about the program behavior or operation during program execution." PO Resp. 31. Dr. Sarrafzadeh testifies that this is how the term is "generally recognized and understood in the programming language arts." Ex. 2027 ¶ 30 (citing IEEE Standard Glossary of Software Engineering Terminology, IEEE Std 610.12-1990 at 41 ("Devices or instructions installed or inserted into hardware or software to monitor the operation of a system or component."); National Bureau of Standards [NBS] Special Publication 500-75 Validation, Verification, and

19

Testing of Computer Software at 48 (1981) ("The insertion of additional code into the program in order to collect information about program behavior during program execution.")).  We agree that this is the ordinary and customary meaning of the first word—"instrumentation"—of the term "instrumentation signal."

### c. Specification

Mentor Graphics further asserts that the term "instrumentation signal" requires that "the signal be provided by logic that is *additional* to the design logic resulting from the synthesis of the RTL source code."  PO Resp. 30.  In other words, the instrumentation signal cannot be created solely by preserving circuit components.

Synopsys argues that Mentor Graphics's construction is too narrow and that the broadest reasonable construction of "instrumentation signal" is broad enough to include creation solely using preservation of circuit components.  Reply 4-8.

According to Mentor Graphics, one of ordinary skill would understand the following excerpts of the specification "to effectively define" "instrumentation signal" to require that instrumentation logic be added to the gate-level netlist (PO Resp. 31-32):

> Generally *instrumentation logic* is created for a synthesizable statement in the RTL source code either by modifying the RTL source code or by analyzing the RTL source code during the synthesis process.  The *instrumentation logic* provides an output signal indicative of whether the corresponding synthesizable statement is active.  A gate-level design including the instrumentation output signal is then synthesized.  Referring to FIG. 2, *the resulting gate-level design 250 contains additional logic to create the additional instrumentation output signals* referenced in instrumentation data 238.

20

Case IPR2012-00042
Patent 6,240,376 B1

Ex. 1001, col. 5, ll. 21-30 (emphasis added by Mentor Graphics).

> FIG. 7 illustrates one embodiment of the logic 700 generated
> through instrumentation. In particular, FIG. 7 illustrates the
> *additional gate-level logic added* to generate signals
> SIG_TRACE1 through SIG_TRACE6 from synthesis of the
> modified source code.

*Id.* at col. 8, ll. 60-64 (emphasis added by Mentor Graphics). We are not
persuaded that the quoted language qualifies as a limiting definition of
"instrumentation signal." "To be his own lexicographer, a patentee must use
'a special definition of the term [that] is clearly stated in the patent
specification or file history.'" *Laryngeal Mask Co. v. Ambu*, 618 F.3d 1367,
1372 (Fed. Cir. 2010) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90
F.3d 1576, 1580 (Fed. Cir. 1996)). The specification here does not indicate
clearly the patentee's intent to define or limit the definition of
"instrumentation signal." Indeed, the first excerpt relied upon by Mentor
Graphics is extracted from a paragraph that begins: "In one
embodiment . . . ." Similarly, the second excerpt begins by stating that it
"illustrates one embodiment." Thus, all of the language relied upon by
Mentor Graphics as "effectively defin[ing]" the term, refers only to
illustrative examples. It is well-settled that when claim language is broader
than the preferred embodiment, the claims are not to be confined to that
embodiment. *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1348 (Fed.
Cir. 2008). Moreover, "just as the preferred embodiment itself does not
limit claim terms, mere inferences drawn from the description of an
embodiment of the invention cannot serve to limit claim terms, as they are
insufficient to require a narrower definition of a disputed term." *Johnson
Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 992 (Fed. Cir. 1999)
(internal citations omitted).

21

Case IPR2012-00042
Patent 6,240,376 B1

Mentor Graphics adds that Figure 7, which "illustrates the additional

gate-level logic added to generate signals SIG_TRACE1 through

SIG_TRACE6 from synthesis of the modified source code [shown in Figure

6]" (Ex. 1001, col. 8, ll. 61-64), supports its narrow construction.  Dr.

Sarrafzadeh testifies that this can be shown with an annotated copy of Figure

7, reproduced below.



Ex. 2027 ¶ 33.  The annotated copy of Figure 7, above, illustrates gate-level

logic synthesized from modified RTL source code.  Ex. 1001, col. 3, ll. 29-

30.  Dr. Sarrafzadeh testifies that the circle was added to emphasize the

instrumentation logic (two AND gates and two OR gates) added to the

original circuit shown in Figure 5.  Ex. 2027 ¶ 33.

As pointed out by Synopsys (Reply 6), however, this Figure actually

supports a broader construction of "instrumentation signal."  The additional

logic within the marked circle is required only for four (SIG_TRACE3,

SIG_TRACE4, SIG_TRACE5, and SIG_TRACE6) of the six

instrumentation signals included in the figure.  SIG_TRACE1 and

SIG_TRACE2 are shown with no additional logic gates.  Mentor Graphics

22

Case IPR2012-00042
Patent 6,240,376 B1

attempts to explain away this incongruity in its argument by stating that the
specification itself is incorrect.  For example, at the final hearing, in
response to the question "[w]hat you're telling us about additional logic, is it
consistent with the patent at column 9 when it talks about Figure 10 where it
calls SIG_TRACE1 and SIG_TRACE2 instrumentation signals?" counsel
for Mentor Graphics stated:

> The patent with respect to Figures 7 and 10 calls all of the
> added signals instrumentation signals, that is correct, but we do
> not believe that all of those are instrumentation signals as that
> term should be included.  It was an unfortunate, but expedient
> way to group all of the signals that have been added to Figure 7
> and Figure 10.  Some of those signals do not, however, provide
> any additional information.  First, they're not logic.

Paper 59 (Transcript) 28-29.  We are not persuaded that the term
"instrumentation signal" should be limited such that it is inconsistent with
explicit statements in the specification.

### d. Alternate Embodiment

In addition, Mentor Graphics argues that the challenged claims should
be construed to exclude the cross-reference embodiment.  PO Resp. 33.  The
'376 patent explicitly states that in the cross-reference embodiment, "the
gate-level netlist is not modified but the instrumentation signals
implementing the instrumentation logic are contained in a cross-reference
database."  Ex. 1001, col. 2, ll. 47-50.  Moreover, in both of the main
embodiments, "instrumentation signals indicate the execution status of the
corresponding cross-referenced synthesizable statement."  *Id.* at ll. 50-52.
Thus, in order to limit the definition of "instrumentation signal" as used in
claims 1, 5, and 28 to signals created by additional instrumentation logic
added to the gate-level netlist, Mentor Graphics contends that the challenged

23

Case IPR2012-00042
Patent 6,240,376 B1

claims exclude this embodiment. PO Resp. 33. Specifically,
Dr. Sarrafzadeh testifies that "[c]laims 1, 5 and 28 do not describe [the
cross-reference] embodiment because in this embodiment, rather than adding
instrumentation signals (and associated logic) to the specified circuit, an
external 'cross-reference database' uses 'already existing signals' to evaluate
whether a particular line of source code is active." Ex. 2027 ¶ 35 (citing Ex.
1001, col. 5, ll. 31-37). This argument is circular, however, and does not
explain why claims 1, 5, and 28 require additional logic be added to the
gate-level netlist.

Moreover, during cross-examination, Dr. Sarrafzadeh admitted to not
understanding the details of how the alternate cross-reference embodiment
would work. For example, when questioned about language in the
specification stating that "[w]ith respect to source code analysis, cross-
reference instrumentation data including the instrumentation signals can be
used to count the number of times a corresponding statement is executed in
the source code" (Ex. 1001, col. 2, l. 66 – col. 3, l. 2), Dr. Sarrafzadeh
answered that the '376 patent does not "show a method for doing this, [the
patent] just draw[s] certain conclusions, and without showing and describing
these designs, I would not have—it would not be clear what they mean
here." Ex. 1019, 28:19 – 29:13. Further, Dr. Sarrafzadeh stated that his
conclusions related to the cross-reference embodiment were based on his
determination that the specification did not explain in detail how it would be
implemented. *Id.* at 21:23 – 22:25.

It is true that "claims need not be construed to encompass all disclosed
embodiments when the claim language is clearly limited to one or more
embodiments." *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d

24

Case IPR2012-00042
Patent 6,240,376 B1

1364, 1375 (Fed. Cir. 2008).  Here, the claim language is broad enough to

include the alternative cross-reference embodiment.  Moreover, the written

description does not evidence a clear intent to limit the invention to a

singular embodiment.  In fact, as described above, the specification

describes two main embodiments, and multiple alternate embodiments that

combine the two main embodiments.  In fact, the first embodiment of the

'376 patent is described in the most detail; however, "although the

specifications may well indicate that certain embodiments are preferred,

particular embodiments appearing in a specification will not be read into the

claims when the claim language is broader than such embodiments."

*Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed.

Cir. 1994).  In the present case, neither the claim language nor the

specification suggests limiting the scope of the subject matter to a single

embodiment.

### e.  Examiner's Reasons for Allowance

Mentor Graphics also points to the following language in the

"'examiner's statement of reasons for allowance' in application

(SN 09/127,584) that issued as the '376 patent" (PO Resp. 33):

> The current invention allows for the *insertion of
> instrumentation logic* which executes to function as a
> simulation breakpoint to be applied to gate-level circuit
> simulation.  This is done by *inserting instrumentation points
> into the Register Transfer Level (RTL) design*, which can then
> be synthesized to the gate-level description . . . .  The current
> invention extends [the higher level debugging of cited prior art]
> to a lower level in the design process, namely in the gate-level
> description that has been synthesized from the RTL description.
> This advantageously allows for the use of simulation
> breakpoints implemented by *inserting "instrumentation logic*

25

Case IPR2012-00042
Patent 6,240,376 B1

> *into the RTL description* (as indicated in the specification pg.
> 42, line 24) in a gate-level circuit simulation.

Ex. 2027 ¶ 35 (quoting Ex. D) (underlining in original; italics added by
Mentor Graphics). We are not persuaded by this argument. The language
quoted from the reasons for allowance makes it clear that the invention
*allows for*, but does not state that the invention *requires*, additional logic to
be added to the gate-level netlist resulting from the synthesis of the RTL
source code. Moreover, Mentor Graphics neglects to include, in the quoted
language, the last sentence of the paragraph, which states: "This provides a
distinct advance over the prior art methods of matching input vectors to
output vectors and attempting to back out the fault based only on these
vectors." Ex. 2027: Ex. D at 106. This last sentence clarifies that the
Examiner's statements were directed to distinguishing the claimed process
of using instrumentation signals from the prior art methods of comparing
input and output vectors, not to providing a definition of "instrumentation
signal" or indicating that the instrumentation signal cannot be created solely
using preservation of circuit components.

### f. Definition of "Instrumentation Signal"

Thus, although we agree with Mentor Graphics that the definition of
"instrumentation signal" does not require that additional logic inserted
during synthesis of RTL source code is "preserved from the source code,"
we do not agree that "instrumentation signal" excludes creation by
preserving already existing circuit components. Instead, we determine that
the broadest reasonable construction of "instrumentation signal," in light of
the '376 patent specification, at least includes an output signal created
during synthesis of RTL source code by inserting additional code into a

26

Case IPR2012-00042
Patent 6,240,376 B1

program that indicates whether the corresponding RTL source code statement is active.

### 2. "Execution Status"

The term "execution status" is recited in claims 1-4, 28, and 29. Mentor Graphics states that "in the HDL context, 'execution status' refers to information regarding whether particular HDL statements have been executed or not." PO Resp. 37 (citing Ex. 2027 ¶ 41). This definition is consistent with the use of the term in the '376 patent. For example:

> In some cases the execution status of each branch of the code can be determined even though every branch is not explicitly instrumented. To verify the execution status of every branch, the instrumentation process need only ensure that each branch is instrumented either explicitly or implicitly through the instrumentation of other branches.

Ex. 1001, col. 12, ll. 33-38.

Synopsys does not address explicitly this proposed definition.

We determine that the broadest reasonable construction of "execution status" in light of the '376 patent specification is information regarding whether a particular HDL instruction has been performed.

### D. Alleged Anticipation by Gregory under 35 U.S.C. § 102(e)

Synopsys asserts that claims 1-9, 11, 28, and 29, are unpatentable under 35 U.S.C. § 102(e) as anticipated by Gregory. As discussed above, claims 1, 5, and 28 are independent. Claims 2, 3, and 4 depend, directly or indirectly, from claim 1. Claims 6-9 and 11 depend, directly or indirectly, from claim 5. Claim 29 depends from claim 28.

To establish anticipation, each and every element in a claim, arranged as is recited in the claim, must be found in a single prior art reference. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008);

27

Case IPR2012-00042
Patent 6,240,376 B1

*Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).

We have reviewed Synopsys's anticipation argument and supporting evidence, including Gregory's disclosure and the detailed claim chart appearing on pages 31-43 of the Petition. The claim chart persuasively reads all elements of each of claims 5, 8, and 9 onto the disclosure of Gregory. Despite the counter-arguments in Mentor Graphics's Patent Owner Response, and the evidence cited therein, which we also have considered, Synopsys has shown, by a preponderance of the evidence, that each of claims 5, 8, and 9 is unpatentable under 35 U.S.C. § 102(e) as anticipated by Gregory. *See* 35 U.S.C. § 316(e).

For claims 1-4, 6, 7, 11, 28, and 29, however, we give significant weight to the testimony of Mentor Graphics's expert, Dr. Sarrafzadeh, who persuasively explains that Gregory does not disclose each and every element of the claims. Synopsys does not provide sufficient evidence to rebut this testimony. Thus, as described below, we conclude that Synopsys has not met its burden to show by a preponderance of the evidence, as required by 35 U.S.C. § 316(e), that claims 1-4, 6, 7, 11, 28, and 29 are unpatentable.

    *1. Gregory (Ex. 1007)*

Gregory "relates to . . . debugging digital circuits constructed using logic or behavioral synthesis." Ex. 1007, col. 1, ll. 12-15. Gregory describes a method of "providing a designer with the ability to mark the synthesis source code in the places that the designer wants to be able to debug" by "mark[ing] the source code with a particular text phrase, such as 'probe[,'] along with some additional optional information." *Id.* at col. 8, ll. 21-26. Further, Gregory describes a translation process that "interjects

28

Case IPR2012-00042
Patent 6,240,376 B1

information into the netlist" when it encounters a probe statement and "generates a circuit th[at] provides the same function as it did without the 'probe' statement, but adds additional information or components to the initial circuit that indicate that certain components should not be replaced during optimization" (col. 8, ll. 26-30). These components "are traceably related to the source HDL" and they "facilitate[] debugging." *Id.* at col. 8, ll. 35-41.

### 2. Claims 1-4, 28, and 29

Synopsys asserts that Gregory discloses claim 1's limitation of "synthesizing the source code into a gate-level netlist including at least one instrumentation signal, wherein the instrumentation signal is indicative of an execution status of the at least one statement." Pet. 31-32. Synopsys explains that "[s]ynthesizing the FIG. 8 VHDL code produces the gate-level circuit illustrated in FIG. 9, which includes the instrumentation signal tempout, which indicates an execution status of the instrumented statement." *Id.* at 32. Figures 8 and 9 of Gregory are reproduced below.



Figure 8, above, illustrates VHDL source code with a probe inserted.

Case IPR2012-00042
Patent 6,240,376 B1

Ex. 1007, col. 9, ll. 55-56.  Gregory explains that the probe is "a directive to the translator" that "indicates that this particular VHDL statement should be processed so that it will be possible to relate analysis information to this point in the circuit."  *Id.* at col. 12, ll. 54-61.



Figure 9, above, illustrates a circuit that a translator could produce using the source code with probe inserted shown in Figure 8.  *Id.* at ll. 62-67.  As discussed, Synopsys points to "tempout" as constituting the instrumentation signal.  Pet. 32.

Mentor Graphics argues that tempout does not equate to the claimed "instrumentation signal" and Synopsys has not shown that Gregory discloses an "instrumentation signal, wherein the instrumentation signal is indicative of an execution status of the at least one statement."

Mentor Graphics argues that Gregory fails to disclose the claimed "instrumentation signal" because "tempout" does not involve additional logic, but instead simply preserves identified circuit nets during the optimization process.  PO Resp. 41-46.  This argument, however, requires a narrower construction of the term "instrumentation signal" than we have adopted, as discussed above.  Thus, we agree with Synopsys that "tempout" qualifies as an "instrumentation signal" as we have construed that term.

Case IPR2012-00042
Patent 6,240,376 B1

Mentor Graphics also argues that "tempout" is not "indicative of an execution status," as required by claim 1. *Id.* at 46-50. Mentor Graphics points out that, in its petition, the only element Synopsys describes with particularity as disclosing this particular limitation of claim 1 is the "tempout" signal of Figure 9. *Id.* at 49-50. Dr. Sarrafzadeh testifies that in Figure 9, the result of the "tempout" signal is not indicative of the execution status of the HDL statement identified in Figure 8. Ex. 2027 ¶ 73. According to Dr. Sarrafzadeh, "tempout" reflects the result of "not (A or B)," while the HDL statement identified in Figure 8 is "Z<=not (A or B)," executed conditionally based on whether the "if" condition (if (C and B) then)) is true. *Id.* at ¶¶ 73-74. The execution status of the HDL statement thus depends on whether the "if" condition is true or not, but "tempout" does not indicate this information. *Id.*

In response to this argument, Synopsys asserts that Mentor Graphics improperly is looking solely at the 'tempout' signal and, in doing so, excluding an alternate embodiment also described in Gregory. Reply 10-11. Specifically, Synopsys argues that because execution status of every branch can be verified implicitly and not every branch need be instrumented, Mentor Graphics's argument is incorrect. *Id.* at 11 (citing Ex. 1001, col. 12, ll. 33-38). According to Synopsys, it is not necessary to determine the "C and B" condition in the "if" statement of Figure 8 to meet the "execution status" requirement. *Id.* Synopsys, however, does not point to any expert testimony to support these statements.

We give substantial weight to Mentor Graphics's expert testimony. Dr. Sarrafzadeh explains, persuasively, that the "tempout" signal is not "indicative of an execution status of the at least one statement" as required

31

Case IPR2012-00042
Patent 6,240,376 B1

by claim 1, where "execution status" is information regarding whether the particular source code instruction, identified in Figure 8, has been performed. *See* Ex. 2027 ¶¶ 73-78. Synopsys's unsupported argument to the contrary is not persuasive. Moreover, Synopsys only points to "tempout" in its petition (Pet. 32; 42-43) as disclosing this element of claim 1. Whether or not a particular embodiment requires the execution status of every branch to be verified explicitly, the claim language of claim 1 requires an "instrumentation signal, wherein the instrumentation signal is indicative of an execution status of the at least one statement." Synopsys has not shown persuasively that the "tempout" signal of Figure 9 discloses this limitation.

Gregory does not state explicitly that "tempout," or any other element, indicates an "execution status" of an HDL instruction. Although, as discussed, Gregory states that a probe "is a directive to the translator" that "indicates that this particular VHDL statement should be processed so that it will be possible to relate analysis information to this point in the circuit," (col. 12, ll. 54-61), we agree with Mentor Graphics that Synopsys does not point to any disclosure in Gregory that "analysis information" includes "execution status." PO Resp. 47. In fact, when Gregory discusses "analysis," it generally refers to characteristics of the circuit, such as timing and power, which are not related to "execution status" as we have construed that term. *See, e.g.*, Ex. 1007, col. 7, l. 59 – col. 8, l. 10; col. 12, ll. 49-61; col. 16, ll. 25-50.

Alternatively, Synopsys argues that Gregory *does* indicate the execution status of the "if" condition at the output of AND gate 232 in Figure 9. Reply at 11. Here, Synopsys appears to be arguing that B and C,

Case IPR2012-00042
Patent 6,240,376 B1

as opposed to the "tempout" signal, are the claimed "instrumentation signals." *Id.* ("Any argument that signals B and C cannot be instrumentation signals ignores the alternate embodiment which specifically contemplates implicit instrumentation and the use of already existing signals to determine execution status.").

We are not persuaded by this argument. To the extent that Synopsys is arguing that an element other than "tempout" discloses this limitation of claim 1, the argument is presented for the first time in Synopsys's reply and is not responsive to arguments made in Mentor Graphics's response. 37 CFR 42. 23(b). Moreover, Synopsys does not point to any evidence or persuasive argument to explain how B and C disclose the claimed instrumentation signal.

Synopsys has not shown that Gregory discloses the limitation "instrumentation signal, wherein the instrumentation signal is indicative of an execution status of the at least one statement." Thus, we conclude that Synopsys has not met its burden to show, by a preponderance of the evidence, that Gregory anticipates independent claim 1. *See* 35 U.S.C. § 316(e). Because independent claim 28 includes the same limitation, Synopsys also has not met its burden to show, by a preponderance of the evidence, that Gregory anticipates independent claim 28. For the same reasons, we conclude that Synopsys has not met its burden with regard to claims 2-4 and 29, which depend, either directly or indirectly, from claims 1 and 28.

### 3. Independent Claim 5

Independent claim 5 includes the limitation "creating an instrumentation signal associated with at least one synthesizable statement

Case IPR2012-00042
Patent 6,240,376 B1

contained in a register transfer level (RTL) synthesizable source code."
Synopsys points to the analysis of claim 1 to show that this limitation is
anticipated by Gregory.  Pet. 34.  In addition, to support its argument,
Synopsys points to Gregory's Figures 12, 16, and 18 and the associated text
describing a "block probe methodology for instrumenting all of the signals
within a process statement."  *Id.* at 34-35.  Specifically, Synopsys asserts
that the "signals 'temp_out' in FIG. 18 are instrumentation signals
associated with the VHDL (RTL) statements within the instrumented
'process.'"  *Id.* at 35.  Figures 12, 16, and 18 are reproduced below.

34

Case IPR2012-00042
Patent 6,240,376 B1

401    300

```
entity interrupt_controller is
  port(new_request  : in bit_vetcor(3'downto 1);
      current_level: in bit_vector( 1 downto 0);

      should_service: out bit);
end;

architecture synthesizable of interrupt_controller is

 signal new_level: bit_vector(1 downto 0);

begin

  decode: process(new_request)
  begin
    if(new_request(3) = '1') then
      new_level <= '11";
    elsif(new_request(2) = '1') then
      new_level <= '10";
    elsif(new_request(1) = '1') then
      new_level <= "01";
    else
      new_level <= "00";
    end if;
  end process;

  compare:process(current_level, new_level)
  begin

    if(new_level(1) >current_level(1)) then
      should_service <= '1' ;
    elsif(new_level(1) <current_level(1)) then
      should_service <= '0' ;
    elsif(new_level(0) >current_level(0)) then
      should_service <= '1' ;
    else
      should_service <=" 0";
    end if;

  end process;
end;
```

**Figure 12**

Figure 12, above, illustrates VHDL source code without probes using two
process blocks.  Ex. 1007, col. 9, ll. 64-65.

35

A76

Case IPR2012-00042
Patent 6,240,376 B1

```
entity interrupt_controller is
  port(new_request  : in bit_vector(3 downto 1);
    current_level: in bit_vector(1 downto 0);

    should_service: out bit);
end;

architecture synthesizable of interrupt_controller is

  signal new_level: bit_vector(1 downto 0);

begin
  --Synopsys block_probe_begin
  decode: process(new_request)
  begin
    if(new_request(3) = '1') then
      new_level <= "11";
    elsif(new_request(2) = '1') then
      new_level <= "10";
    elsif(new_request(1) = '1') then
      new_level <= "01";
    else
      new_level <= "00";
    end if;
  end process;
  --Synopsys block_probe_end

  compare: process(current_level,new_level)
  begin

    if(new_level(1) > current_level(1)) then
      should_service <= '1';
    elsif(new_level(1) < current_level(1)) then
      should_service <= '0';
    elsif(new_level(0) > current_level(0)) then
      should_service <= '1';
    else
      should_service <= '0';
    end if;
  end process;
end;
```

**Figure 16**

Figure 16, above, illustrates the VHDL source code of Figure 12 with two
block probes installed. *Id.* at col. 10, l. 7.

36

Case IPR2012-00042
Patent 6,240,376 B1



Figure 18, above, illustrates the circuit obtained by optimizing the circuit of Figure 17—a circuit generated by translating the VHDL source code of Figure 16. *Id.* at col. 10, ll. 9-12.

Mentor Graphics argues that Gregory fails to disclose the claimed "instrumentation signal" because "temp_out" does not involve additional logic, but instead simply preserves identified circuit nets during the optimization process. PO Resp. 53-56. This argument, however, requires a narrower construction of the term "instruction signal" than we have adopted, as discussed above.

Mentor Graphics also argues, without detailed explanation, that "[t]he proposed challenges to claims 3, 4, 5, 6, 7, 9, 11, 28, and 29 rely on portions of Gregory that are not arranged as recited in the claim." *Id.* at 40. This argument appears to be based on the statement in Gregory that Figures 12-19 "show another way to use probes to evaluate the performance of blocks of HDL code." Ex. 2007, col. 13, ll. 29-31. Thus, according to Mentor Graphics, the challenges to all the recited claims improperly combine portions of Gregory concerning Figures 12 and 16 with an alternate embodiment described in Figures 8 and 9. We are not persuaded that

37

Case IPR2012-00042
Patent 6,240,376 B1

Figures 12 through 19 are an entirely separate embodiment from that described in Figures 8 and 9.  Instead, the difference between the two examples is that the initial source code differs.  *See id.* at Figs. 8, 12.  Furthermore, as described below, Gregory discloses all the limitations of claim 5 without any improper combination of embodiments.

We conclude that Gregory discloses all the limitations of claim 5 arranged as recited in the claim.  Gregory discloses "a method of generating a gate level design."  Ex. 1007, Abstract.  Gregory also discloses "synthesizing the source code into a gate-level design having the instrumentation signal" by describing that the translation, or synthesis process, injects information into the resulting netlist when a probe is encountered, which results in components of the final circuit that are traceably related to the source code.  Ex. 1007, col. 8, ll. 21-30.  Either "tempout," as shown in Figure 9, or "temp_out," as shown in Figure 18, qualifies as "instrumentation signals" as construed above.

Finally, we determine that Gregory discloses "creating an instrumentation signal associated with at least one synthesizable statement contained in a register transfer level (RTL) synthesizable source code" as required by claim 5.  For example, Gregory states that "any analytic result related to [tempout of Figure 9] . . . can be identified with the probe statement 401 in the HDL."  Ex. 1007, col. 13, ll. 15-20.  This language describes an "instrumentation signal" ("tempout") "associated" (identified) "with at least one synthesizable statement" (statement 401 in the HDL of Figure 8).

Case IPR2012-00042
Patent 6,240,376 B1

### 4. Dependent claims 6 and 7

Claim 6 depends from claim 5 and adds the limitation:

wherein step a) further comprises the step of:

(i) inserting a unique variable assignment statement into the source code, wherein the variable assignment statement is adjacent to at least one associated sequential statement; and

(ii) inserting a unique output signal assignment statement into the source code, wherein the unique output signal is assigned a value associated with the unique variable.

Synopsys relies on Figures 16 and 18 of Gregory as disclosing this additional limitation. Pet. 35-36. Specifically, Synopsys asserts that the statements in Figure 16 adjacent each of the if, elsif, and else statements ("new_level <=") qualify as unique local variable statements. *Id.* at 35. Synopsys adds that synthesizing the VHDL code in Figure 16 produces the circuit of Figure 18 with "instrumentation signals" "temp_out" that are "assigned the value of the new_level local variable with a[n] initial, second value." *Id.* at 36.

Mentor Graphics argues that Gregory does not disclose the "variable assignment statement" limitation of claim 6. PO Resp. 56-57. Again, we give substantial weight to Mentor Graphics's expert testimony on this issue. Dr. Sarrafzadeh testifies, persuasively, that the "new_level" assignment in Figure 16 is a *signal* assignment and not a *variable* assignment. Ex. 2027 ¶ 84 (explaining that in VHDL variables are declared by the term "VARIABLE" and signals are assigned using the symbol ":="). Dr. Sarrafzadeh explains that "Gregory does not disclose including variable assignments, but instead only preserves signal assignments," which are substantively different than variable assignments. *Id.* at ¶¶ 85-87.

Case IPR2012-00042
Patent 6,240,376 B1

In response, Synopsys argues that Mentor Graphics does not use the broadest reasonable construction of the term "variable assignment statement" and improperly limits the scope of the claim to distinctions in terms provided by VHDL when the specification broadly talks about other HDL languages. Reply 13-14. We are not persuaded by Synopsys's argument. Mentor Graphics, in explaining its argument in terms of VHDL, is not limiting the scope of the claimed subject matter, but instead is responding to Synopsys's assertion that certain VHDL code shown in Gregory discloses the limitations of claim 6. We conclude that Synopsys has not met its burden with regard to claim 6. For the same reasons, we conclude that Synopsys has not met its burden with regard to claim 7, which depends from claim 6.

### 5. Dependent Claims 8 and 9

Claim 8 depends from claim 5 and adds the limitation:

> wherein step a) is repeated to create a unique instrumented output signal for each list of sequential statements in the source code, wherein each list corresponds to a synthesizable executable branch of the source code.

Synopsys relies on Figure 16 of Gregory as disclosing this additional limitation. Pet. 36-37. Specifically, Synopsys asserts that the "VHDL of FIG. 16 creates a unique instrumented output signal corresponding to the unique values of new_level for each list of sequential (if-then) statement," each of the statements being in a different branch of the VHDL. *Id.* at 37.

Claim 9 depends from claim 5 and adds the limitation:

> c) generating cross-reference instrumentation data mapping each statement in a selected list to the instrumented output signal associated with that list for every list in the source code.

40

Case IPR2012-00042
Patent 6,240,376 B1

Synopsys relies on Figure 16 and related language in Gregory as disclosing this limitation. Pet. 37 (citing Ex. 1007, col. 8, ll. 35-41).

For claim 8, Mentor Graphics relies solely on its argument made for claim 5 that Gregory fails to disclose the claimed "instrumentation signal" because "temp_out" does not involve additional logic, but instead simply preserves identified circuit nets during the optimization process. PO Resp. 59. As discussed, this argument is not persuasive.

For claim 9, Mentor Graphics also argues, without detailed explanation, that "[t]he proposed challenges to claims 3, 4, 5, 6, 7, 9, 11, 28, and 29 rely on portions of Gregory that are not arranged as recited in the claim." *Id.* at 40. As discussed above, we do not find this argument persuasive.

We conclude that Gregory discloses all the limitations of dependent claims 8 and 9.

### 6. Dependent Claim 11

Claim 11 depends from claim 5. Mentor Graphics argues that in its claim chart, Synopsys does not assert that claim 11 is anticipated by Gregory, but only that it would have been obvious over Gregory. Pet. 38. In reply, Synopsys states that "the Petition explicitly states that 'Gregory (Ex. 1007) *anticipates* claims 1-9, 11-14, 24-25 and 28-33 under section 102.'" Reply 15 (citing Pet. 4, 12, 38). This statement, however, is not evidence of anticipation. We agree with Mentor Graphics that nothing in the petition or in further briefing points to any language in Gregory that discloses all the limitations of claim 11. Thus, Synopsys has not met its burden with regard to claim 11.

Case IPR2012-00042
Patent 6,240,376 B1

*E. Mentor Graphics's Motion to Amend Claims*

Mentor Graphics filed a motion to amend claims. Paper 31 ("Mot. to Amend"). Mentor Graphics proposes nine substitute claims 34-36 and 38-43.[3] Mentor Graphics proposes that substitute claims 34, 35, and 36 are contingent substitute claims to replace original independent claims 1, 5, and 28, respectively, to be considered only if the original patent claim it replaces is unpatentable. *Id.* at 5. Similarly, proposed substitute claims 38-43 are contingent substitute claims to replace original dependent claims 3, 6, 8, 9, 11, and 29, respectively. *Id.* Because we determine that claims 5, 8, and 9 are anticipated by Gregory, the contingency has materialized for these claims, and, thus, we consider proposed substitute claims 35, 40, and 41.

As the moving party, Mentor Graphics bears the burden of proof to establish that it is entitled to the relief requested. 37 C.F.R. § 42.20(c). The proposed amendment is not entered automatically, but only upon Mentor Graphics's having demonstrated the patentability of those substitute claims.

Mentor Graphics contends that the proposed substitute independent claim, 35, "introduce[s] language to more explicitly recite the meaning of the term 'instrumentation signal'" and that the dependent claims are changed solely to change the dependency to the proposed substitute independent claim that corresponds to the dependent claim's respective independent base claim. Mot. to Amend 5. Proposed substitute independent claim 35 is reproduced below, with underlined text indicating material inserted relative to that claim:

---

[3] Mentor Graphics initially proposed substitute claim 37 replace original claim 2 without any contingency. Mot. to Amend 5. Subsequently, this request was withdrawn. Paper 39, 1.

Case IPR2012-00042
Patent 6,240,376 B1

35.  A method of generating a gate level design, comprising the steps of:

a) creating an instrumentation signal associated with at least one synthesizable statement contained in a register transfer level (RTL) synthesizable source code; and

b) synthesizing the source code into a gate-level design having the instrumentation signal, the synthesizing comprising generating instrumentation logic to provide the instrumentation signal, the instrumentation logic comprising instrumentation logic circuitry that is additional to circuitry specified in the source code.

Proposed dependent claims 40 and 41 are identical to the claims they are to replace, claims 8 and 9, except that instead of depending from claim 5, proposed claims 40 and 41 would depend from proposed claim 35.  Mot to Amend 4.

### 1.  No Broadening of Scope

Proposed substitute claims may not enlarge the scope of original patent claims.  35 U.S.C. § 316(d)(3); 37 C.F.R. § 42.121(a)(2)(ii). Proposed substitute claims 35, 40, and 41 merely add features to the claims for which they substitute and do not remove any limitation therefrom. Accordingly, no issue exists with regard to the prohibition against broadening original patent claims.

### 2.  Patentability over Prior Art

#### a.  Anticipation by Gregory

Mentor Graphics asserts that the technique disclosed in Gregory prevents already synthesized circuit elements and signals from being altered structurally during optimization.  Mot. to Amend 13 (citing Ex. 2027 ¶¶ 49-52).  According to Mentor Graphics, in Gregory, "[n]o additional logic is added to the relabeled signals such that they are structurally changed in any

43

Case IPR2012-00042
Patent 6,240,376 B1

way to indicate that the signals have been instrumented." *Id.* at 13-14 (citing Ex. 2027 ¶¶ 63, 67-69).

Synopsys argues that Gregory's Figure 18 discloses the additional instrumentation logic circuitry limitation required by the proposed substitute claims. Opp. 4-6. Synopsys's expert, Dr. Brad Hutchings, testifies that the addition of logic gates to Figure 18 is apparent by comparison with Figure 14. Ex. 1013 ¶ 31. Figure 14 of Gregory, reproduced below, shows the circuit that results from optimizing the circuit shown in Figure 13, which in turn is the circuit resulting from translating the VHDL source code shown in Figure 12. Ex. 1007, col. 14, ll. 5-7.



Figure 14, above, is a schematic for the circuit resulting from optimizing a circuit created by translating VHDL source code. *Id.* Figure 18, reproduced below, shows the circuit that results from optimizing the circuit shown in Figure 17, which in turn is the circuit resulting from translating the VHDL source code shown in Figure 16. *Id.* at col. 10, ll. 9-12.

Case IPR2012-00042
Patent 6,240,376 B1



Figure 18, above, is a schematic for the circuit resulting from optimizing a circuit created by translating VHDL source code. *Id.* at col. 14, ll. 30-36. Because the VHDL source code in Figure 16 is the same as the VHDL source code in Figure 12 with block probes, or instrumentation, Figure 14 shows the circuit that results from translating uninstrumented source code, and Figure 18 shows the circuit that results from translating instrumented source code. Ex. 1013 ¶ 31; Ex. 1007, Fig. 12, 16; col. 9, ll. 64-65 ("Fig. 12. VHDL source without probes using two process blocks."); col. 10, l. 7 ("Fig. 16. VHDL source with two block probes installed.").

Dr. Hutchings testifies that the circuits of Figures 14 and 18 are "functionally identical but structurally different" and testifies that Figure 18 has a higher gate count than Figure 14. Ex. 1013 ¶ 32. Dr. Hutchings, however, does not testify affirmatively that the structural differences or the additional gate count are the result of the probes, as required by the proposed amendment, as opposed to the optimization process. *See id.* at ¶¶ 31-36.

Mentor Graphics responds that the differences in logic discussed by Dr. Hutchings come from the process of optimization, not additional logic resulting from probe statements. Paper 39, 2 ("Reply Mot. to Amend")

45

Case IPR2012-00042
Patent 6,240,376 B1

(citing Ex. 2027 ¶¶ 44, 51-53, 61-63). We are persuaded by Mentor
Graphics's arguments and evidence that Gregory does not show
"instrumentation logic comprising instrumentation logic circuitry that is
additional to circuitry specified in the source code," as required by proposed
substitute claims 35, 40, and 41.

### b. Obviousness over Gregory

Mentor Graphics asserts that "one skilled in the art would not have
been motivated to modify *Gregory* to include instrumentation logic circuitry
that is additional to circuitry specified in the source code" because Gregory
concerns software simulation and, therefore, eliminates the need for
additional or generated instrumentation logic. Mot. to Amend 13-14 (citing
Ex. 2027 ¶¶ 21, 27). Mentor Graphics asserts that "in view of the
fundamental technical differences between Gregory and the claimed subject
matter, any modification to Gregory such that the technique involved
generating instrumentation logic circuitry that is additional to circuitry
specified in the source code would change the principle of operation of
*Gregory*." *Id.* at 14.

Synopsys argues that Mentor Graphics does not establish the
nonobviousness of the proposed substitute claims over Gregory because it
does not address the basic skill set possessed by a person of ordinary skill in
the art and points to no evidence to support the assertion that one skilled in
the art would not have been motivated to modify Gregory to include the
additional logic circuitry limitation. Opp. 6. Dr. Hutchings testifies that
"[n]umerous engineering texts and technical literature available to a person
of ordinary skill in the art at the time of the invention taught inserting
additional logic to debug circuits" and that an ordinary skilled artisan would

46

Case IPR2012-00042
Patent 6,240,376 B1

have known to use similar techniques when debugging synthesizable HDL. Ex. 1013 ¶¶ 37-38 (citing Ex. 1014-18). We give substantial weight to Dr. Hutchings's testimony on this issue, which is based on support from objective sources.

Mentor Graphics responds that Synopsys's "failure to present a strong showing of obviousness based on other references . . . render the alleged evidence insufficient to demonstrate obviousness." Reply Mot. to Amend 5. Mentor Graphics, however, misstates the burden required in this situation. It is Mentor Graphics who has the burden to show that it is entitled to the proposed substitute claims because they are patentable. Synopsys does not bear the burden to show that the claims are unpatentable.

We conclude, based on the record, that Mentor Graphics has not met its burden to show that independent claim 35 or claims 40 and 41, which depend from claim 35, would not have been obvious to a person of ordinary skill in the art based on the disclosure of Gregory.

### c. Mentor Graphics's Burden

Moreover, distinguishing the proposed substitute claims only from the prior art references applied to the original patent claims is insufficient to demonstrate general patentability over prior art. As the moving party, a patent owner bears the burden to show entitlement to the relief requested. 37 C.F.R. § 42.20(c).

Mentor Graphics makes the conclusory statement, unsupported by evidence, that "the Patent Owner believes *Gregory* to be the closest known prior art and therefore believes the proposed substitute claims to be patentable over all known prior art." Mot. to Amend 14-15; *see also id.* at 11 ("Patent Owner believes *Gregory* to be the closest known prior art and is

Case IPR2012-00042
Patent 6,240,376 B1

not currently aware of any other prior art that would affect the patentability
of the substitute claims.").

This statement is insufficient, without discussing the level of ordinary
skill in the art, and what was previously known, with respect to each added
feature, including the ordinary skill set possessed by such a hypothetical
person. For each proposed claim, Mentor Graphics focuses on the added
feature requiring additional instrumentation logic circuitry. However,
Mentor Graphics reveals little, if anything, about the level of ordinary skill
and what was previously known with respect to that feature.

In the context of the claim element added by Mentor Graphics, it is
essential to know whether synthesizing source code, including additional
instrumentation logic circuitry, pre-existed the claimed invention, in any
context, and, if so, how it worked. Otherwise, Mentor Graphics is expected,
reasonably, to explain such pre-existing art, and why it would not have been
applicable to render the invention of the proposed substitute claims obvious
to one with ordinary skill in the art. Mentor Graphics has failed to do either.

Without having discussed sufficiently, in its motion, the level of
ordinary skill in the art and what was previously known regarding the
features on which Mentor Graphics focuses for establishing patentability,
Mentor Graphics has not, in its motion, set forth a prima facie case for the
relief requested—that independent claim 35 and claims 40 and 41, are
patentable—or satisfied its burden of proof.

### 3. Written Description Support

Because Mentor Graphics has not shown patentability of the proposed
substitute claims over the prior art, we do not reach whether it has shown
that the proposed substitute claims have written description support in the

48

Case IPR2012-00042
Patent 6,240,376 B1

'584 application as filed. We note that Mentor Graphics should have cited

to the disclosure of the '584 application as filed rather than the disclosure of

the '376 patent as issued.

Mentor Graphics's Motion to Amend Claims is *denied*.

*F. Mentor Graphics's Motion to Exclude Evidence*

Mentor Graphics filed a Motion to Exclude Evidence (Paper 42)

seeking to exclude the Declaration testimony of Dr. Hutchings because it is

not competent expert testimony. Mentor Graphics argues that Dr. Hutchings

did not have an understanding of the claimed subject matter as a whole,

including each limitation of the claim, and therefore his testimony fails to

satisfy the criteria of Federal Rule of Evidence 702. Paper 42, 3-8. Mentor

Graphics bases this assertion on Dr. Hutchings's testimony that he had not

formed an opinion on the meaning of "execution status" or "instrumentation

signal," but instead assumed that "the Board already ruled on anticipation, so

I focused on the amended language" of the proposed substitute claims. *Id.* at

7-8 (quoting Ex. 2032, 97:3-11).

We agree with Synopsys that Dr. Hutchings's testimony should not be

excluded. Mentor Graphics's objections to Dr. Hutchings's testimony go to

the weight and sufficiency of his testimonial evidence, rather than its

admissibility. *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209,

1221 (Fed. Cir. 2006) (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK*

*Ltd.*, 326 F.3d 1333, 1344-45 (11th Cir. 2003)); *In re TMI Litig.*, 193 F.3d

613, 692 (3d Cir. 1999) ("So long as the expert's testimony rests upon 'good

grounds,' it should be tested by the adversary process—competing expert

testimony and active cross-examination." (quoting *Ruiz–Troche v. Pepsi*

*Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir.1998)));

Case IPR2012-00042
Patent 6,240,376 B1

*Wilmington v. J.I. Case Co.*, 793 F.2d 909, 920 (8th Cir.1986) ("Virtually all the inadequacies in the expert's testimony urged here by [the defendant] were brought out forcefully at trial . . . .  These matters go to the weight of the expert's testimony rather than to its admissibility.").  Mentor Graphics had the opportunity to address any alleged deficiencies in Dr. Hutchings's testimony in the Reply in support of the Motion to Amend.  *See* Reply Mot. to Amend 1, 3 (stating that Dr. Hutchings's testimony is "incompetent and entitled to no weight").

Nevertheless, we have reviewed the testimony in question and conclude that Dr. Hutchings has demonstrated appropriate credentials, adequate preparation, and sufficient understanding of the '376 patent.  *See, e.g.*, Ex. 1013 ¶¶ 4-11, 19-22.  Mentor Graphics does not point to any authority supporting its position.  Here, Dr. Hutchings presumed the Board would adopt certain constructions for the terms in the claims and stated his opinions based on those constructions.  This presumption was logical given that Dr. Hutchings opines only on proposed substitute claims that are contingent on a finding of anticipation.  Nothing about this presumption indicates a lack of understanding of the claims.

Mentor Graphics's Motion to Exclude Evidence is *denied*.

## G. Synopsys's Motion to Exclude Evidence

Synopsys filed a Motion to Exclude Evidence (Paper 44) seeking to exclude (1) all of Mentor Graphics's exhibits relating to assignor estoppel because they are not relevant; (2) all of Mentor Graphics's exhibits relating to the post-2006 relationship between EVE and Synopsys because they are not relevant; and (3) Exhibits 2030 and 2031 because they were not cited or explained in any paper, and Exhibit 2033 because it relates to conception

date of the '376 patent, which is not at issue in this proceeding.

We find it unnecessary to consider the specific objections to the admissibility of exhibits relating to assignor estoppel because Mentor Graphics has failed to demonstrate that assignor estoppel provides an exception to the statutory mandate, even assuming those exhibits to be admissible.

Similarly, we find it unnecessary to consider the specific objections to the admissibility of exhibits relating to the post-2006 relationship between EVE and Synopsys, because Mentor Graphics has failed to demonstrate that a real party-in-interest or privity relationship between EVE and Synopsis existed during the relevant time, even assuming those exhibits to be admissible.

Finally, we find it unnecessary to consider the objections to the admissibility of Exhibits 2030, 2031, and 2033. As pointed out by Synopsys, Exhibits 2030 and 2031 were not cited in any of the briefs. Mentor Graphics explains that the Exhibits are relevant to Dr. Hutchings's retraction of paragraph 33 of his deposition. Paper 47, 6. However, because Dr. Hutchings retracted paragraph 33, we did not rely on this portion of his testimony in making our decision. Thus, we also have not relied on Exhibits 2030 and 2031. We similarly have not relied on Exhibit 2033, a declaration submitted by Mentor Graphics to swear behind the Boubezari reference (*Id.* at 7) because we did not reach that issue in deciding this case.

The motion is dismissed as moot, because even considering the evidence that Synopsys seeks to exclude, we either have not reached the issue to which the evidence relates or we have decided the issue in Synopsys's favor.

Case IPR2012-00042
Patent 6,240,376 B1

III.  CONCLUSION

Synopsys has not shown by a preponderance of the evidence that claims 1-4, 6, 7, 11, 28, and 29 of the '376 patent are unpatentable under 35 U.S.C. § 102(e) over Gregory.

Synopsys has shown by a preponderance of the evidence that claims 5, 8, and 9 of the '376 patent are unpatentable under 35 U.S.C. § 102(e) over Gregory.

Mentor Graphics has not shown that its proposed substitute claims 34-36 and 38-43 are patentable over the prior art.

Accordingly, it is

ORDERED that claims 5, 8, and 9 of the '376 patent are CANCELLED;

FURTHER ORDERED that Mentor Graphics's Motion to Amend Claims is *denied*;

FURTHER ORDERED that Mentor Graphics's Motion to Exclude Evidence is *denied*;

FURTHER ORDERED that Synopsys's Motion to Exclude Evidence is *dismissed.*

Case IPR2012-00042
Patent 6,240,376 B1

PETITIONER:

William H. Wright
Travis Jensen
Orrick, Herrington & Sutcliffe, LLP
Email: wwright@orrick.com
Email: tjensen@orrick.com

PATENT OWNER:

Christopher L. McKee
Michael S. Cuviello
Banner & Witcoff, Ltd.
Email: mentoripr@bannerwitcoff.com

Mark Miller
O'Melveny & Myers LLP
Email: markmiller@omm.com

**U.S. Patent No. 6,240,376**

**Dated May 29, 2001**



US006240376B1

(12) **United States Patent**
Raynaud et al.

(10) **Patent No.:** **US 6,240,376 B1**
(45) **Date of Patent:** **May 29, 2001**

(54) **METHOD AND APPARATUS FOR GATE-LEVEL SIMULATION OF SYNTHESIZED REGISTER TRANSFER LEVEL DESIGNS WITH SOURCE-LEVEL DEBUGGING**

(75) Inventors: **Alain Raynaud**, Paris; **Luc M. Burgun**, Creteil, both of (FR)

(73) Assignee: **Mentor Graphics Corporation**, Wilsonville, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/127,584**

(22) Filed: **Jul. 31, 1998**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/122,493, filed on Jul. 24, 1998.

(51) **Int. Cl.**$^7$ ................................................. **G06F 17/50**
(52) **U.S. Cl.** .............................. **703/15**; 703/14; 714/741
(58) **Field of Search** ........................ 395/500.35, 500.36, 395/500.37; 714/724, 734; 703/14, 15, 16; 716/4, 724, 734, 741

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,220,512 | 6/1993 | Watkins et al. | 364/489 |
| 5,253,255 | * 10/1993 | Carbine | 714/734 |

(List continued on next page.)

OTHER PUBLICATIONS

Chen et al., "A Source–Level Dynamic Analysis Methodology and Tool for High–LevelSynthesis", Proceedings of the Tenth International Symposium on System Synthesis, 1997, pp. 134–140, Sep. 1997.*

(List continued on next page.)

Primary Examiner—Kevin J. Teska
Assistant Examiner—Douglas W. Sergent
(74) Attorney, Agent, or Firm—Columbia IP Law Group, LLC

(57) **ABSTRACT**

Methods of instrumenting synthesizable source code to enable debugging support akin to high-level language programming environments for gate-level simulation are provided. One method of facilitating gate level simulation includes generating cross-reference instrumentation data including instrumentation logic indicative of an execution status of at least one synthesizable register transfer level (RTL) source code statement. A gate-level netlist is synthesized from the source code. Evaluation of the instrumentation logic during simulation of the gate-level netlist facilitates simulation by indicating the execution status of a corresponding source code statement. One method results in a modified gatelevel netlist to generate instrumentation signals corresponding to synthesizable statements within the source code. This may be accomplished by modifying the source code or by generating the modified gate-level netlist as if the source code was modified during synthesis. Alternatively, cross-reference instrumentation data including instrumentation logic can be generated without modifying the gate-level design. The instrumentation logic indicates the execution status of a corresponding cross-referenced synthesizable statement. An execution count of a cross-referenced synthesizable statement can be incremented when the corresponding instrumentation signals indicates the statement is active to determine source code coverage. Source code statements can be highlighted when active for visually tracing execution paths. For breakpoint simulation, a breakpoint can be set at a selected source code statement. The corresponding instrumentation logic from the cross-reference instrumentation data is implemented as a simulation breakpoint. The simulation is halted at a simulation cycle where the values of the instrumentation signals indicate that the source code statement is active.

**33 Claims, 22 Drawing Sheets**



A95

SYNOPSYS 1001

US 6,240,376 B1

Page 2

## U.S. PATENT DOCUMENTS

| 5,325,309 | 6/1994 | Halaviati et al. | 364/488 |
| 5,423,023 | 6/1995 | Batch et al. | 395/500 |
| 5,461,576 | 10/1995 | Tsay et al. | 364/490 |
| 5,513,123 | * 4/1996 | Dey et al. | 716/4 |
| 5,519,627 | 5/1996 | Mahamood et al. | 364/488 |
| 5,541,849 | 7/1996 | Rostoker et al. | 364/489 |
| 5,544,067 | 8/1996 | Rostoker et al. | 364/489 |
| 5,553,002 | 9/1996 | Dangelo et al. | 364/489 |
| 5,555,201 | 9/1996 | Dangelo et al. | 364/489 |
| 5,568,396 | 10/1996 | Bamji et al. | 364/491 |
| 5,598,344 | 1/1997 | Dangelo et al. | 364/489 |
| 5,615,356 | 3/1997 | King et al. | 395/500 |
| 5,623,418 | 4/1997 | Rostoker et al. | 364/489 |
| 5,632,032 | * 5/1997 | Ault et al. | 709/100 |
| 5,727,187 | 3/1998 | Lemche et al. | 395/500 |
| 5,758,123 | 5/1998 | Sano et al. | 395/500 |
| 5,768,145 | 6/1998 | Roethig | 364/488 |
| 5,801,958 | 9/1998 | Dangelo et al. | 364/489 |
| 5,835,380 | 11/1998 | Roethig | 364/488 |
| 5,841,663 | 11/1998 | Sharma et al. | 364/490 |
| 5,870,308 | 2/1999 | Dangelo et al. | 364/489 |
| 5,870,585 | * 2/1999 | Stapleton | 703/15 |
| 5,880,971 | * 3/1999 | Dangelo et al. | 703/16 |
| 5,920,711 | 7/1999 | Seawright et al. | 395/500 |
| 5,937,190 | 8/1999 | Gregory et al. | 395/704 |
| 5,960,191 | 9/1999 | Sample et al. | 395/500.49 |
| 5,991,533 | 11/1999 | Sano et al. | 395/500.49 |
| 6,006,022 | 12/1999 | Rhim et al. | 395/500.02 |
| 6,009,256 | 12/1999 | Tseng et al. | 395/500.34 |

## OTHER PUBLICATIONS

Kucukcakar et al., "Matisse: An Architectural Design Tool for Commodity IC's", IEEE Design & Test of Computers, vol. 15, Issue 2, pp. 22–33, Jun. 1998.*

Koch et al. "Debugging of Beharioral VHDL Specifications by Source Level Emulation", Proceedings of the European Design Automation Conference, pp. 256–261, Sep. 1995.*

Fang et al., "A Real–Time RTL Engineering–Change Method Supporting On–Line Debugging for Logic–Emulation Applications", Proceedings of the 34th Design Automation Conference, pp. 101–106, Jun. 1997.*

Howe, H., "Pre– and Postsynthesis Mismatches", IEEE International Conf. on Verilog HDL 1997, pp. 24–31, Apr. 1997.*

Postula et al., "A Comparison of High Level Synthesis and Register Transfer Design Techniques for Custom Computing Machines", Proc. of the 31st Hawaii Inter. Conf. on System Sciences, vol. 7, pp. 207–214, Jan. 1998.*

Orailoglu, A., "Microarchitectural Sythesis for Rapid BIST Testing", IEEE Transactions on Computer–Aided Design of Integrated Circuits and Systems, vol. 16, Issue 6, pp. 573–586, Jun. 1997.*

* cited by examiner

SYNOPSYS 1001



# FIG. 1
# (Prior Art)

SYNOPSYS 1001



FIG. 2

SYNOPSYS 1001

**U.S. Patent**    May 29, 2001    Sheet 3 of 22    US 6,240,376 B1

# FIG. 3



INITIALIZATION

CREATE A UNIQUE LOCAL VARIABLE FOR EACH LIST OF SEQUENTIAL STATEMENTS ⟋310

INITIALIZE THE UNIQUE LOCAL VARIABLES ⟋320

FLOW INSTRUMENTATION

INSERT ONE UNIQUE LOCAL VARIABLE ASSIGNMENT STATEMENT INTO EACH LIST OF SEQUENTIAL STATEMENTS ⟋330

GATHERING

ASSIGN THE UNIQUE LOCAL VARIABLES TO GLOBAL SIGNALS ⟋340

SYNOPSYS 1001

**FIG. 4**

400

```
ENTITY ALOOP IS

PORT(
        A : IN BIT_ VECTOR ( 0 TO 1 ) ;
        RESET : IN BOOLEAN;
        STATUS : OUT BOOLEAN ) ;

END ENTITY ALOOP ;


ARCHITECTURE RTL OF ALOOP IS

BEGIN

PROCESS ( A, RESET )

VARIABLE ZEROS, ONES : INTEGER ;

        BEGIN
410 ──────▶ IF ( RESET )                          -- STATEMENT # 1
            THEN
420 ──────▶     STATUS <= 0 ;                      -- STATEMENT # 2
            ELSE
430 ──────▶     ZEROS := 0;                        -- STATEMENT # 3
440 ──────▶     ONES := 0;                         -- STATEMENT # 4
450 ──────▶     FOR I IN 0 TO 1 LOOP               -- STATEMENT # 5
460 ──────▶         IF A ( I ) = '0'               -- STATEMENT # 6
                    THEN
470 ──────▶             ZEROS := ZEROS + 1 ;  -- STATEMENT # 7
                    ELSE
480 ──────▶             ONES := ONES + 1 ;     -- STATEMENT # 8
                    END IF ;

                END LOOP ;

490 ──────▶     STATUS <= ( ZEROS > ONES ) ;      -- STATEMENT # 9
            END IF ;

END PROCESS ;
END ARCHITECTURE ;
```



**FIG. 5**

SYNOPSYS 1001

# FIG. 6A



600

```
ENTITY ALOOP IS
PORT(
A : IN BIT_VECTOR (0 TO 1) ;
RESET : IN BOOLEAN ;
STATUS : OUT BOOLEAN ;
SIG_ TRACE1, SIG_ TRACE2, SIG_ TRACE3, SIG_ TRACE4, SIG_TRACE5,   }～610
SIG_TRACE6 : OUT BIT
);
END ENTITY ALOOP ;

ARCHITECTURE RTL OF ALOOP IS
BEGIN
PROCESS (A, RESET)
VARIABLE TRACE1, TRACE2, TRACE3, TRACE4, TRACE5, TRACE6 : BIT ;   }～612
VARIABLE ZEROS, ONES : INTEGER ;

BEGIN
TRACE1 :='0' ; TRACE2 :='0' ;
TRACE3 :='0' ; TRACE4 :='0' ;   }～620
TRACE5 :='0' ; TRACE6 :='0' ;
```

# FIG. 6B

6A

**6B**

<u>600</u>

```
630 ──► TRACE1 := '1' ;                    -- INSTRUMENT STATEMENT #1
        IF (RESET)                          -- STATEMENT #1
        THEN
632 ──────► TRACE2 := '1' ;                 -- INSTRUMENT STATEMENT #2
            STATUS <= FALSE ;               -- STATEMENT #2
        ELSE
634 ──────► TRACE3 := '1' ;                 -- INSTRUMENT STATEMENT #3, #4, #5, #9
            ZEROS := 0 ;                    -- STATEMENT #3
            ONES := 0 ;                     -- STATEMENT #4
            FOR I IN 0 TO 1 LOOP            -- STATEMENT #5
636 ──────────► TRACE4 := '1' ;             -- INSTRUMENT STATEMENT #6
                IF A (I) ='0' ;             -- STATEMENT #6
                THEN
638 ────────────► TRACE5 := '1' ;           -- INSTRUMENT STATEMENT #7
                  ZEROS := ZEROS +1 ;       -- STATEMENT #7
                ELSE
640 ────────────► TRACE6 := '1' ;           -- INSTRUMENT STATEMENT #8
                  ONES := ONES +1;          -- STATEMENT  #8
                END IF;
              END LOOP;


642 ──────► STATUS <= (ZEROS > ONES) ;      -- STATEMENT #9


        END IF ;
        SIG_ TRACE1 <= TRACE1 ; SIG_ TRACE2 <= TRACE2 ;
        SIG_ TRACE3 <= TRACE3 ; SIG_ TRACE4 <= TRACE4 ;  ⎫
        SIG_ TRACE5 <= TRACE5 ; SIG_ TRACE6 <= TRACE6 ;  ⎬~ 650
        END PROCESS ;                                    ⎭

        END ARCHITECTURE ;
```

SYNOPSYS 1001

FIG. 7

SYNOPSYS 1001

# FIG. 8

<u>800</u>

```
MODULE SAMPLE (RESET, D, CLK, Q) ;

INPUT RESET ;
INPUT D ;
INPUT CLK ;
REG Q ;
OUTPUT Q ;


ALWAYS @ (CLK OR RESET OR D)
BEGIN
        IF (RESET==1)
              Q <= 0 ;
        ELSE
              IF (CLK==1)
                  Q <= D ;

END


ENDMODULE
```

# FIG. 9

900

```
MODULE SAMPLE
(RESET, D, CLK, Q, SIG_TRACE1, SIG_TRACE2, SIG_TRACE3, SIG_ TRACE4 ) ;

INPUT RESET ;
INPUT D ;
INPUT CLK ;
REG Q ;
OUTPUT Q ;

REG SIG_TRACE1, SIG_TRACE2, SIG_TRACE3, SIG_TRACE4 ;
OUTPUT SIG_TRACE1, SIG_TRACE2, SIG_TRACE3, SIG_TRACE4 ;

INTEGER TRACE1, TRACE2, TRACE3, TRACE4 ;

ALWAYS @ (CLK OR RESET OR D)
BEGIN
        TRACE1 = 0 ; TRACE2 = 0 ; TRACE3 = 0 ; TRACE4 = 0 ;

        TRACE1 = 1 ;
        IF (RESET==1)
        BEGIN
             TRACE2 = 1 ;
             Q <= 0 ;
        END
        ELSE
        BEGIN
             TRACE3 = 1 ;
             IF (CLK== 1)
             BEGIN
                   TRACE4 = 1 ;
                    Q <= D ;
             END
        END
SIG_TRACE1 = TRACE1 ;
SIG_TRACE2 = TRACE2 ;
SIG_TRACE3 = TRACE3 ;
SIG_TRACE4 = TRACE4 ;

END

ENDMODULE
```



FIG. 10

SYNOPSYS 1001

# FIG. 11

<u>1100</u>

```
PROCESS (CLK, D, RESET)
BEGIN

        IF (RESET = '1') THEN
                Q <= '0' ;

        ELSIF (CLK'EVENT AND CLK = '1') THEN
                Q <= D ;

        END IF;

END PROCESS
```

SYNOPSYS 1001

# FIG. 12



1210 — SAMPLE EVERY SIGNAL USED AS AN EVENT

1220 — GENERATE INSTRUMENTATION EVENT SIGNAL CORRESPONDING TO THE SAMPLED SIGNAL

1230 — DUPLICATE EACH PROCESS REFERENCING THE SAMPLED SIGNAL

1240 — REPLACE EACH STATEMENT LIST WITHIN THE DUPLICATED VERSION OF THE SOURCE CODE WITH A UNIQUE LOCAL VARIABLE ASSIGNMENT STATEMENT

1250 — REPLACE EACH OCCURRENCE OF THE SAMPLED SIGNALS IN THE DUPLICATED CODE WITH THE CORRESPONDING INSTRUMENTATION EVENT SIGNAL

1260 — SYNTHESIZE MODIFIED SOURCE CODE INTO GATE-LEVEL DESIGN

 SYNOPSYS 1001

# FIG. 13

1300

```
PROCESS (FAST_CLK)
BEGIN
      IF (FAST_CLK'EVENT AND FAST_CLK = '1')
      THEN
             SAMPLED_CLK <= CLK ;
      END IF
END PROCESS ;

CLK_EVENT <= SAMPLED_CLK / = CLK ;
CLK_STABLE <= SAMPLED_CLK = CLK ;
CLK_LASTVALUE <= SAMPLED_CLK ;
```
1310

```
PROCESS (CLK, D, RESET, CLK _ EVENT)
      VARIABLE TRACE1, TRACE2 : BIT ;
BEGIN
      TRACE1 := '0' ; TRACE2 := '0' ;
      IF (RESET = '1') THEN
           TRACE1 := '1' ;

      ELSIF (CLK_EVENT AND CLK = '1') THEN
           TRACE2 := '1' ;

      END IF;
SIG_TRACE1 <= TRACE1 ;  SIG_TRACE2 <= TRACE2 ;
END PROCESS ;
```
1320

```
PROCESS (CLK, D, RESET)
BEGIN
      IF (RESET = '1') THEN
           Q <= '0' ;
      ELSIF (CLK'EVENT AND CLK = '1') THEN
           Q <= D ;
      END IF ;
END PROCESS
```
1330

SYNOPSYS 1001



FIG. 14

SYNOPSYS 1001

# FIG. 15

1500

```
ALWAYS @ (POSEDGE CLK OR NEGEDGE RESET)
BEGIN
        IF (RESET == 0)
                Q <= 0 ;
        ELSE
                Q <= D ;
END
```

SYNOPSYS 1001

# FIG. 16

1600

```
ALWAYS @ (POSEDGE FAST_CLK)
BEGIN
      SAMPLED_CLK <= CLK
      SAMPLED_RESET <= RESET ;

END
ASSIGN CLK_EDGE = SAMPLED_CLK ^ CLK ;
ASSIGN RESET_ EDGE = SAMPLED_ RESET ^ RESET;

INTEGER TRACE1, TRACE2;
REG [1:0] SIG_ TRACE ;
ALWAYS @ (CLK_EDGE OR RESET_EDGE OR CLK OR RESET)
BEGIN

      TRACE1 = 0 ; TRACE2 = 0 ;
      IF ((CLK_EDGE == 1) && (CLK == 1)II(RESET_EDGE == 1) && (RESET == 0))
            IF (RESET == 0)
                        TRACE1 =1;
                ELSE
                        TRACE2 =1;
                SIG_TRACE[0] = TRACE1 ;
                SIG_TRACE[1] = TRACE2 ;

END
ALWAYS @ (POSEDGE CLK OR NEGEDGE RESET)
BEGIN


      IF (RESET == 0)
         Q <=0 ;
       ELSE
          Q <= D ;
END
```

A113
19                              SYNOPSYS 1001

# FIG. 17



SYNOPSYS 1001

# FIG. 18

P1: PROCESS (A,B,C)

```
PROCESS (FAST_CLK)
 BEGIN
        IF (FAST_ CLK'EVENT AND FAST_ CLK='1')
         THEN
                SAMPLED_A <=A ;
                SAMPLED_B <=B ;
                SAMPLED_C <=C ;
         END IF
         END PROCESS;
```

1810

```
P1_ ACTIVE <= (SAMPLED_A /= A)
      OR (SAMPLED_B /= B)
      OR (SAMPLED_C /= C);
```

1820



**FIG. 19**

```
CASE OPCODE IS
     WHEN "00" => TRACE1 := 1;
                  STATE := 1;
     WHEN "01" => TRACE2 := 1;
                  STATE:= 2 ;
     WHEN "10" => TRACE3 := 1;
                  STATE := 2 ;
     WHEN "11" => TRACE4 := 1;
                  STATE := 1 ;
END CASE ;
```
1910

**FIG. 20**

2010
SELECT INSTRUMENTATION SIGNAL

2020
CAN SELECTED INSTRUMENTATION SIGNAL BE SIMPLIFIED TO A LOGICAL "AND" BETWEEN ANOTHER SIGNAL AND A SIMPLIFIED EXPRESSION?

NO

2030
FINISHED WITH ALL INSTRUMENTATION SIGNALS?

NO

YES

YES

ELIMINATE THE "AND" GATE AND ADD THE EXTRACTED SIGNAL TO THE TRIGGER CONDITIONS — 2040

DONE — 2090

SYNOPSYS 1001

# FIG. 21



# FIG. 22



USER SETS BREAKPOINT AT SPECIFIED LINE NUMBER OF THE SOURCE CODE — 2210

IDENTIFY LIST ASSOCIATED WITH SPECIFIED LINE NUMBER — 2220

IDENTIFY INSTRUMENTATION OUTPUT SIGNAL CORRESPONDING TO STATEMENT LIST AS BREAKPOINT OUTPUT SIGNAL — 2230

HIGHLIGHT ACTIVE LISTS OF SOURCE CODE IN ACCORDANCE WITH STATUS OF ASSOCIATED INSTRUMENTATION OUTPUT SIGNALS DURING SIMULATION — 2240

HALT SIMULATION AT SIMULATION CYCLE THAT RESULTS IN 0 TO 1 TRANSITION FOR BREAKPOINT OUTPUT SIGNAL — 2250

SYNOPSYS 1001

US 6,240,376 B1

1

## METHOD AND APPARATUS FOR GATE-LEVEL SIMULATION OF SYNTHESIZED REGISTER TRANSFER LEVEL DESIGNS WITH SOURCE-LEVEL DEBUGGING

This is a continuation in part of application Ser. No. 09/122,493, filed Jul. 4, 1998.

### FIELD OF THE INVENTION

This invention relates to the fields of simulation and prototyping hen designing integrated circuits. In particular, this invention is drawn to debugging synthesizable code at the register transfer level during gate-level simulation.

### BACKGROUND OF THE INVENTION

Integrated circuit designers have adopted the use of high-level hardware description languages due in part to the size and complexity of modem integrated circuits. One such description language is Very High Speed Integrated Circuit (VHSIC) Description Language, or VHDL. Further information regarding VHDL may be found in the IEEE Standard VHDL Language Reference Manual (IEEE 1076–1987, IEEE 1076–1993). Another such description language is Verilog. These high level description languages are typically generically referred to as hardware description languages (HDLs).

Synthesis is the process of generating a gate-level netlist from the high level description languages. Presently, synthesis tools recognize a subset of the high-level description language source code referred to as Register Transfer Level (RTL) source code. Further information regarding RTL source code may be found in the IEEE 1076.6/D1.10 Draft Standard for VHDL Register Transfer Level Synthesis (1997).

The RTL source code can be synthesized into a gate-level netlist. The gate-level netlist can be verified using gate-level simulation. The gate-level simulation can be performed using a software gate-level simulator. alternatively, the gate-level simulation may be performed by converting the ate-level netlist into a format suitable for programming an emulator, a hardware accelerator, or a rapid-prototyping system so that the digital circuit description can take an actual operating hardware form.

Debugging environments for high-level hardware description languages frequently include a number of functionalities for analyzing and verifying the design when performing simulation. For example, a designer can typically navigate the design hierarchy, view the RTh source code, and set breakpoints on a statement of RTL source code to stop the simulation. Statements are usually identified by their line number in the RTL source code. In addition, the debugging environment often supports viewing and tracing variables and signal values. The RTL simulation environment typically offers such RTL debugging functionality.

RTL simulation is typically performed by using software RTL simulators which provide good flexibility. However, for complex designs, a very large number of test vectors may need to be applied in order to adequately verify the design. This can take a considerable amount of time using software RTL simulation as contrasted with hardware acceleration or emulation starting from a gate-level netlist representation (i.e., "gate-level hardware acceleration," or "gate level emulation"). Furthermore, it may be useful to perform in-situ verification, which consists of validating the design under test by connecting the emulator or hardware accelerator to the target system environment (where the design is to be inserted after the design is completed).

2

One disadvantage with gate-level simulation, however, is that most of the high-level information from the RTL source code is lost. Without the high-level information, many of the debugging functionalities are unavailable.

For example, the designer typically cannot set a breakpoint from the source code during gate-level simulation. Although signals can be analyzed during gate-level simulation, mapping signal values to particular source code lines can be difficult, if not impossible. If the source code is translated into a combinatorial logic netlist, for example, the designer cannot "step" through the source code to trace variable values. Instead, the designer is limited to analyzing the input vector and resulting output vector values. Although the signals at the inputs and outputs of the various gates may be traced or modified, these values are determined concurrently in a combinatorial network and thus such analysis is not readily mappable to the RTL source code.

A typical design flow will include creating a design at the RTL level, then synthesizing it into a gate-level netlist. Although simulation of this netlist can be performed at greater speeds using emulators or hardware accelerators, the ability to debug the design at the gate level is severely limited in comparison with software RTL simulation.

### SUMMARY OF THE INVENTION

Methods of instrumenting synthesizable register transfer level (RTL) source code to enable debugging support akin to high-level language programming environments for gate-level simulation are provided.

One method of facilitating gate-level simulation includes the step of generating cross-reference instrumentation data including instrumentation logic indicative of the execution status of at least one synthesizable statement within the RTL source code. A gate-level netlist is synthesized from the RTL source code. Evaluation of the instrumentation logic during simulation of the gate-level netlist enables RTL debugging by indicating the execution status of the cross-referenced synthesizable statement in the RTh source code.

In one embodiment, the gate-level netlist is modified to provide instrumentation signals implementing the instrumentation logic and corresponding to synthesizable statements within the RTL source code. In various embodiments, this may be accomplished by modifying the RTL source code or by generating the modified gate-level netlist during synthesis as if the source code had been modified.

Alternatively, the gate-level netlist is not modified but the instrumentation signals implementing the instrumentation logic are contained in a cross-reference instrumentation database. In either case, the instrumentation signals indicate the execution status of the corresponding cross-referenced synthesizable statement. The instrumentation signals can be used to facilitate source code analysis, breakpoint debugging, and visual tracing of the source code execution path during gate-level simulation.

For example, a breakpoint can be set at a selected statement of the source code. A simulation breakpoint is set so that the simulation is halted at a simulation cycle where the value of the instrumentation signals indicate that the statement has become active .

With respect to visually tracing the source code during execution, the instrumentation logic is evaluated during gate-level simulation to determine a list of at least one active statement. The active statement is displayed as a highlighted statement.

With respect to source code analysis, cross-reference instrumentation data including the instrumentation signals

SYNOPSYS 1001

US 6,240,376 B1

3

can be used to count the number of times a corresponding statement is executed in the source code. For example, an execution count of the cross-referenced synthesizable statement is incremented when evaluation of the corresponding instrumentation logic indicates that the cross-referenced synthesizable statement is active.

Other features and advantages of the present invention will be apparent from the accompanying drawings and from the detailed description that follows below.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention is illustrated by way of example and not limitation in the figures of the accompanying drawings, in which like references indicate similar elements and in which:

FIG. **1** illustrates the process of synthesizing RTL source code into a gate-level design.

FIG. **2** illustrates one embodiment of a modified process for generating a gate-level design.

FIG. **3** illustrates one embodiment of a method for instrumenting level-sensitive RTL source code.

FIG. **4** illustrates VHDL source code.

FIG. **5** illustrates the gate-level design synthesized from the RTL source code of FIG. **4**.

FIG. **6** illustrates the VHDL source code of FIG. **4** modified in accordance with the method of FIG. **3**.

FIG. **7** illustrates one embodiment of the gate-level logic synthesized from the modified VHDL source code.

FIG. **8** illustrates sample Verilog source code before instrumentation.

FIG. **9** illustrates the Verilog source of FIG. **8** instrumented in accordance with the method of FIG. **3**.

FIG. **10** illustrates the gate-level logic synthesized from the instrumented Verilog source code of FIG. **9**.

FIG. **11** illustrates VHDL source code for a D flip-flop with asynchronous reset.

FIG. **12** illustrates one method of instrumenting event-sensitive RTL source code.

FIG. **13** illustrates the source code of FIG. **11** modified in accordance with the instrumentation process of FIG. **12**.

FIG. **14** illustrates the gate-level logic synthesized for the instrumented source code of FIG. **13**.

FIG. **15** illustrates Verilog source code for a D flip-flop with asynchronous reset.

FIG. **16** illustrates the Verilog source code of FIG. **15** after instrumentation in accordance with the method of FIG. **12**.

FIG. **17** illustrates a method of instrumenting process activation.

FIG. **18** illustrates source code modified in accordance with the method of FIG. **17**.

FIG. **19** illustrates an instrumented "case" statement.

FIG. **20** illustrates a process for decreasing the logic needed to instrument the source code.

FIG. **21** illustrates incorporating instrumentation within the synthesis process.

FIG. **22** illustrates a method of setting a breakpoint in RTL source code for use during gate-level simulation.

## DETAILED DESCRIPTION

FIG. **1** illustrates a typical RTL source code synthesis process. HDL code including synthesizable RTL source code (**110**) serves as input to a synthesis process **120**. In one

4

embodiment, the RTL source code **110** is synthesized in step **140** to produce a gate-level design **150**. The gatelevel design can be used for gate-level simulation as illustrated in step **160**.

Typically the gate-level design comprises a hierarchical or flattened gate level netlist representing the circuit to be simulated. The various signals in a design are referred to as nets. A hierarchical netlist is made of a list of blocks, whereas a flattened netlist comprises only one block. A block contains components and a description of their interconnection using nets. Components can be reduced to combinatorial or sequential logic gates, or they may be hierarchical blocks of lower level.

For example, the component may be a primitive gate denoting a single combinatorial logic function (e.g., AND, NAND, NOR, OR, XOR, NXOR, etc.) or a single storage element such as a flip-flop or latch for sequential logic. One example of a set of primitive gates is found in the generic library GTECH available from Synopsys, Inc. of Mountain View, Calif.

Alternatively the component may be an application specific integrated circuit (ASIC) library cell which can be represented by a set of primitive gates. One example of an ASIC library is the LCA300K ASIC library developed by LSI Logic, Inc., Milpitas, Calif.

A component may also be a programmable primitive that represents a set of logic functions and storage. One example of a programmable primitive is the configurable logic block (CLB) as described in The Programmable Gate Array Handbook, Xilinx Inc., San Jose, 1993.

Another example of a component is a macro block denoting a complex logic function such as memories, counters, shifters, adders, multipliers, etc. Each of these can be further reduced to primitive gates forming combinatorial or sequential logic.

Three major categories of tools are available to the designer to simulate and test the design. Software RTL simulators (such as ModelSim™ from Model Technology, Inc.) typically offer a high-level of abstraction for their debugging environment, but have limited performance in terms of speed and no in-situ capacity. Software gate-level simulators (such as QuickSim™ from Mentor Graphics Corporation) typically offer limited level of abstraction and speed as well as no in-situ capacity. Hardware gatelevel simulators (such as Cobalt™ and System Realizer™ from Quickturn Inc., Avatar™ from Ikos, and fast-prototyping systems usually built from FPGAs) typically offer very good performance in terms of speed and in-situ capacity, but a limited debugging environment.

When testing the design described by the HDL source code a designer may choose to simulate and validate the design at the RTL source code level (i.e., RTL simulation). RTL simulation typically permits the designer to set breakpoints in the source code, navigate the design hierarchy, view variables and signals and trace the value of these variables and signals.

When testing complex designs, millions or billions of test vectors may need to be applied in order to adequately test the design. Hardware accelerators or emulators can be used with the gate-level design to test the design at a much greater speed than what is typically possible through software simulation (i.e. either software RTL simulation or software gate-level simulation). Unfortunately, the gate-level design generated in step 150 typically includes none of the high-level information available in the RTL source code **110**. As a result, features available during RTL simulation such as

**A120**

SYNOPSYS 1001

US 6,240,376 B1

5

setting breakpoints or analyzing the source code coverage are not available during gate-level simulation.

Instrumentation is the process of preserving high-level information through the synthesis process. Instrumentation permits simulation of a gatelevel netlist at the level of abstraction of RTL simulation by preserving some of the information available at the source code level through the synthesis process.

FIG. 2 illustrates one embodiment of the instrumentation process in which instrumentation is integrated with the synthesis process. RTL source code 210 is provided to the synthesis process 220. The synthesis process 120 of FIG. 1 has been modified to include an instrumentation step 234. After instrumentation the instrumented code is then synthesized in step 240 as the original RTL source code was in step 140 of FIG. 1.

In one embodiment, instrumentation results in generating a modified gate-level design to permit reconstitution of the flow of execution of the original RTL source code during gate-level simulation. Generally instrumentation logic is created for a synthesizable statement in the RTL source code either by modifying the RTL source code or by analyzing the RTL source code during the synthesis process. The instrumentation logic provides an output signal indicative of whether the corresponding synthesizable statement is active. A gate-level design including the instrumentation output signal is then synthesized. Referring to FIG. 2, the resulting gate-level design 250 contains additional logic to create the additional instrumentation output signals referenced in instrumentation data 238.

In an alternative embodiment, the RTL source code is analyzed to generate a cross-reference database as instrumentation data 238 without modifying the gate-level design. The cross-reference database indicates the combination of already existing signals in the form of instrumentation logic that can be evaluated during simulation to determine whether a particular line of the RTL source code is active. The cross-reference database contains a cross-reference between these instrumentation logic output signals and the position of the corresponding statement in the source code. The instrumentation data 238 is likely to contain considerably more complex logic to evaluate during simulation when the approach of not modifying the gate-level design (i.e., "pure" cross-reference database) is taken.

The two approaches have tradeoffs. The gate-level design modification technique does not require special knowledge of the target simulation environment. Moreover, the gate-level design modification technique significantly reduces or eliminates the complexity of the logic to be evaluated during simulation to the extent that emulator or accelerator hardware triggering circuitry can be used to take an action when the corresponding statement is executed.

For example, the hardware triggering circuitry may be used to halt the simulation at a particular statement or to count the number of times a particular statement is executed. The resulting gate-level design used during simulation, however, will not be the design actually used for production thus simulation may not verify accurately the behavior of the gate-level design used for production. Furthermore, simulation of modified gate-level design may require more physical resources in hardware than the original design alone if gates have been added in order to implement the instrumentation logic.

Alternatively, the pure cross-reference database technique typically results in greater complexity of instrumentation logic to evaluate during simulation, but does not otherwise affect the original gate-level design. The greater complexity, however, may prevent the use of the hardware triggering circuitry to halt the simulation or to track source code coverage. Thus the pure cross-reference database technique may result in a significantly slower simulation time. Furthermore, since the evaluation may be performed by software, direct verification of the gate-level design in the target system through in-situ verification may not be possible. The instrumentation data including the logic added for instrumentation purposes can be eliminated after testing, however, without disrupting the gate-level design.

In essence the gate-level design modification technique greatly simplifies the analysis and the instrumentation logic required for cross-referencing by modifying the gate-level design to create unique signals and therefore simpler logic to evaluate (i.e., a single signal). The resulting instrumentation logic cross-referenced in the instrumentation data 238 is easily evaluated during simulation. Various embodiments of instrumentation may combine the gate-level design modification technique or the pure cross-referencing technique in order to trade off simulation speed, density, and verification accuracy.

If the gate-level simulator, hardware accelerator, or emulator (e.g., through the use of a logic analyzer which can be external to the emulator) has the capacity to set breakpoints whenever certain signals reach a given value, then it is possible to implement breakpoints corresponding to RTL simulation breakpoints in the gate-level design. Whenever the user specifies a breakpoint in the RTL source code, the condition can be converted to a comparison with key signals in the gate-level design.

Instrumentation data 238 identifies the RTL source code statements each instrumentation output signal is associated with. Instrumentation data 238 is generated during the instrumentation process of step 234. In one embodiment, the instrumentation data is implemented as gates that can then be simulated by the target-level simulator. By examining the state of each instrumentation output signal during gate-level simulation, the user can determine which portions of RTL source code are being simulated. This in turn permits the designer to determine RTL source code coverage. By tracking the instrumentation signal values for each cycle of execution, the designer can determine how many times each line of the RTL source code has been activated.

The instrumentation data 238 can be used during simulation to ensure every possible state transition has been tested. For example, a Finite State Machine analyzer can determine from the values of the instrumentation output signals whether every possible state transition has been tested.

The instrumentation data 238 can also be used to enhance the source code display. In one embodiment, the source code is repositioned on the display so as to indicate the execution paths that are active during a current cycle. In another embodiment, the active source code in a given cycle is highlighted to indicate that it is active. This permits the designer to visually see the process flow without having to determine the value of each signal. In one embodiment, the instrumentation data 238 is used to enhance the display of the original RTL source code rather than the source code resulting from instrumentation.

An integrated circuit design is typically built by assembling hierarchical blocks. In VHDL, a block corresponds to an entity and architecture. In Verilog, a block corresponds to a module. In both HDLs, a block typically includes a declarative portion and a statement portion. The declarative portion generally includes the list of the ports or connectors.

SYNOPSYS 1001

US 6,240,376 B1

7

The statement portion describes the block's behavior and is typically where a designer needs help when debugging a design. The statement portion includes concurrent signal assignment statements and sequential statements.

Concurrent signal assignment statements assign a logic expression to a signal. The signal is typically available for viewing at all times and thus breakpoints can be set in accordance with when the signals reach a certain value.

Sequential statements assign values depending upon the execution flow of the sequence. Sequential statement analysis is typically where the designer needs the greatest aids in debugging the design.

Sequential statements are typically found in VHDL "processes" and in Verilog "always" blocks. Processes or always blocks can be built of an unlimited combination of sequential statements including loops, conditional statements, and alternatives. There are at least two classes of sequential statements: level-sensitive and event-sensitive. Level-sensitive sequential statements only depend on the value of the inputs and can be synthesized to logic networks of combinatorial gates and latches. Event-sensitive sequential statements additionally require sequential logic such as flip-flops.

In one embodiment, level-sensitive RTL source code is instrumented by creating and associating one output signal with each list of synthesizable sequential statements. A list can consist of one or more sequential statements.

In one embodiment, each statement is a list. In an alternative embodiment, each list corresponds to a branch of the RTL source code. A list corresponding to a branch typically comprises a plurality of adjacent sequential statements, but may comprise a single sequential statement. Only one output signal is needed for each list of synthesizable sequential statements in a branch rather than for every sequential statement in the source code. Examples of sequential statements that create branches in the RTL source code are conditional statements such as IF-THEN statements and SELECT-CASE statements.

FIG. 3 illustrates one method of modifying RTL source code for level-sensitive code. Generally, a unique local variable is created for each list of adjacent sequential statements in step 310. The level sensitive code instrumentation includes the step of modifying the RTL source code to initialize each of these unique variables to zero at the beginning of the process being instrumented in step 320. One unique variable assignment statement is inserted into each list of adjacent sequential statements corresponding to an executable branch in step 330. The assignment statement sets the unique variable to one. At the end of the process all the unique local variables are assigned to global signals in step 340. Steps 310 and 320 are more generically referred to as initialization. Step 330 is referred to as flow instrumentation. Step 340 is referred to as "gathering."

FIG. 4 illustrates non-instrumented VHDL source code. The VHDL source code 400 includes nine sequential statements within the process block. Eight of these nine statements are non-signal assignment sequential statements. These eight sequential statements form six statement lists or executable branches of the code. IF-THEN statement 410 comprises one list. Signal assignment statement 420 comprises a second list. Statements 430, 440, 450 and 490 comprise a third list because they would be executed sequentially within the same execution path. Statements 460, 470, and 480 form individual lists.

FIG. 5 illustrates one embodiment of the logic 500 resulting from the synthesis of the RTL source code of FIG.

8

4. This figure may be used for comparison with the gate level design generated from instrumented code described below.

FIG. 6 illustrates the source code of FIG. 4 after instrumentation as described in FIG. 3. The added statements are italicized for emphasis. For example, line 612 has been added to the source code to create six unique local variables (TRACE1 through TRACE6), one for each of the six identified lists, in accordance with step 310 of FIG. 3.

In accordance with step 330 of FIG. 3, a trace variable assignment statement has been added adjacent to each of the lists. Referring to FIGS. 4 and 6, variable assignment statement 630 has been added adjacent to the first list comprising statement 410. Variable assignment statement 632 has been added adjacent to the second list comprising statement 420. Variable assignment statement 634 has been added adjacent to the third list comprising statements 430, 440, 450 and 490. Variable assignment statement 636 has been added adjacent to the fourth list comprising statement 460. Similarly, variable assignment statements 638 and 640 have been added adjacent to the fifth list comprising statement 470 and the sixth list comprising 480, respectively. Each of variable assignment statements 630 through 640 assigns a unique local variable the value of one.

Code portion 620 is added to initialize the unique local variables to zero at the beginning of the process in accordance with step 320 of FIG. 3.

Each of the local variables is assigned to a global output signal in accordance with step 340 of FIG. 3 by code portion 650. If required by the HDL, the global signals are declared by code portion 610. Similarly, the trace variables are declared by code portion 612.

In one embodiment, the unique local variables can actually be a single array where each "unique variable" or trace variable corresponds to a different position in the array. Similarly, in one embodiment, the additional global signals are described by an array where each of the global signals is represented by a different index of the array.

Coding practices for VHDL generally require variables to be used within the process and a signal assignment at the end of the process to propagate the variable values at the end of the process. In one embodiment, markers such as variable assignment statements are used to track the execution paths. Markers such as variable assignment statements are not typically synthesized into logic indicating the variable values, thus the variable assignment statements are used in conjunction with signal assignment statements in order to produce signals indicating whether various portions of the synthesized code are being executed.

If permitted by the HDL, however, global signal assignments can be used in lieu of local variable assignment statements. This would simplify the process of FIG. 3 in that there would be no need to create or initialize local variables. In addition the step of assigning the local variables to global signals could be eliminated because values are assigned directly. The key is ensuring that there is a unique output signal created and associated with each list of sequential statements regardless of the coding practice used to achieve this goal.

FIG. 7 illustrates one embodiment of the logic 700 generated through instrumentation. In particular, FIG. 7 illustrates the additional gate-level logic added to generate signals SIG_TRACE1 through SIG_TRACE6 from synthesis of the modified source code.

FIG. 8 illustrates a Verilog "always" block 800. FIG. 9 illustrates the same code after instrumentation in accordance with the process of FIG. 3. Due to Verilog syntax

SYNOPSYS 1001

US 6,240,376 B1

9

requirements, "BEGIN-END" statements were used to properly group the instrumentation variable with the other statements in each executable path.

Although the code of FIG. 8 results in a latch, application of the technique of FIG. 3 to the source code of FIG. 8 ensures that the instrumentation output signals are the result of combinatorial logic only. Thus the logic for determining which lines of code are active can be purely combinatorial even when the RTL source code is synthesized into latches.

FIG. 10 illustrates one embodiment of gate-level logic 1100 generated by synthesis of the instrumented "always" block 900 of FIG. 9. The instrumentation signals SIG_ TRACE1, SIG_TRACE2, SIG_TRACE3, and SIG_ TRACE4 are the result of combinatorial logic only.

Referring to FIG. 2, the instrumentation data 238 can be stored in a cross-reference file. In one embodiment, the cross-reference file contains a mapping between original source code line numbers and instrumentation signals. Each time an instrumentation variable (and its associated signal) is added to the source code, all the line numbers of the statements in the list associated with the instrumentation variable are added to the file. This cross-reference file (i.e., instrumentation data 238) can be used by the gate-level simulation environment to convert the designer's breakpoints into actual conditions on instrumentation signals.

A more sophisticated method than that illustrated in FIG. 3 is required to instrument RTL source code having references to signal events. Typically such source code is used to describe edge-sensitive devices. References to signal events typically imply flip-flops. A signal event is a signal transition. Thus any signal computed from a signal transition references a signal event.

FIG. 11 illustrates sample VHDL code 1100 with references to a signal event. VHDL code 1100 implements a D-type flip-flop with asynchronous reset. The event in this example is a transition on the clock signal (CLK) as referenced by the term "CLK'EVENT."

In accordance with VHDL specifications signals can have various attributes associated with them. A function attribute executes a named function on the associated signal to return a value. For example, when the simulator executes a statement such as CLK'EVENT, a function call is performed to check this property of the signal CLK. In particular, CLK'EVENT returns a Boolean value signifying a change in value on the signal CLK. Other classes of attributes include value attributes and range attributes.

In VHDL code 1100, the signal CLK has a function attribute named "event" associated with it. The predicate CLK'EVENT is true if an event (i.e., signal transition) has occurred on the CLK signal. Assigning a value to a signal (i.e., a signal transaction) qualifies as an event only if the transaction results in a change in value or state for the signal. Thus the predicate CLK'EVENT is true whenever an event has occurred on the signal CLK in the most recent simulation cycle. The predicate "IF (CLK'EVENT and CLK='1')" is true on the rising edge of the signal CLK.

Depending upon the specifics of the HDL, another function such as RISING_EDGE(CLK) might be used to accomplish the same result without the use of attributes. The function RISING_EDGE(CLK) is still an event even though the term "event" does not appear in the function.

FIG. 12 illustrates a method of instrumenting source code having references to signal events. In step 1210, every signal event is sampled using a fast clock. In other words, every signal whose state transition serves as the basis for the determination of another signal is sampled. An instrumen-

10

tation signal event corresponding to the original signal event is generated in step 1220. Any attributes of the original signal must similarly be reproduced based on the instrumentation signal if the source code uses attributes of the original signal event.

In step 1230, every process that references a signal event is duplicated. In step 1240, each list of sequential statements within the duplicate version of the code is replaced by a unique local variable assignment statement. In step 1250, each time a signal event is referenced in the duplicated version of the code, it is replaced by the sampled signal event computed in step 1210. The modified RTL source code can then be synthesized in step 1260 to generate gate-level logic including the instrumentation output signals.

FIG. 13 illustrates application of the method of FIG. 12 to the source code of FIG. 11. In order to detect signal events properly for instrumentation, the signal events are sampled using a fast clock provided during gate-level simulation (i.e., FAST_CLK). FAST_CLK has a higher frequency than the CLK signal and thus permits detecting transition edges before signals depending upon CLK (including CLK itself) can.

The only signal event referenced in FIG. 11 is a transition in the signal CLK indicated by the term CLK'EVENT. Thus an instrumentation version of CLK'EVENT is created by sampling the signal CLK using FAST_CLK. The signal FAST_CLK has a higher frequency than the signal CLK.

Code portion 1310 samples the CLK signal on every rising edge of the signal FAST_CLK to generate a sampled version of the signal CLK named SAMPLED_CLK. The instrumentation version of CLK'EVENT is CLK_EVENT which is generated in code portion 1310 based on SAMPLED_CLK. The instrumentation signal CLX_ EVENT (corresponding to CLK'EVENT) is determined by comparison of signals SAMPLED_CLK and CLK. The signal CLK_EVENT is true only when the signal SAMPLED_CLK is not the same as CLK, thus indicating a transition has occurred in the signal CLK.

Although not required for this example, code portion 1310 also illustrates the generation of instrumentation clock signal attributes based on SAMPLED_CLK. For example, the signal CLK'STABLE is the complement of CLK'EVENT. Thus code portion 1310 indicates the instrumentation version of the attribute CLK'STABLE (i.e., CLK_STABLE) computed on the instrumentation clock signal (i.e., SAMPLED_CLK). The signal CLK'LASTVALUE is a function signal attribute that returns the previous value of the signal CLK. The instrumentation version (i.e., CLK_LASTVALUE) of the attribute CLK'LASTVALUE is similarly computed on the instrumentation clock signal SAMPLED_CLK.

Although CLK_LASTVALUE is the same as the sampled clock signal, SAMPLED_CLK, code 1310 introduces the intermediate signal SAMPLED_CLK for purposes of illustrating sampling of the CLK signal. The signal CLK_LASTVALUE can be defined in lieu of SAMPLED_ CLK in order to eliminate the introduction of an unnecessary intermediate signal SAMPLED_CLK and the subsequent step of assigning CLK_LASTVALUE the value of SAMPLED_CLK.

Neither CLK_LASTVALUE nor CLK_STABLE are needed in this example for code portion 1320, however, code portion 1310 serves as an example of how to generate instrumentation versions of signal attributes typically used to describe edge-sensitive devices.

Code portion 1320 represents the instrumented duplicate of original code portion 1330. The process of code portion

A123

SYNOPSYS 1001

US 6,240,376 B1

11

1330 references the event CLK'EVENT in the IF-ELSIF statement. In code portion 1320, all sequential statements (except the statement referencing an event) have been replaced with unique local variable assignment statements. These statements assign a local variable (i.e., TRACE1, TRACE2) the value "1." Code portion 1320 also includes statements to create and initialize these unique local variables.

In accordance with step 1240, every occurrence of a signal event is replaced with the sampled version of that event. Thus, for example, references to CLK'EVENT in code portion 1330 are replaced with references to CLK_EVENT in code portion 1320. Moreover, the process parameter list is modified to include the generated signal CLK_EVENT. FIG. 14 illustrates the gate-level logic 1400 resulting from synthesis of the code in FIG. 13.

FIG. 15 illustrates Verilog source code 1500 for a D flip-flop with asynchronous reset. FIG. 16 illustrates the code 1600 resulting from modifying source code 1500 in accordance with the method of FIG. 12.

One advantage of the instrumentation approach of FIG. 12 is that the gates generated by the synthesis tool are the same ones that would be generated if the source code had not been instrumented. The gates generated for the instrumentation logic are not intermingled with the gates generated from the non-instrumented source code. This permits design verification with gate-level logic that does not need to be re-verified after instrumentation verification. Thus the designer can verify the result of synthesis at the gate level while retaining RTL breakpoint feature. In some cases, however, the synthesis tool may not recognize that the same code appears twice. This may incur an additional relatively expensive phase of resource sharing in order to achieve the same performance results as the process illustrated in FIG. 3.

One advantage of the instrumentation process of FIG. 3 over that of FIG. 12, however, is that a synthesis tool can typically analyze the source code to detect obvious resource sharing.

The instrumentation methods of FIGS. 3 and 12 permit detecting any path that has been taken while a VHDL process or a Verilog "always" block is active. Tracking the activation of each process permits further analysis.

FIG. 17 illustrates a method of instrumenting the activation of the processes (or "always" blocks) themselves for subsequent determination of whether the process is active during gate-level simulation .

In step 1710, the sensitivity list of a process is identified. In step 1720, logic is generated to compare the signals in the sensitivity list between consecutive simulation cycles. Subsequently, during gate-level simulation in step 1730, a determination is made as to whether an event has occurred on any of the sensitivity list signals. Each simulation cycle that a signal indicates a difference (i.e., a signal event has occurred), the process is active as indicated by step 1740. Otherwise, if no events have occurred on any of the sensitivity list signals, the process is inactive as indicated by step 1750.

FIG. 18 illustrates the code added to determine if process P1 is active. The added code is italicized. The sensitivity list of process P1 includes signals a, b, and c. In accordance with step 1720 of FIG. 17, code section 1810 creates sampled versions of a, b, and c using FAST_CLK as described above. The sampled versions of a, b, and c are SAMPLED_A, SAMPLED_B, and SAMPLED_C, respectively.

Code section 1820 determines if an event has occurred on each of the sensitivity list signals. The test "(SAMPLED_A

12

/=A)" is true if an event occurs with respect to signal A. Similarly "(SAMPLED_B /=B)" and "(SAMPLED_C /=C)" indicate whether an event has occurred with respect to signals B and C. Process P1 is active if any one of these tests is true. Thus the variable P1_ACTIVE is generated by combining each of these signal events using the logical OR function in code section 1820. Thus signal P1_ACTIVE indicates whether process P1 is active.

Process instrumentation data can be added to the instrumentation data cross-reference file in order to enhance the source code display. For example, the active process in a given cycle can be highlighted to indicate it is active. This permits the designer to visually see the active processes without having to determine the value of each signal. In one embodiment, the instrumentation data is used to enhance the display of the original RTL source code rather than the source code resulting from instrumentation.

The instrumentation techniques presented result in gate level designs providing explicit instrumentation signals to indicate that some specific portion of the source code is active. The number of instrumentation signals tends to increase with the complexity of the system being modeled.

Some optimizations may be performed to decrease the number of instrumentation signals. At least one execution path will be active any time a process is activated. As a result, the TRACE1 variable in the examples of FIGS. 6 and 9 tend to provide no additional information and thus SIG_TRACE1 is somewhat trivial as can be seen from the synthesized logic of FIGS. 7 and 10. Thus at least one trace variable (and therefore one output signal trace) can typically be eliminated.

In some cases the execution status of each branch of the code can be determined even though every branch is not explicitly instrumented. To verify the execution status of every branch, the instrumentation process need only ensure that each branch is instrumented either explicitly or implicitly through the instrumentation of other branches.

In some instances, the capacity of hardware triggers can be used to eliminate some of the instrumentation by combining several signals into one condition. The number of gates simulated can be reduced by replacing logical AND conditions that appear in the equations of instrumentation signals by simulator-specific triggers.

For example, consider the instrumented CASE statement code fragment 1910 illustrated in FIG. 19. For purposes of example, only the four trace variable assignment statements are shown for the four possible cases. A synthesis tool will generate four comparisons with the vector "opcode." Each trace variable is associated with one of the possible values of opcode. Clearly, however, the additional logic is unnecessary because setting a breakpoint on any one of the case conditions corresponds to setting a trigger on the vector for the corresponding value of "opcode."

FIG. 20 illustrates a method for optimizing the instrumentation process. In particular, an instrumentation signal is selected in step 2010. In step 2020, a determination is made to whether the equation of the current signal can be expressed as a logical AND between a signal and a simplified expression. If so, then the AND gate should be eliminated in step 2030 and the extracted signal can be added to the trigger conditions during simulation in step 2040. If triggers can be activated on zeroes as well as ones, then step 2020 can also determine whether an equation can be simplified as a logical negation of a subexpression and the logical negation of the subexpression can be added to the trigger conditions during simulation in step 2040 where

A124

SYNOPSYS 1001

US 6,240,376 B1

13

appropriate. Step 2020 would then be applied recursively until the equation cannot be further simplified. This process is then applied to all of the instrumentation signals.

For example, signal TRACE4 is the result of performing a logical AND between opcode(0) and opcode(1). Thus TRACE4 is active only when opcode ="11". In accordance with FIG. 20, the AND gate can be removed and the simulator trigger conditions would be changed from TRACE4=1 to "OPCODE(0)=1 AND OPCODE(1)=1." This process would then be applied recursively to all signals remaining in the trigger condition. Thus if OPCODE(0) happened to be the result of an AND between two other signals, the AND gate could again be eliminated from the synthesized gate-level design and the trigger conditions could be updated accordingly as long as no other signals used "OPCODE(0)" as an input. If no other logic uses "OPCODE(0)" as an input, then the trigger conditions can be updated to refer to the signals used to generate OPCODE (0) and the gate-level netlist AND gate can safely be eliminated. More generally, any optimization that consists of eliminating gates and other elements by transferring the implementation of the instrumentation logic to the logic analyzer of the target simulator can be performed.

Where permitted by the gate-level simulator, the instrumentation required for detecting activation of a process may similarly be reduced. In particular, greater efficiency may be possible by keeping a list of all the signals in the process sensitivity list and then testing whether events occurred on the signals in the sensitivity list. Further optimization may be made possible by sharing the logic for signals that appear on the sensitivity list of more than one process. The original signal can be sampled once initially. A comparison is made between the initial value and the current value of the signal to generate an event signal indicative of whether an event has occurred on that signal. The event signal can then be used for instrumentation of processes with events and for tracking process activation.

FIGS. 3, 12, and 17 illustrate methods of modifying the original RTL source code for instrumenting processes and level-sensitive and edge-sensitive source code. Trace variables (i.e., instrumentation variables) can be used to track the execution of any path within the source code. Additional output signals are generated from instrumentation variables in order to detect the execution paths of the source code. In the illustrated embodiments, the instrumentation variables are reset at the beginning of a process and the signals are assigned at the end of the process in order to ensure that all the signals are assigned regardless of which execution path is taken inside the process.

In an alternative embodiment, the signals might be directly assigned in the execution path of the process. Typically, this alternative embodiment would force the synthesis tool to generate complicated structures including latches due to the nature of HDLs and simulation rules.

The methods of FIGS. 3,12, and 17 can be applied to the source code before the source code is synthesized. Thus in one embodiment the steps that modify the RTL source code can be performed before but entirely independently of the synthesis process itself.

FIG. 21 illustrates an embodiment in which the instrumentation data is generated entirely within the synthesis process. The process of creating output signals associated with synthesizable statements in the source code and then synthesizing the source code into a gate-level design including the output signal can be incorporated into the synthesis tool itself so that modification of the RTL source code is not required.

14

For example, one of the steps performed by a synthesis tool for generation of the gate-level design is parsing the RTL source code. Parsing the RTL source code results in a parser data structure that is subsequently used to generate the gate-level design. Instead of modifying the source code, the synthesis tool can simply set markers inside the parser data structure.

FIG. 22 illustrates one application of using the instrumentation signals for tracing execution flow using breakpoints. In step 2210, the user sets a breakpoint at a specified line number of the source code. The specified line number is then associated with one of the instrumented lists of statements in step 2220. In step 2230, the instrumentation signal for the associated list is identified as the breakpoint output signal.

During the gate-level simulation run, the active lists (identified by transitions in their corresponding instrumentation signals) may be highlighted and displayed for the user as indicated in step 2240. For example, the active lists may be portrayed in a different color than the inactive lists. Alternatively, the active lists may be displayed using blinking characters, for example. The instrumentation data file can be used to associate an instrumentation signal with a list of source code line numbers to be highlighted.

In response to a 0 to 1 transition in the breakpoint output signal, the simulation can be stopped as indicated in step 2250. Thus through instrumentation the designer has the ability to effectively set breakpoints in the RTL source code which can be acted upon during RTL simulation.

The methods of instrumentation may be implemented by a processor responding to a series of instructions. In various embodiments, these instructions may be stored in a computer system's memory such as random access memory or read only memory.

The instructions may be distributed on a nonvolatile storage medium for subsequent access and execution by the processor. Typically the instructions are stored in the storage medium for distribution to a user. The instructions may exist in an application program form or as a file stored in the storage medium. The instructions are transferred from the nonvolatile storage medium to a computer system for execution by the processor.

In one embodiment, the program or file is installed from the storage medium to the computer system such that the copy of the instructions in the nonvolatile storage medium is not necessary for performing instrumentation. In another embodiment, the program or file is configured such that the original nonvolatile storage medium is required whenever the instructions are executed.

Nonvolatile storage mediums based on magnetic, optical, or semiconductor memory storage principles are readily available. Nonvolatile magnetic storage mediums include floppy disks and magnetic tape, for example. Nonvolatile optical storage mediums include compact discs, digital video disks, etc. Semiconductor-based nonvolatile memories include rewritable flash memory.

Instrumentation allows the designer to perform gate-level simulation of synthesized RTL designs with source-level debugging. In addition, the instrumentation process allows the designer to examine source code coverage during simulation.

In the preceding detailed description, the invention is described with reference to specific exemplary embodiments thereof. Various modifications and changes may be made thereto without departing from the broader spirit and scope of the invention as set forth in the claims. The specification and drawings are, accordingly, to be regarded in an illustrative rather than a restrictive sense.

A125

SYNOPSYS 1001

US 6,240,376 B1

15

What is claimed is:

1. A method comprising the steps of:

a) identifying at least one statement within a register transfer level (RTL) synthesizable source code; and

b) synthesizing the source code into a gate-level netlist including at least one instrumentation signal, wherein the instrumentation signal is indicative of an execution status of the at least one statement.

2. The method of claim 1 wherein step b) includes the step of:

i) generating instrumentation logic to provide the instrumentation signal as if the source code included a corresponding signal assignment statement within a same executable branch of the source code as the identified statement.

3. The method of claim 1 wherein step b) includes the steps of:

i) initializing a marker to a first value at the beginning of a process within the source code; and

ii) setting the marker to a second value within a same executable branch of the source code as the identified statement.

4. The method of claim 3 further comprising the step of:

iii) assigning the value of the marker to the instrumentation signal at the end of the process.

5. A method of generating a gate level design, comprising the steps of:

a) creating an instrumentation signal associated with at least one synthesizable statement contained in a register transfer level (RTL) synthesizable source code; and

b) synthesizing the source code into a gate-level design having the instrumentation signal.

6. The method of claim 5 wherein step a) further comprises the step of:

i) inserting a unique variable assignment statement into the source code, wherein the variable assignment statement is adjacent to at least one associated sequential statement; and

ii) inserting a unique output signal assignment statement into the source code, wherein the unique output signal is assigned a value associated with the unique variable.

7. The method of claim 6 wherein the variable is assigned a first value in step a)i), the method further comprising the step of:

iii) modifying the source code to initialize the unique variable to a second value.

8. The method of claim 5 wherein step a) is repeated to create a unique instrumented output signal for each list of sequential statements in the source code, wherein each list corresponds to a synthesizable executable branch of the source code.

9. The method of claim 5 further comprising the step of:

c) generating cross-reference instrumentation data mapping each statement in a selected list to the instrumented output signal associated with that list for every list in the source code.

10. The method of claim 9 further comprising the steps of:

d) simulating the gate level design using at least one of the instrumentation signals to establish a simulation breakpoint.

11. The method of claim 5 further comprising the steps of:

c) displaying the source code, wherein at least one statement within a selected list is highlighted if the instrumentation signal corresponding to the selected list changes to a pre-determined value.

16

12. A method of generating a gate-level netlist, comprising the steps of:

a) receiving register transfer level (RTL) synthesizable source code including synthesizable statements;

b) inserting a unique local variable assignment statement into the source code for each branch of code having a list of at least one sequential statement, wherein the unique local variable assignment statement is adjacent to at least one statement within the list;

c) inserting a corresponding instrumentation signal assignment statement into the source code for each of the inserted local variables, wherein the instrumentation signal is assigned a value of the corresponding unique local variable; and

d) synthesizing the source code into a gate-level design including the instrumentation signals.

13. The method of claim 12 wherein step b) further comprises the steps of:

i) assigning each unique local variable a first value; and

ii) initializing each local variable with second value.

14. The method of claim 12 further comprising the step of:

e) mapping every statement within a selected list to the corresponding instrumentation signal for that selected list as cross-reference instrumentation data.

15. The method of claim 12 further comprising the steps of:

e) setting a breakpoint at a selected statement of the source code;

f) identifying the instrumentation signal corresponding to the list associated with the selected statement as a breakpoint signal; and

g) simulating the gate-level design, wherein simulation is halted at a simulation cycle that results in the breakpoint signal transitioning to a pre-determined value.

16. A method of generating a gate-level netlist, comprising the steps of:

a) receiving register transfer level (RTL) synthesizable source code including synthesizable statements;

b) modifying the source code to generate a corresponding sampled version of each signal event in a selected process;

c) modifying the source code to duplicate the selected process;

d) replacing each occurrence of a selected signal event with the corresponding sampled version in the duplicated process;

e) replacing each list of sequential statements within an executable branch of the duplicated process with a unique variable assignment statement;

f) modifying the duplicated process to include an instrumentation signal assignment for each unique variable; and

g) synthesizing the modified source code into a gate-level design.

17. The method of claim 16 wherein step e) further comprises the steps of:

i) assigning the unique variables a first value; and

ii) initializing the unique variables with second value.

18. The method of claim 16 further comprising the step of:

e) mapping every statement within each selected list to its corresponding instrumentation signal.

19. The method of claim 16 further comprising the steps of:

A126
SYNOPSYS 1001

US 6,240,376 B1

17

h) setting a breakpoint at a selected statement of the source code;

i) identifying the instrumentation signal corresponding to the list associated with the selected statement as a breakpoint signal; and

j) simulating the gate-level design, wherein simulation is halted at a simulation cycle that results in a transition of the breakpoint signal to a predetermined value.

20. A method of debugging a gate-level design including the steps of:

a) setting a breakpoint at a selected statement of a register transfer level (RTL) synthesizable source code;

b) inserting a local variable assignment statement adjacent to at least one statement in a list of sequential statements, wherein the list corresponds to an executable branch of the source code including the selected statement;

c) modifying the source code to include an instrumentation signal assignment statement for the local variable; and

d) generating a gate-level design from the modified source code.

21. The method of claim 20 further comprising the steps of:

e) simulating the gate-level design, wherein simulation is halted at a simulation cycle that results in a transition of the instrumentation signal to a pre-determined value.

22. The method of claim 20 wherein step b) further comprises the steps of:

i) assigning the local variable a first value; and

ii) initializing the local variable with second value.

23. The method of claim 20 further comprising the step of

e) mapping every statement within the executable branch of source code to the instrumentation signal.

24. A method of simulating a gate-level design comprising the steps of:

a) identifying a sensitivity list of a process;

b) generating logic to identify signal events for any signal in the sensitivity list; and

c) identifying the process as active during simulation when a signal event occurs for any signal in the sensitivity list.

25. The method of claim 24 wherein step c) further comprises the step of:

i) highlighting a source code description of the process displayed during simulation.

26. The method of claim 24 wherein step b) further comprises the step of:

i) sampling each signal in the sensitivity list to generate corresponding instrumented signals; and

ii) comparing each signal in the sensitivity list with its corresponding instrumented signal to test each signal in the sensitivity list for an event.

27. The method of claim 26 wherein step c) further comprises the step of:

i) generating an active process output signal defined by logically ORing the results of the comparisons.

28. A storage medium having stored therein processor executable instructions for generating a gate-level design

18

from a register transfer level (RTL) synthesizable source code, wherein when executed the instructions enable the processor to synthesize the source code into a gate-level netlist including at least one instrumentation signal, wherein the instrumentation signal is indicative of an execution status of at least one synthesizable statement of the source code.

29. The storage medium of claim 28 wherein the processor performs the steps of:

i) inserting a unique variable assignment statement into the source code, wherein the variable assignment statement is adjacent to at least one associated sequential statement; and

ii) inserting a unique output signal assignment statement into the source code, wherein the unique output signal is assigned a value associated with the unique variable.

30. A storage medium having stored therein processor executable instructions for generating a gate-level design from a register transfer level (RTL) synthesizable source code, wherein when executed the instructions enable the processor to perform the steps of:

a) inserting a unique local variable assignment statement into the source code for each branch of code having a list of at least one sequential statement, wherein the unique local variable assignment statement is adjacent to at least one statement within the list;

b) inserting a corresponding instrumentation signal assignment statement into the source code for each of the inserted local variables, wherein the instrumentation signal is assigned a value of the corresponding unique local variable; and

c) synthesizing the source code into a gate-level design including the instrumentation signals.

31. The storage medium of claim 30 having stored therein further instructions to enable the processor to perform the step of:

d) mapping every statement within each selected list to its corresponding instrumentation signal.

32. A storage medium having stored therein processor executable instructions for debugging a gate-level design during simulation, wherein when a breakpoint is set at a selected statement of a register transfer level (RTL) synthesizable source code the instructions enable the processor to perform the steps of:

a) inserting a local variable assignment statement adjacent to at least one statement in a list of sequential statements within the source code, wherein the list corresponds to an executable branch of the source code including the selected statement;

b) modifying the source code to include an instrumentation output signal assignment statement for the local variable; and

c) generating a gate-level design from the modified source code.

33. The storage medium of claim 32 having stored therein further instructions to enable the processor to perform the step of:

d) mapping every statement within each selected list to its corresponding instrumentation signal.

*  *  *  *  *

A127

          SYNOPSYS 1001

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.     : 6,240,376 B1                                    Page 1 of 1
DATED          : May 29, 2001
INVENTOR(S)  : Alain Raynaud and Luc M. Burgun

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 1,
Line 11, "hen" should read -- when --.
Line 17, "modem" should read -- modern --.
Line 37, "simulator. alternatively," should read -- simulator. Alternatively, --.
Line 38, "converting the ate-" should read -- converting the gate- --.
Line 47, "RTh" should read -- RTL --.

Column 2,
Line 39, "RTh" should read -- RTL --.

Column 10,
Line 33, "signal CLX_" should read -- signal CLK_ --.

Signed and Sealed this

Sixteenth Day of July, 2002

Attest:

JAMES E. ROGAN
Attesting Officer        Director of the United States Patent and Trademark Office

**U.S. Patent No. 6,132,109**

**Dated October 17, 2000**



US006132109A

# United States Patent [19]

## Gregory et al.

[11] **Patent Number:** 6,132,109

[45] **Date of Patent:** *Oct. 17, 2000

[54] **ARCHITECTURE AND METHODS FOR A HARDWARE DESCRIPTION LANGUAGE SOURCE LEVEL DEBUGGING SYSTEM**

[75] Inventors: **Brent Gregory**; **Trinanjan Chatterjee**; **Jing C. Lin**; **Srinivas Raghvendra**, all of Sunnyvale; **Emil Girczyc**, Los Altos; **Paul Estrada**, Mountain View; **Andrew Seawright**, Cupertino, all of Calif.

[73] Assignee: **Synopsys, Inc.**, Mountain View, Calif.

[ * ] Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

[21] Appl. No.: **08/253,470**

[22] Filed: **Jun. 3, 1994**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/226,147, Apr. 12, 1994, abandoned.

[51] Int. Cl.$^7$ ............................. **G06F 9/445**; G06F 9/45; G06F 15/00

[52] U.S. Cl. ............................................. **395/704**; 364/489

[58] Field of Search ................................... 395/700, 701, 395/704, 705; 364/578, 488, 489, 490, 491

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,546,435 | 10/1985 | Herbert et al. | 364/300 |
| 4,667,290 | 5/1987 | Goss et al. | 395/707 |
| 4,703,435 | 10/1987 | Darringer et al. | 364/489 |
| 4,827,427 | 5/1989 | Hyduke | 364/489 |
| 4,852,173 | 7/1989 | Bahl et al. | 381/43 |
| 4,866,663 | 9/1989 | Griffin | 395/500 |
| 4,868,770 | 9/1989 | Smith et al. | 364/578 |
| 4,882,690 | 11/1989 | Shinsha et al. | 364/490 |

(List continued on next page.)

### OTHER PUBLICATIONS

Weiss, Ray, "ASIC's forcing logic synthesis' hand," Electronic Engineering Times, n516, T16 (pp. 1–2), Dec. 12, 1988.

Weiss, Ray, "Designers moving toward high–level logic representation via logic synthesis—Logic synthesis edging up design hierarchy," Electronic Engineering Times, n526, 81, (pp. 1–10), Feb. 6, 1989.

Weiss, Ray, "Synopsys fine–tunes logic synthesis," Electronic Engineering Times, n534, 138 (pp. 1–3), Apr. 17, 1989.

Brian Ebert et al., "SeeSaw: A Verilog Synthesis Viewer," 2nd Annual International Verilog HDL Conference, Design Excellence for Today and Tomorrow; Santa Clara, CA, Mar. 22–24, 1993, pp. 55–60.

Lis et al., "VHDL Synthesis Using Structured Modeling," 26th ACM/IEEE Design Automation Conference, Jun. 25, 1989, pp. 606–609.

Sougata Mukherjea, et al., "Applying Algorithm Animation Techniques for Program Tracing, Debugging, and Understanding," Proceedings 15th International Conference on Software Engineering, May 17, 1993, Baltimore, MD, pp. 456–465.

Design Analyzer Reference (per paper #9), "Text Viewer," v.3.1, pp. 1–15, Mar. 1994.

(List continued on next page.)

*Primary Examiner*—Tariq R. Hafiz
*Assistant Examiner*—Michael Pender
*Attorney, Agent, or Firm*—Brown Raysman Millstein Felder & Steiner LLP; Jonathan T. Kaplan

[57] **ABSTRACT**

This invention provides a method for displaying circuit analysis results corresponding to parts of the circuit near the portion of the hardware description language (HDL) specification that generated that part of the circuit. The invention also includes a method for using probe statements in the HDL specification to mark additional points in the initial circuit that should not be eliminated during optimization. This improves the ability to display circuit analysis results near the appropriate part of the HDL specification.

**2 Claims, 33 Drawing Sheets**



A1103

SYNOPSYS 1007

6,132,109
Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,907,180 | 3/1990 | Smith | 364/578 |
| 4,942,536 | 7/1990 | Watanabe et al. | 364/490 |
| 4,942,615 | 7/1990 | Hirose | 364/578 |
| 4,967,386 | 10/1990 | Maeda et al. | 364/578 |
| 4,970,664 | 11/1990 | Kaiser et al. | 364/521 |
| 5,111,413 | 5/1992 | Lazensky et al. | 364/578 |
| 5,146,583 | 9/1992 | Matsunaka et al. | 395/500 |
| 5,191,541 | 3/1993 | Landman et al. | 364/489 |
| 5,191,646 | 3/1993 | Naito et al. | 395/161 |
| 5,265,254 | 11/1993 | Blasciak et al. | 395/700 |
| 5,282,146 | 1/1994 | Aihara et al. | 364/489 |
| 5,282,148 | 1/1994 | Poirot et al. | 364/491 |
| 5,329,471 | 7/1994 | Swoboda et al. | 364/578 |
| 5,335,191 | 8/1994 | Kundert et al. | 364/578 |
| 5,377,997 | 1/1995 | Wilden et al. | 273/434 |
| 5,437,037 | 7/1995 | Furuichi | 395/700 |
| 5,446,900 | 8/1995 | Kimelman | 395/700 |
| 5,452,239 | 9/1995 | Dai et al. | 364/578 |
| 5,493,507 | 2/1996 | Shinde et al. | 395/500.35 |
| 5,530,841 | 6/1996 | Gregory et al. | 395/500 |
| 5,541,849 | 7/1996 | Rostoker et al. | 364/489 |
| 5,544,066 | 8/1996 | Rostoker et al. | 364/489 |
| 5,544,067 | 8/1996 | Rostoker et al. | 364/489 |
| 5,544,068 | 8/1996 | Takimoto et al. | 364/489 |
| 5,553,002 | 9/1996 | Dangelo et al. | 364/489 |
| 5,555,201 | 9/1996 | Dangelo et al. | 364/489 |
| 5,557,531 | 9/1996 | Rostoker et al. | 364/489 |
| 5,581,738 | 12/1996 | Dambrowski | 395/500.17 |

OTHER PUBLICATIONS

D. E. Thomas et al., "Algorithmic and Register–Transfer Level Synthesis: The System Architect's Workbench," pp. 257–274, publication date unknown.

Pure Software Inc., Pure Coverage Data Sheet (Web Page), copyright 1996.

Pure Software Inc., Quantify Data Sheet (Web Page), copyright 1996.

Pure Software Inc., Purify, Finding Run–Time Memory Errors (Web Page), coyright 1996.

Reed Hastings et al., Pure Software, Inc., Purify, Usenix White Paper on Purify (Web Page), copyright 1996.

Printout of Web Page for Centerline, Code Center, Release 4, Nov. 1994.

HDC Computer Corporation, FirstApps User's Guide, pp. 112–116, copyright 1992.

Louis Trevillyan, "An Overview of Logic Synthesis Systems," 1987, pp. 166–172.

Timothy Kam, "Comparing Layouts with HDL Models: A Formal Verification Technique," 1992, pp. 588–591.

"A Programming the User Interface", Manual of Symbolics, Inc., 4 New England Tech Center, 555 Virginia Road, Concord, MA 01742, title page, pp. iii–v and pp. 1–134, Sep. 1986.

SYNOPSYS 1007



**Figure 1**



900 (HDL Source Code)

901 (Parse Tree)

902 (Initial Circuit)

903 (Final Circuit)

904 (Analysis Report)

**Figure 2**

**U.S. Patent**    Oct. 17, 2000    Sheet 3 of 33    6,132,109



**Figure 3**

A1107

    SYNOPSYS 1007

400

300



```
if (C and B) then
        Z <= not(A or B);
else
        Z <= not B;
end if;
```

**Figure 4**



**Figure 5**

SYNOPSYS 1007



**Figure 6**



# Figure 7

SYNOPSYS 1007



```
if (C and B) then
        Z <= not(A or B);    --Synopsys probe_statement
else
        Z <= not B;
end if;
```

**Figure 8**



**Figure 9**



**Figure 10**

SYNOPSYS 1007



```
if (C and B) then
        Z <= not(A or B);    --Synopsys probe_statement
else
        Z <= not B;
end if;
```

1.0ns

400  301  500

**Figure 11**

SYNOPSYS 1007



401

300

```
entity interrupt_controller is
  port(new_request  : in bit_vetcor(3'downto 1);
      current _level: in bit_vector( 1 downto 0);

       should_service: out bit);
end;

architecture synthesizable of interrupt_controller is

  signal new_level: bit_vector(1 downto 0);

begin

  decode: process(new_request)
  begin
    if(new_request(3) = '1') then
      new_level <= '11";
    elsif(new_request(2) = '1') then
      new_level <= '10";
    elsif(new_request(1) = '1') then
      new_level <= "01";
    else
      new_level <= "00";
    end if;
  end process;

  compare:process(current_level, new_level)
  begin

    if(new_level(1) >current_level(1)) then
      should_service <= '1' ;
    elsif(new_level(1) <current_level(1)) then
      should_service <= '0' ;
    elsif(new_level(0) >current_level(0)) then
      should_service <= '1' ;
    else
      should_service <=" 0";
    end if;

  end process;
end;
```

**Figure 12**



Figure 13

| design : | interrupt_controller | designer : | | date : | 4/5/94 |
| technology : | lsi_10k | company : | | sheet : | 1 of 1 |

SYNOPSYS 1007

**Figure 14**

| design : | interrupt_controller | designer : | | date : | 4/5/94 |
| technology : | lsi_10k | company : | | sheet : | 1 of 1 |

SYNOPSYS 1007

| | TIME | AREA |
|---|---|---|
| ```
entity interrupt_controller is
  port(new_request  : in bit_vetcor(3 downto 1);
    current _level: in bit_vector( 1 downto 0);

    should_service: out bit);
end;
``` | | |
| ```
architecture synthesizable of interrupt_controller is

  signal new_level: bit_vector(1 downto 0):

begin
``` | 21 ns | 9 gates |
| ```
  decode: process(new_request)
  begin
   if(new_request(3) = '1') then
     new_level <=  "11";
   elsif(new_request(2) = '1') then
     new_level <= "10";
   elsif(new_request(1) = "1") then
     new_level <= "01";
   else
     new_level <= "00";
   end if;
  end process;
``` | ? | ? |
| ```
  compare:process(current_level, new_level)
  begin

   if(new_level(1) >current_level(1)) then
     should_service <= '1';
   elsif(new_level(1) <current_level(1)) then
     should_service <= '0';
   elsif(new_level(0) >current_level(0)) then
     should_service <= '1';
   else
     should_service <= '0';
   end if;

  end process;
end;
``` | ? | ? |

## Figure 15

A1119

17                                        SYNOPSYS 1007

```
entity interrupt_controller is
 port(new_request  : in bit_vector(3 downto 1);
    current_level: in bit_vector(1 downto 0);

    should_service: out bit);
end;

architecture synthesizable of interrupt_controller is

 signal new_level: bit_vector(1 downto 0);

begin
 --Synopsys block_probe_begin
 decode: process(new_request)
 begin
  if(new_request(3) = '1') then
    new_level <= "11";
  elsif(new_request(2) = '1') then
    new_level <= "10";
  elsif(new_request(1) = '1') then
    new_level <= "01";
  else
    new_level <= "00";
  end if;
 end process:
 --Synopsys block_probe_end

 compare: process(current_level,new_level)
 begin

  if(new_level(1) > current_level(1)) then
    should_service <= '1';
  elsif(new_level(1) < current_level(1)) then
    should_service <= '0';
  elsif(new_level(0) > current_level(0)) then
    should_service <= '1';
  else
    should_service <= '0';
  end if;
 end process;
end;
```

**Figure 16**

A1120

18                              SYNOPSYS 1007



Figure 17

| design : | interrupt_controller | designer : | | date : | 4/5/94 |
| technology : | gtech | company : | | sheet : | 1 of 1 |



Figure 18

| design : | interrupt_controller | designer : | | date : | 4/5/94 |
| technology : | lsi_10k | company : | | sheet : | 1 of 1 |

| | TIME | AREA |
|---|---|---|
| entity interrupt_controller is<br>  port(new_request  : in bit_vector(3 downto 1);<br>   current_level: in bit_vector(1 downto 0);<br><br>   should_service: out bit);<br>end:<br><br>architecture synthesizable of interrupt_controller is<br><br>  signal new_level: bit_vector(1 downto 0); | | |
| begin<br> --Synopsys block_probe_begin<br> decode: process(new_request)<br> begin<br>  if(new_request(3) = '1') then<br>   new_level <= "11";<br>  elsif(new_request(2) = '1') then<br>   new_level <= "10";<br>  elsif(new_request(1) = '1') then<br>   new_level <= "01";<br>  else<br>   new_level <= "00";<br>  end if;<br> end process:<br> --Synopsys block_probe_end | 9 ns | 5 gates |
|  compare: process(current_level,new_level)<br> begin<br><br>  if(new_level(1) > current_level(1)) then<br>   should_service <= '1';<br>  elsif(new_level(1) < current_level(1)) then<br>   should_service <= '0';<br>  elsif(new_level(0) > current_level(0)) then<br>   should_service <= '1';<br>  else<br>   should_service <= '0';<br>  end if;<br> end process;<br>end; | 15 ns | 6 gates |

## Figure 19

A1123

SYNOPSYS 1007



**Figure 20**

SYNOPSYS 1007



**Figure 21**

300

```
entity interrupt_controller is
  port(new_request  : in bit_vector(3 downto 1);
      current_level: in bit_vector(1 downto 0);

      should_service: out bit);
end;

architecture synthesizable of interrupt_controller is

  signal new_level: bit_vector(1 downto 0);

begin

  decode: process(new_request)
  begin
    if(new_request(3) = '1') then
      new_level <= "11";
    eisif(new_request(2) = '1') then
      new_level <= "10";
    eisif(new request(1) = '1') then
      new_level <= "01";
    else
      new_level <= "00";
    end if;
  end process;

  compare:process(current_level_new_level)
  begin

    if(new_level(1) > current_level(1)) then
      should_service <=  '1';
    eisif(new_level(1) < current_level(1)) then
      should_service <= '0';
    eisif(new_level(0) > current_level (0)) then
      should_service <= '1';
    else
      should_service <= '0';
    end if;

  end process;
end;
```

## Figure 22

```
entity interrupt_controller is
  port(new_request : in bit_vector(3 downto 1);
    current_level: in bit_vector(1 downto 0);

    should_service: out bit);
end;

architecture synthesizable of interrupt_controller is

  signal new_level: bit_vector(1 downto 0);

begin

  decode: process(new_request)
  begin
    if(new_request(3) = '1') then
      new_level <= "11";
    eisif(new_request(2) = '1') then
      new_level <= "10";
    eisif(new request(1) = '1') then
      new_level <= "01";
    else
      new_level <= "00";
    end if;
  end process;

  compare:process(current_level_new_level)
  begin

    if(new_level(1) > current_level(1)) then
      should_service <= '1';
    eisif(new_level(1) < current_level(1)) then
      should_service <= '0';
    eisif(new_level(0) > current_level (0)) then
      should_service <= '1';
    else
      should_service <= '0';
    end if;

  end process;
end;
```

300

**Figure 23**

A1127

          SYNOPSYS 1007



**Figure 24**

A1128

26                                    SYNOPSYS 1007



**Figure 25**

A1129

        SYNOPSYS 1007



Figure 26



Figure 27

SYNOPSYS 1007



MULTIPLEXOR]
File Edit View Tools Window Help
U36:IV110 1.00 1.0%
U20:IV110 1.00 1.0%
U21:IV140 2.00 2.0%
U24:BU160 4.00 4.0%
U33:MU220 7.00 7.1%
U32:MU220 7.00 7.1%
U34:MU220 7.00 7.1%
U31:MU220 7.00 7.1%
U22:MU220 7.00 7.1%
U23:MU220 7.00 7.1%
U30:MU220 7.00 7.1%
U35:IV101 7.00 7.1%
U25:MU220 7.00 7.1%
U26:MU220 7.00 7.1%
U27:MU220 7.00 7.1%
U28:MU220 7.00 7.1%
U29:MU220 7.00 7.1%
MUX_BLK Total: 99.00
U36:IV110
U20:IV110
U21:IV140
U24:BU160
U33:MU220
U32:MU220
U34:MU220
U31:MU220
U22:MU220
U23:MU220
U30:MU220
U35:IV101
U25:MU220
U26:MU220
U27:MU220
U28:MU220
U29:MU220
Ready

Figure 28



Figure 29

A1133



Synopsys— Editor3
File
Edit
View
Window
Query
Help
all.v
Cursor
Select
[] operator
gtech Area = 6 (6)
Design: STACK
Name: []
Class: (array(index)hdl-'
gtech Area = 530
Logic level = 18
PTNN: 824
Breakdown:
Ready
3000
3010
3020
3030
3040
3050
3080
3081
3082
3083
3084
3087
3088
3089
3090

Figure 30



Synopsys — Editor2
File Edit View Window Query Help
Editor2
Virtual Schematic
Editor4
Driven
Ready
3155
3145
3110
3150
3120
3100
3130

Figure 31



**Figure 32**

A1136

34                                                        SYNOPSYS 1007



Figure 33

6,132,109

1

# ARCHITECTURE AND METHODS FOR A HARDWARE DESCRIPTION LANGUAGE SOURCE LEVEL DEBUGGING SYSTEM

## RELATED APPLICATION

This application is a continuation-in-part of U.S. application Ser. No. 08/226,147 by Gregory et al, filed on Apr. 12, 1994, now abandoned.

## BACKGROUND

### 1. Field of the Invention

This invention relates to the field of computer aided design for digital circuits, and particularly to debugging digital circuits constructed using logic or behavioral synthesis. This invention also relates to displaying the results of circuit analysis determined in one domain, such as an annotated netlist of gates, in the context of the circuit structure in another domain, such as the hardware description language (HDL) source text.

### 2. Statement of the Related Art

A digital circuit designer needs to ensure that the circuit performs the correct function subject to many design constraints. For example, the circuit should perform the correct computation in the proper amount of time. The area that the circuit occupies on a semiconductor die should remain within certain bounds. The power that the circuit consumes while operating should also remain within specified bounds. To be economically manufacturable, the circuit should be testable. An economically useful circuit should not take too long to design, manufacture, test or use.

The digital circuit design process involves translating the designer's sometimes ambiguous thoughts about the function and constraints into the tooling necessary to produce a working circuit. For example, producing a full-custom semiconductor chip requires producing masks that define the deposition of chemicals into a substrate as well as producing test patterns that exercise the final product. As another example of tooling, producing a field programmable gate array requires generating the bit pattern to be downloaded into the chip to specify the configuration of the architecture. Computer Aided Design (CAD) tools facilitate the iterative translation of the designer's developing thoughts into the tooling required to produce a working circuit that satisfies the design constraints. The process of iteratively adjusting a design to meet its requirements is called debugging.

The historical model of the digital design process using conventional CAD tools for a semi-conductor chip is as follows. The designer first conceives of a particular function to implement, as well as constraints such as timing or area that the implementation must meet. Next, historically, the designer mentally transforms the desired function into a high level circuit consisting of components such as gates, adders, registers and RAMS. The designer then captures that insight by drawing a schematic of a circuit that implements that function with a schematic capture tool. The schematic shows how more primitive functional elements, such as gates or transistors, connect together to form more sophisticated functions such as arithmetic logic units. In addition, modern schematic capture tools allow the designer to divide the design hierarchically into interconnected pieces, and then allow the user to specify the details of each of the pieces separately. For example, Design Architect by Mentor Graphics of Wilsonville, Oregon provides these schematic capture functions.

Conventional CAD tools, such as those indicated above, can then take the connections in the schematic and other

2

information to evaluate the circuit and to specify the tooling necessary to construct the circuit. Such tools evaluate the circuit in many ways. For example, commercial CAD tools often have a simulator that predicts the response of a circuit to designer specified input patterns. QuickSim II by Mentor Graphics of Wilsonville, Oreg. is a commonly used simulator. Another common CAD tool is a path delay analyzer that identifies the longest timing path in a circuit design. DesignTime by Synopsys, Inc. of Mountain View, Calif. is a tool that provides path delay analysis.

Conventional CAD tools also have the ability to generate the geometric layout of the circuit with layout tools. Cell3 Ensemble by Cadence of San Jose, Calif. is an example of this type of tool. Layout tools are required to produce masks to make a semi-conductor chip.

Conventional CAD tools also have the ability to check that the circuit meets the design rules, and to identify the location of any errors to the designer. Design rules help ensure that the specified circuit will operate once manufactured.

Conventional CAD tools also are used to determine how testable a circuit is, and to generate test patterns automatically. Showing the designer the parts of the circuit that are not testable allows the designer to make modifications that will increase the probability of making a successful chip or circuit. Generating test patterns automatically allows for more thorough testing of the circuit immediately after manufacturing.

As described above, the concept of debugging a circuit design historically refers to the process by which a circuit designer specified a particular implementation with a schematic capture tool, and then used various circuit evaluation tools to verify that the implementation did what the circuit designer wanted. For example, the designer would use a simulator to determine if the circuit produced appropriate outputs from specified inputs. The designer could use the path delay analyzer to determine whether the current design was fast enough to meet the requirements. The layout tools could inform the designer whether the design would fit in the available space.

When a particular design did not meet the designer's expectations or requirements, the designer then modified the design. For example, if the circuit was too slow, the designer identified the offending circuitry and revamped it to increase performance. If the circuit was too large, then the designer revised the circuit to use fewer or smaller components. If the circuit did not behave as required, the designer changed the components and the interconnections to produce the correct function. Because the conventional CAD tools began the analysis with the captured circuit, the timing or area problems could be readily identified to the designer. Because the designer specified the structure of the circuit, the designer could then thoughtfully make adjustments. However, because historically the designer mentally performed the transformation from desired function to circuit, the CAD tools were limited in their ability to identify functional problems to the designer.

Logic synthesis developed to provide the designer with an automatic mechanism to translate a hardware description language (HDL) description of a desired function to a structural description of a circuit that performed the desired function. Logic synthesis begins with the designer describing the desired function using VHDL, Verilog, or any other logic synthesis source language, to specify the behavior. A translator then converts that description into gates and other circuit structures that directly correspond statement by state-

SYNOPSYS 1007

6,132,109

3

ment with the designer's description. Theoretically, conventional CAD tools could then evaluate the resulting circuit and develop the appropriate tooling.

However, the circuit created by a statement-by-statement translation is generally large and slow. In logic synthesis, translation is followed by logic optimization. Optimization replaces the directly translated structure with a functionally equivalent, yet improved structure.

Unfortunately, the circuit transformations performed by the logic optimizer usually modifies the structure of the circuit. This results in a circuit that is unrecognizable by the designer. The fact that the designer generally can not recognize the original function performed by the transformed circuit makes debugging synthesized logic difficult. Conventional evaluation tools can determine the timing or area problems in the transformed circuit, but the designer can not relate those problems easily to the HDL source specification. Theoretically, the designer could manually determine what part of the HDL specification caused the problem. With that insight, the designer could make the desired changes at the HDL specification, and resynthesize the entire circuit. If the designer's problem occurred in a part of the circuit that passed through the optimizer with few changes, manual backtracking might work. However, the optimization process generally makes many changes, making it either difficult or impossible to backtrack because many points in the original circuit do not exist in the final circuit.

Alternatively, the designer could simply modify the final circuit directly. This would not allow the designer to resynthesize the design from the HDL specification because the designer's circuit changes would be overwritten by subsequent translation and optimization steps. This would destroy the value gained by using the synthesis approach to design.

There are some existing tools and techniques for determining where and how to modify a HDL source specification. One tool allows the designer to examine a gate in the optimized circuit schematic, and inquire where that gate came from in the HDL source, provided that it directly existed in the HDL source. If the tool could not tell where a gate came from, it would say so. An example of a gate tracing tool is Design Analyzer's source-to-gates function, produced by Synopsys, Inc. of Mountain View, Calif. However, many gates are removed and others are added during the translation and optimization process. The gate tracing tool has not proven to be very useful in helping designers debug circuits because many of the components in a optimized circuit can not be traced back to the HDL source specification.

Another method of debugging a synthesized circuit is to partition the design into hierarchical components, and synthesize and optimize the smaller pieces. Because the synthesis and optimization tools generally do not traverse primary inputs and outputs, such a partitioning can reduce the size of the backtracking problem. However, it has the disadvantage that the designer may have to rewrite functionally correct, but nonetheless problematic, synthesis source code to isolate the troublesome parts of the circuit. In addition, this approach will greatly limit the optimizer's ability to reduce the area and increase the speed of the resulting circuits because the optimizer will be constrained by the designer's partition.

In addition, a designer can be mislead by the results obtained by debugging by partitioning. The designer's bug in the circuit might be that it is too slow or too big. Partitioning the synthesis source to locate the cause will result in a different circuit than the unpartitioned source. Therefore, the problem that the designer is chasing could vanish or be made significantly worse by the debugging process itself.

4

Conventionally, using a synthesizer to translate a specification into a circut can also raise substantial computational problems to incorporate minor changes into a design late in the design process. For example, a designer could have the design fairly close to completion when the designer discovers the need to make a small functional change, such as inverting a particular signal. Intuitively, one would expect that such a small change would require only a small change in the circuit all the way to the layout level. However, it is quite possible that, with conventional synthesis and optimization tools, a small change could require substantial changes in the circuit and the layout. Currently, a designer can limit this kind of problem by partitioning the design into smaller pieces and thus limiting the effect to the directly implicated pieces. However, as described previously, inappropriate or unduly narrow partitioning can limit the ability of the optimization tools to construct a good circuit.

3. A Conventional Design and Debugging Process Overview

FIG. 1 shows an overview of the conventional process for designing and debugging circuits specified with a Hardware Description Language (HDL). The process begins with the designer writing HDL source code **100**. A typical language used for specifying circuits is VHDL which is described in the IEEE Standard VHDL Language Reference Manual available from the Institute of Electrical and Electronic Engineers in Piscataway, N.J., which is hereby incorporated by reference. VHDL stands for Very high speed integrated circuit Hardware Description Language. Another language used for specifying circuits is Verilog that is described in Hardware Modeling with Verilog HDL by Eliezer Sternheim, Rajvir Singh, and Yatin Trivedi, published by Automata Publishing Company, Palo Alto, Calif., 1990, which is hereby incorporated by reference. Verilog is also described in the Verilog Hardware Description Language Reference Manual (LRM), version 1.0, November 1991, which is published by Open Verilog International, and is hereby incorporated by reference. The examples used in this document are in VHDL, but the principles readily apply to other circuit specification languages.

After writing a HDL description of a desired function, the designer then simulates the function **101** embedded in the description with a HDL simulator. An example of a functional simulator is VHDL System Simulator that is available from Synopsys, Inc. of Mountain View, Calif. The functional simulator allows the designer to determine whether the circuit produces correct values in response to inputs without regard to timing, area or power constraints. A functional simulator can perform function-only simulation relatively quickly, thus enabling the designer to determine that the circuit will produce the desired output.

If there is a problem with the function, the designer can fix function problems **102** by examining the simulation output and going back to writing HDL code **100**. Functional simulation executes the source specification directly without generating or optimizing circuits. Therefore, problems identified during functional simulation can readily be linked to their cause in the HDL source.

If the designer believes that the described circuit provides the correct function, then designer then specifies constraints for the synthesis process **103**, e.g. maximum clocking periods, total circuit area, and maximum power. This part of the process is described in Design Compiler Family Reference Manual, Version 3.1a, which is available from Synopsys, Inc. of Mountain View, Calif. and is hereby incorporated by reference. Examples of Computer Aided

SYNOPSYS 1007

6,132,109

**5**

Design software that use constraint specification are Synergy by Cadence, and Autologic by Mentor Graphics, and Design Compiler by Synopsys.

After developing constraints, the designer then proceeds to synthesize **104** a circuit from the HDL description produced in the writing HDL **100** step. This step involves translating the description into an initial circuit that correspond directly with the statements in the source HDL. An example of software that performs this function is described in the VHDL Compiler Reference Manual, Version 3.1a, which is available from Synopsys, and is hereby incorporated by reference. After translation, the initial circuit is then optimized into a final circuit that meets the performance constraints established in step **103**. Prior to optimization, it is a straight-forward task to identify which circuit element of the initial circuit corresponds to what part of the HDL source code. Conventionally, because of the extensive manipulations performed during the optimization process, such identification after optimization becomes almost impossible except at registers and module interface boundaries.

FIG. **2** shows the intermediate data structures involved in the synthesis process **104**. The synthesis process begins with HDL source **900**. The translator creates a data structure called a parse tree **901** that represents the organizational structure of the HDL. The translator then turns the parse tree into an initial circuit **902**. Russ B. Segal's Master's Thesis, "BDSYN: Logic Design Translator" at the University of California at Berkeley, Memo#UCB/ERL M87/33, describes a such a translator, and is hereby incorporated by reference. United States patent application Ser. No. 07/632,439, filed on Dec. 21, 1990, entitled "Method and Apparatus for Synthesizing HDL Descriptions with Conditional Assignments" by Gregory et al, and commonly assigned to Synopsys, Inc. also describes such a translator, and is hereby incorporated by reference. An example of a tool that does this is version 3.1a of the HDL compiler available from Synopsys, Inc.

An optimizer is used to produce the final circuit **903** from the initial circuit **902**. The optimization process is explained in "Logic Synthesis Through Local Transformations" by J. Darringer, W. Joyner, L. Berman, and L. Trevillyan in the IBM Journal of Research and Development, volume 25, number 4, July 1981, pages 272–280, which is hereby incorporated by reference. It is also explained in "LSS: A System for Production Logic Synthesis" by J. Darringer, D. Brand, J. Gerbi, W. Joyner, and L. Trevillyan in the IBM Journal of Research and Development, volume 28, number 5, September 1984, pages 537–545, which is hereby incorporated by reference. It is also explained in "MIS: A Multiple-Level Logic Optimization System" by R. Brayton, R. Rudell, A. Sangiovanni-Vincentelli, and A. Wang in the IEEE Transactions on Computer Aided Design, Volume 6, number 6, November 1987, pages 1062–1081, which is hereby incorporated by reference. It is also explained in the Ph.D. dissertation "Logic Synthesis for VLSI Design" by R. Rudell at the University of California at Berkeley in 1989, which is hereby incorporated by reference. The optimization process is also described in the Design Compiler Family Reference Manual, version 3.1a which is available from Synopsys, and is hereby incorporated by reference. An example of software that performs this function is the Design Compiler available from Synopsys, Inc. Other examples of software that performs optimization include Synergy from Cadence, Inc., and AutoLogic by Mentor Graphics.

One approach to optimization is to group one or more initial circuit elements together, and replace those elements

**6**

with a functionally equivalent collection of elements that has better characteristics than the collection of elements replaced. This results in an intermediate circuit that is functionally equivalent to the original. This intermediate circuit can then some or all of its elements grouped for another replacement. This process is repeated until the optimizer meets the constraints imposed in step **103** of FIG. **1**, or is unable to make any further improvement.

Before beginning the optimization process, the components of the initial circuit can be divided into two groups: those components that must be preserved through the optimization process, and those that can be replaced with functional equivalents. For example, a logic optimizer may replace a block of boolean logic with another block so long as function is maintained. Generally, replaceable components can also be eliminated. Examples of components that are generally preserved through the optimization process are primary inputs, primary outputs and registers.

After developing a circuit, the designer can then analyze the circuit **105** using conventional analysis tools, as shown in FIG. **1**. For example, the designer could estimate the area that the circuit consumes or what the longest delay path is in the circuit. This analysis can identify problems to the designer. The analysis report **904** is often a text document, as shown in FIG. **2**.

After identifying timing, area, testing or power problems with the analysis tools, the designer then devises a means to adjust the circuit to fix these problems **108**. Ideally, the designer would go back to the HDL where the function is specified and make adjustments there. However, because it is currently hard to identify the specific places in the source HDL that led to the problem, modifying the appropriate part of the HDL is currently not an effective debugging technique. The designer can usually identify which hierarchical module contains some, of the problem, and the designer could then manually rewrite that module to create more primary inputs and outputs to examine. This is very time consuming and is generally done as a last resort. Alternatively, the designer could adjust the constraints **103** and synthesizes the circuit **104** again to see if the problem is alleviated.

After debugging the circuit, the designer then releases the design for fabrication **106**.

4. System Performance

In addition to the debugging problems presented by the transformations made by the logic synthesis process, there are also difficulties associated with efficiently and economically constructing CAD systems that compute and display analysis results. Conceptually, after specifying a design, debugging a circuit involves having the designer repeatedly (1) determine a particular circuit characteristic or property that the designer wants to know about, (2) identify a kind of analysis that will provide information about that characteristic, (3) instruct the CAD system to perform that analysis, (4) display the results of that analysis, and (5) gain insight into the desired characteristic from the display. The designer is interested in completing these steps as quickly as possible. Circuit CAD tools have historically facilitated this goal by making the instruction and display steps computationally efficient. To improve response times, circuit CAD tools have often tightly couple the software that performed the analysis to the software that performed the display function. This was often done by having the display software depend heavily on the data structure used to process or store the results of the analysis.

For example, timing analysis often reveals the portions of the circuit that are too slow. Reviewing this analysis his-

6,132,109

**7**

torically has involved examining the schematic and tracing the critical path. However, as described previously, the schematic may have little to do with the designer's specification of the circuit.

This intimate linking of display to analysis causes several problems. First, as described, in conjunction with logic synthesis, displaying the data structure linked with the analysis may not be particularly insightful to the designer. Second, such an intimate linking requires more software development and designer training. If there were N kinds of displays, and M kinds of analysis, and each kind of display could be combined with each kind of analysis, then conventional CAD systems tended to have N*M individual display/analysis programs. This requires the designer to become proficient with a multiplicity of slightly different interfaces as well as requiring the tool supplier to construct all of these tools.

However, modern CAD tools must support the development of chips containing millions of transistors. Designing chips with this many components requires that the CAD tools display and analyze large data structures. Processing large data structures tends to reduce the response time of CAD tools. The conventional technique of tightly coupling the display software to the analysis software helps the CAD system maintain a reasonable response time with the large data structures.

Intimately linking the display tools to the analysis tool data structures poses some problems. First, it tends to require the maker of the CAD tool to produce a large number of products that require support. Second, the variety of such tools tends to introduce variations in the command interface that the designer must use to identify and initiate circuit analysis. Both of these problems lead to frustrated designers and tool builders.

5. Background Conclusion

Using HDL synthesis can simplify the task of circuit design by allowing the designer to specify the required function in an HDL textual description without specifying the details of the circuit implementation. After creating a circuit using synthesis, the designer can use conventional circuit analysis tools to determine characteristics of the final circuit. Conventional analysis will describe such things as the area consumed by different parts of the circuit, or what the longest delay path is through the circuit. Using these analysis results, the designer can then identify which portions of the circuit are problematic. However, because the optimization portion of synthesis often transforms the design substantially, it is difficult, if not impossible, except in certain special cases, to relate specific portions of the final circuit to the HDL source that generated those portions. This inability to trace the circuit analysis results easily to the HDL source represents a substantial barrier for debugging circuits efficiently.

SUMMARY OF THE INVENTION

The present invention provides a method for displaying the results of synthesized circuit analysis visually near the HDL source specification that generated the circuit. Circuit analysis provides information about the characteristics of each portion of the synthesized circuit. The present invention relates the analysis results of each portion of the synthesized circuit to the particular part of the HDL specification that generated that circuit portion. This permits the designer to modify the part of the HDL specification that is responsible for problems identified by circuit analysis. The synthesis process works by translating HDL source code into

**8**

an initial circuit. Each point in the initial circuit corresponds directly with a particular construct in the HDL source. A final, more efficient circuit is constructed from the initial circuit by logic optimization. Connecting the results of the analysis to the source requires identifying points in the final circuit that can be traced directly to the initial circuit. Circuit analysis results corresponding to these invariant points in the circuit can therefore be directly related to the appropriate part of the HDL source, and thus can be displayed near that part.

The present invention provides a method for introducing additional points in the design that remain traceable through the optimization process without requiring reorganization or modification of the HDL source. The present invention provides these additional points, for example, by artificially injecting primary inputs or outputs into the initial circuit, and noting where in the HDL source these points came from.

The present invention provides a method for linking information gleaned from evaluating and analyzing a synthesized circuit to the source code that produced the circuit. The present invention establishes the link by providing a designer with the ability to mark the synthesis source code in the places that the designer wants to be able to debug. The designer marks the source code with a particular text phrase, such as "probe", along with some additional optional information. During translation, the translator generates a circuit the provides the same function as it did without the "probe" statement, but adds additional information or components to the initial circuit that indicate that certain components should not be replaced during optimization. Because those components will not be replaced during optimization, the circuit analysis results corresponding to any unreplaced components that are in the final circuit will be directly and traceably related to those components in the initial circuit. Because those components are traceably related to the source HDL, the results are traceably related to the source HDL, and therefore be displayed near the appropriate portion of the HDL. Allowing for the interjection of unreplaced components by the designer facilitates debugging without rewriting the designer's original hierarchical design or manually backtracking through the optimization process.

In another aspect of the invention, the designer can assign a priority level to each probe to help manage the debugging process. These priority levels could then be used to activate or deactivate selected probes as a group. An activated probe would establish a link through the synthesis process to facilitate debugging. An inactive probe would have no effect on the synthesis process, and would not establish a debugging link. Establishing many links would provide the designer with a large degree of debugging information, but could limit the ability of the synthesis process to provide a good circuit. Establishing too few links may not provide enough guidance to the designer to resolve circuit problems. By selectively activating groups of probes at different times during the debugging process, the designer can analyze different portions of the design without the probes themselves unduly interfering in the process.

By providing a facility for displaying the results of circuit analysis near the HDL that created the circuit, the present invention allows a designer to make more effective use of logic synthesis and reduce the complexity of the circuit debugging process.

An aspect of the present invention provides a method and system for processing requests from designers about the characteristics associated with the logic synthesis source specifying a circuit, and displaying the results of circuit

A1141

    SYNOPSYS 1007

6,132,109

## 9

analysis with a consistent set of display tools that are not intimately tied to the data structure used for the circuit analysis. The present invention achieves this by first observing that the representation of the circuit can be divided into domains characterized by the structure of the information used to represent the design. Then the tool builder can develop domain dependent display tools for examining the state of the design in that domain. In addition, the tool builder can also develop tools that evaluate or analyze the state of the circuit in a particular domain. Display tools showing the circuit structure in one domain can obtain information related to analysis obtained in another domain by the forward and backward linkages provided by this invention.

The designer can inquire about the characteristics related to a specific part of the design by first examining part of the design in one domain with a display tool. This domain is the inquiry domain. After identifying a relevant portion of the design in the inquiry domain, the designer selects a constituent piece of the design to evaluate, and makes an inquiry about that piece. This information constitutes a query. The display tool forwards the identification of the object in the inquiry domain and an identifier indicating the requested analysis or evaluation to the database. The database then determines the domain that would contain the relevant analysis results. If those results do not yet exist, the database invokes the appropriate analysis tool to put those results into the database. Using the linkage established with the HDL-debugging method, the database locates the related object in the analysis domain. From the related object, the appropriate information is passed back to the display tool where the designer can see it displayed appropriately.

One aspect of the present invention provides display tools that are not dependent on the structure of the domain in which the analysis is actually performed. Another aspect of the invention provides analysis tools that are not dependent on the structure of the display domain. Another aspect of the invention is to allow the different display and analysis tools to remain independent from one another.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1. A flow diagram showing an earlier design process.

FIG. 2. A flow diagram showing a new design process in accordance with the present invention.

FIG. 3. A flow diagram showing an earlier synthesis-analysis process.

FIG. 4. An example of VHDL source with no probes.

FIG. 5. A parse tree corresponding to the source fragment in FIG. 4.

FIG. 6. A circuit arising from the conventional translation of the source fragment in FIG. 4.

FIG. 7. An optimized version of the circuit of FIG. 6.

FIG. 8. The VHDL source in FIG. 4 with statement probes inserted.

FIG. 9. Translation of the source in FIG. 8.

FIG. 10. An optimized circuit derived from the circuit of FIG. 9.

FIG. 11. An example of a display relating information found from analysis of the optimized circuit of FIG. 10 to the source HDL.

FIG. 12. VHDL source without probes using two process blocks.

FIG. 13. Conventional translation of the source in FIG. 12 into a circuit.

## 10

FIG. 14. An optimized circuit derived from the circuit of FIG. 13.

FIG. 15. An example of a display relating data found from analysis of the optimized circuit of FIG. 10 to the source VHDL showing that information can only be related to the highest level in the description.

FIG. 16. VHDL source with two block probes installed.

FIG. 17. A circuit generated by translating the VHDL source of FIG. 16.

FIG. 18. The circuit obtained by optimizing the circuit of FIG. 17.

FIG. 19. An example of a display relating data found from analysis of the optimized circuit of FIG. 18 to the source VHDL showing information related to the block probes.

FIG. 20. An alternate method of implementing probes in accordance with the present invention.

FIG. 21. An second alternate method of implementing probes in accordance with the present invention.

FIG. 22. Display of the transitive fan-in trace of a particular signal in the source HDL in accordance with the present invention.

FIG. 23. Display of the primary inputs reached from transitive fan-in trace of a particular signal in the source HDL in accordance with the present invention.

FIG. 24 shows the relationship between the display tools, analysis tools, and the database that maintains the design.

FIG. 25 shows the architecture of FIG. 24 with one display tool and one analysis tool.

FIG. 26 shows a stacked bar graph display of circuit information.

FIG. 27 shows a stacked bar graph display of circuit information showing the relative contribution of one of the sub-blocks in FIG. 26.

FIG. 28 shows a stacked bar graph display of circuit information showing the relative contribution of one of the sub-blocks in FIG. 27.

FIG. 29 shows a histogram display of circuit timing information.

FIG. 30 shows a text display of HDL source code and circuit information related to that source code.

FIG. 31 shows a virtual schematic display showing the inputs and outputs associated with a particular part of VHDL source code.

FIG. 32 shows another virtual schematic display tracing the output of the display in FIG. 31.

FIG. 33 shows another virtual schematic display tracing the output of the display in FIG. 32.

### DETAILED DESCRIPTION OF THE INVENTION

The present invention comprises a novel method for the using the links and establishing new links between an HDL source description of a circuit and the analysis results of the translated and optimized actual circuit that arises from the source description. The following description is presented to enable any person skilled in the art to make and use the invention, and is provided in the context of a particular application and its requirements. Various modifications to the preferred embodiment will be readily apparent to those skilled in the art, and the generic principles defined herein

SYNOPSYS 1007

6,132,109

**11**

may be applied to other embodiments and applications without departing from the spirit and scope of the invention. Thus, the present invention is not intended to be limited to the embodiment shown, but is to be accorded the widest scope consistent with the principles and features disclosed herein.

Improved Design and Debugging Process

FIG. **3** shows the general design and debugging process in accordance with the present invention. The designer writes HDL with probe statements **150**. The probe statements identify the places in the resulting circuit that the designer will wish to examine. The designer may not initially know where probes will be required until later in the design process. The probes have no impact on functionality so functional simulation **101** and functional repair **102** proceed as before. The designer also constrains synthesis **103** as before.

Synthesizing with probes **154** differs from conventional synthesis **104**. When the translator encounters a probe statement, the translator interjects information into the netlist to indicate to the optimizer that optimization should not proceed "past" or "through" that particular point. The optimizer then produces a new circuit subject to these constraints. In one embodiment, the probed portions of the HDL source are treated as both primary inputs and primary outputs during translation and optimization.

The circuit analysis step **105** proceeds as before. After analysis, the tool then uses information developed during translation to relate the results of the analysis to the HDL source as indicated by step **120**.

With the information gleaned from the probes, the designer can now identify problems and evaluate solutions that directly change the HDL, as shown in step **121**.

After completely analyzing and debugging the design, the actual circuit can be fabricated as it was before as shown in step **106**.

As described above, optimizers divide an initial circuit's components into two groups: components that can be replaced and those that can't. One method of implementing probes would be to mark the components of the initial circuit attributable to the probed part of the HDL as components that can not be replaced during optimization. For example, the translator could create a primary input and a primary output at the places in the initial circuit corresponding to the probed part of the HDL source.

After optimization, the circuit can then be analyzed with conventional circuit analysis tools to provide an analysis report **904**. For example, the analysis report can indicate the time it takes for a signal to reach various points in the optimized circuit. Analysis could also reveal what portions of the design are not testable or occupy a large amount of area. Because each report provides information linked to the nodes of the optimized circuit, each report therefore provides information about each node that did not change during the optimizer's iterations. Each node that did not change during the optimization process can be traced to a particular place in the HDL source using the information developed in constructing the parse tree.

Examples of Using and Processing Probes

FIG. **4** through FIG. **18** illustrate by example how probes work and how the debugging information could be displayed to the user. The examples use VHDL as the source language. The principles illustrated do not depend on the particular language.

**12**

FIG. **4** shows a text editor window **300** containing a VHDL code fragment **400** that does not contain any probe statements. The code fragment shown in FIG. **4** is repeated below:

```
if (C and B) then
    Z <= not(A or B);
else
    Z <= not(B);
end if;
```

FIG. **5** shows a graphical representation of the parse tree constructed while translating the source code in FIG. **4**. Link **1100** is the connection that this fragment has with the rest of the VHDL description. The "if" statement in VHDL has three parts: a condition; a VHDL statement to process when the condition is true; and a VHDL statement to process when the condition is false. The condition is dealt with in the tree descending from node **1001**. The true condition is handled by the tree descending from node **1004**. The false condition is handled by the tree descending from node **1010**. The assignments represented by nodes **1004** and **1010** are used to link the signal values represented by node **1005** and node **1011** to their functions represented in the trees descending from nodes **1006** and **1012** respectively.

Without a probe statement, the VHDL fragment would translate into the circuit of FIG. **6**. Inputs A, B, and C are schematically represented by the connectors **200**, **201**, and **202**. The "if" statement would translate into multiplexor **231**. The condition "(C and B)" would translate into and gate **232**. The "true" condition would translate into nor gate **233** while the "false" condition would translate into invertor **230**.

FIG. **7** shows a circuit optimized from the digital circuit of FIG. **6**. In particular, the logic function that this code fragment really performs is not(B). At this point, without probes in the conventional synthesis design process, the designer can not obtain much information about the internal timing information descending from the fragment. For example, if the designer needed to know when the value of not(A or B) was computed to help analyze some other aspect of the design, then the designer would not be able to deduce that information from the resulting analysis.

FIG. **8** shows how a probe statement **401** could be inserted into the source description. The code fragment is repeated below:

```
if (C and B) then
    Z <= not(A or B); --Synopsys probe_statement
else
    Z <= not(B);
end if;
```

In VHDL, "--" begins a comment. The word "Synopsys" immediately after the "--" indicates that this is not an ordinary comment, but rather a directive to the translator or other part of the computer aided design tool environment. The word "probe_statement" indicates that this particular VHDL statement should be processed so that it will be possible to relate analysis information to this point in the circuit.

FIG. **9** shows a circuit that a translator could produce from the code fragment shown in FIG. **8** with the probe statement. The parse tree produced with the probe statement is the same as before, namely the tree of FIG. **5**. However, the probe statement will cause the signal represented by node **1005** to behave as both a primary output and a primary input.

6,132,109

**13**

In creating the circuit of FIG. **9** from the parse tree, the translator could add temporary input **203** and a new temporary output **221**. In addition to synthesizing this circuit, the translator connects the new temporary input to the new output at a higher level in the net list produced from translating the whole specification.

FIG. **10** shows the circuit of FIG. **9** after optimization. The optimizer is not permitted to optimize circuits past the boundaries established by the probe statement. This means that nor gate **233** of FIG. **9** would be transformed into nor gate **253** of the optimized circuit. The nor gates are not necessarily identical because additional details may be specified about the gates during the design compilation process. Those details are not relevant to the implementation of probes.

Because the logic optimization process left temporary input **203** and temporary output **221** alone, and those points correspond to a particular point in the HDL circuit, any analytic result related to temporary input **203** or temporary output **221** can be identified with the probe statement **401** in the HDL. FIG. **11** shows how timing information could be related back to the HDL in a special text window **301**. For example, suppose a critical path analysis tool determined that it took 1.0 nanoseconds to produce temporary output **221** of FIG. **10** after a clock edge arrived at a flip-flop somewhere else in the circuit. By using the fact that temporary output **221** came from this line of the source, the timing result **500** can be displayed next to the appropriate line of the output.

FIG. **12** through FIG. **19** show another way to use probes to evaluate the performance of blocks of HDL code. FIG. **12** shows a text window with an HDL entity described. This text has no probe statements inserted, and the code is repeated below.

```
entity interrupt_controller is
    port(new_request : in bit_vector(3 downto 1);
         current_level: in bit_vector(1 downto 0);
         should_service: out bit);
end;
architecture synthesizable of interrupt_controller is
    signal new_level: bit_vector(1 downto 0);
begin
    decode: process(new_request)
    begin
        if(new_request(3) = '1') then
            new_level <= "11";
        elsif(new_request(2) = '1') then
            new_level <= "10";
        elsif(new_request(1) = '1') then
            new_level <= "01";
        else
            new_level <= "00";
        end if;
    end process;
    compare: process(current_level, new_level)
    begin
        if(new_level(1) > current_level(i)) then
            should_service <= '1';
        elsif(new_level(1) < current_level(1)) then
            should_service <= '0';
        elsif(new_level(0) > current_level(_)) then
            should_service <= '1';
        else
            should_service <= '0';
        end if;
    end process;
end;
```

This VHDL source code computes whether a new interrupt should be serviced. It determines what the new level of the interrupt is by determining what input line is asserted,

and comparing the interrupt priority level associated with that with the level of the currently pending interrupt. If the new level is higher, then the output should_service is set high, and otherwise it is set low.

FIG. **13** shows the circuit resulting from translating the VHDL source. FIG. **14** shows the circuit that results from optimizing the circuit in FIG. **13**.

FIG. **15** shows a special text window that summarizes some of the performance information about the circuit. The analysis tool can provide information about the design as viewed from the inputs. An analysis tool could provide an estimate of the area of the design by counting gates or compute the longest delay through the entire design. The designer might conclude that this circuit is too big or too slow. Because all of the inner details of the design have been optimized, it is not realistic for the designer to examine the schematic in FIG. **14** manually and determine whether the decoding function or the comparing function is too big or too slow.

To determine where the problems lie, the designer could insert block probes textually near the definition of the decoding and comparing processes, as shown in the text window of FIG. **16**. This would probe all signals entering or leaving the sequence of HDL code delineated by the begin and end block statements. When translated, the probed HDL would become the circuit of FIG. **17**. The translator would create temporary inputs **2010** and **2011**, and temporary outputs **2000** and **2001**, much as it did with the statement probe.

The optimizer transforms the circuit of FIG. **17** into the circuit of FIG. **18**. This allows the analysis tools to compute timing and area characteristics of both parts of the circuit. A special purpose display tool can then display, for example, timing and area analysis, as shown in FIG. **19**. In this example, the decoding circuit is approximately the same size and delay as the comparator circuit.

The block probes used in FIGS. **16** through **20** illustrate a mechanism to select many parts of the HDL source for probing without typing a text statement probe command for each line of HDL. In particular, the block probes in the previous example prohibited the optimizer from eliminating the inputs and outputs of the block. Another kind of block probe that might be useful is one that places a probe on every signal within the block. This will significantly limit the optimizer's ability to improve the circuit within the block, but it will give the designer the maximum amount of information about how the HDL source was translated. A third kind of block probe could place a probe on every statement in the block. A fourth kind of block probe could place a probe on every signal driving multiplexor control inputs within the block. Multiplexors are generated in HDL translation to implement "if" and "case" constructs. Probing the control inputs to these multiplexors would provide a designer with much insight into the circuit behavior.

As described previously, the circuit produced when probes are used can be different from the circuit that occurs when probes are not used. Because probes interfere with the ability of the optimizer to produce higher quality circuits, the designer generally should only use them when the designer needs to gather particular information. During the debugging process, a designer may insert many probe statements into the HDL source at various times to discover the characteristics of different parts of the circuit. One method of managing the number and location of active probes would be to let the designer specify a number with every probe statement that would be the statement's priority. When invoking the optimizer, the designer could then specify a

A1144

6,132,109

## 15

optimization priority. The optimizer would then eliminate every probe with a priority greater than the invoked priority. This would have the effect of permitting the designer to only use the most important probes without having to textually remove the lesser probes.

Alternate Methods for Probing

FIG. 20 shows an alternate method of having the translator implement probes. The circuit in FIG. 20 would come from the VHDL code fragment of FIG. 11. Instead of creating both a new input and a new output, only a new output 210 is created.

FIG. 21 shows another method of having the translator implement probes. The circuit in FIG. 21 would come from the VHDL code fragment of FIG. 11. Here, a new part 270 is inserted into the design. This part would need to have an additional attribute associated with it to indicate to the optimizer that it was not to be eliminated.

Another method of implementing probes requires attaching an attribute to the net connecting gates together. For example, in processing a probe statement, the translator could create the circuit in FIG. 6, but add information to net 280 that net 280 could not be removed during the optimization process.

Tracing Transitive Fan-In and Fan-Out in the Source HDL

During debugging, the designer may need to consider the impact that a change in one part of the design would have other parts of the design. If the designer is considering changing a particular function in HDL, the designer would find it useful to identify all of the inputs to that function or all of the outputs to that function. The collection of all of the points in a circuit leading to a particular point is referred to as the Transitive Fan-In of that point. The collection of all of the points in a circuit that depend on the value of a particular point is the transitive fan-out. While tracing all of the inputs (or outputs) of a particular part of the source HDL is a difficult task using only the HDL source, using the direct correspondence between the HDL and the initial circuit formed during translation makes it possible to highlight the inputs (or outputs) in the source HDL.

For example, a designer might be interested in finding all of the computations that feed into the multi-bit signal new_level in the VHDL source of FIG. 12. The designer could select the signal new_level with a mouse and enter a trace command with keystrokes or mouse clicks. A tracing program would trace the desired signal through all computations leading to primary inputs. As the tracing program traces signals back through the initial circuit, it identifies those points corresponding directly to the HDL source, and makes it possible for the text editor to highlight the corresponding HDL source. FIG. 22 provides an example of the text that would be highlighted during such a trace.

Alternatively, the designer might be interested only in the primary inputs or registers that lead to the indicated signal. FIG. 23 shows the result of tracing new_level back to the primary inputs.

System Architecture

FIG. 24 illustrates the architectural relationship between the display tools 111, 112, 113, 114, 115, 116, 117, 118, and 119 the analysis tools 130, 131, 132, 133, 134, 135, 136, 137, and 138 and the database 125. The designer 520 interacts with the display tools by seeing information on a screen and providing information to the tool by keyboard and mouse. The database 125 contains different representations of the circuit design under development. These representations are grouped into domains 1500, 1510, 1520, 1530, and 1540. The analysis tools 130, 131, 132, 133, 134, 135, 136, and 137 interact with the design information in the various domains to summarize and evaluate the design.

## 16

Design Representation: Domains

Providing useful information to the designer about the current state of a circuit design requires an explanation of how different aspects of a designs are stored in a CAD system. Previous sections described the process that a designer goes through to create and debug a design using logic synthesis. In going through the design process, the designer, through the CAD system, manipulated and transformed digital data having some information about the circuit into other digital data that had different information about the circuit. This section explains how the information describing all of the aspects of a design is organized into domains.

A domain is a collection of the design data that contains common structural characteristics. Each domain represents a particular level of abstraction of the design information. In the CAD system architecture of FIG. 24, the design can be divided into a source domain 1500, a generic technology domain 1510, which is also known as a G-Tech domain, a gate domain 1520, a layout domain 1530, and possibly other domains 1540. The design data in one domain can be the result of a transformation of design data from another domain using design tools, such as a logic synthesizer, and libraries of components.

The source domain 1500 contains the HDL source files that the designer creates in step 100 of FIG. 1 or step 150 of FIG. 3. It also contains the parse trees and symbol tables generated during the translation step of logic synthesis. Here, this portion of the design representation only contains information about the desired function of the circuit without reference to circuit topology or technology.

The generic technology domain 1510 contains the initial circuit that arises from the translation step of the synthesis process, as shown in step 104 of FIG. 1 or step 154 of FIG. 3. Data stored in the generic technology domain 1510 contains information about the topology of the circuit, but does not have information about the specific technology to be used.

The gate domain 1520 contains the final circuit that arises after the optimization step of the synthesis process, as shown by link 502. The debugging method previously described establishes the reverse link 505. Like the generic technology domain 1510, the data in the gate domain 1520 contains information about how components are connected together. However, in the gate domain, a particular technology is specified, thus providing information about the physical characteristics of the components used to implement the desired function. It is in this domain that preliminary timing, area, power, testability, and other calculations of step 105 of FIG. 1 and FIG. 3 can be made.

The layout domain 1530 contains information about the geometric placement of the components on the chip substrate and the connections between the components. The design information in the layout domain 1530 is obtained from the design information in the gate domain 1520 by using placement and routing tools.

It would also be possible to have additional domains, as shown by other domains 1540.

Objects within a Domain

Conceptually, the design information within a domain can be thought of as a collection of interconnected objects, with the objects and the connections possessing certain characteristics. For example, in the source domain, the objects could include the text of the HDL source code or the nodes of the parse tree constructed from the source code or the entries in the symbol table. In the gate domain 1520, the objects could include the individual gates or other library

6,132,109

17

parts or the connections between them. In any case, database **125** maintains the relationships between the objects within the domain. The debugging method presented discussed earlier shows how to establish a link between a group of objects in one domain and a group of related objects in another domain.

Display Tools

The information specifying the design is actually represented in binary form within a computer system. For the human designer **520** to develop and debug the design, information about that design must be presented in a form that can be understood by the human, such as by a visual display on a monitor. In addition, the designer **520** must also have a way to manipulate the design information, such as by keyboard and mouse. Display tools **111, 112, 113, 114, 115, 116, 117, 118,** and **119** provide a mechanism for that interaction.

However, circuit design information is particularly complicated, and efficiently allowing the designer **520** to control and analyze the design requires that the display tools take advantage of the structure of the design data. One way to take advantage of the structure is to design particular display tools to communicate with a particular domain in the database. For example, as shown in FIG. **24**, display tools **111, 112,** and **113** communicate with the source domain **1500**. Display tools **114** and **115** communicate with the G-Tech domain **1510**. Display tools **116** and **117** communicate with the gate domain **1520** while display tools **118** and **119** communicate with the layout domain.

A display tool interacts with its related domain by communicating messages back and forth. These messages involve specifying an object in the domain and some related action to perform on that object. The display tool is customized to interact with a particular domain in the sense that it is constructed to process objects in that domain. In particular, a display tool needs to be able to display an object and have a list available of operations that can be performed on that object, although the display tool does not perform those operations. The database, in contrast, needs to be able to provide the display tool with objects and process requests associated with objects.

Analysis Tools

Analysis tools are used to process information contained within a domain. In general terms, there are two kinds of analysis that one might want to perform in a given domain. The more conventional kind of analysis tool takes one or more objects in a domain, and computes characteristics associated with those objects. For example, in the gate domain, a timing analyzer is used to compute the delay times and slacks to various nodes in the circuit. In the analysis sense, the timing analyzer is determining a certain characteristic, for example, the time that the data signal will become valid after a clock edge, of certain objects in the domain, namely a connection between gates.

Another kind of analysis involves summarizing the characteristics associated with a particular group of objects. For example, estimating the total area in a circuit at the gate level involves summing the area associated with each component and connection.

For an analysis tools to summarize characteristics of objects, the analysis tools requires information about the structure of the objects and the connections between them. Therefore, analysis tools are associated with a particular domain. For example, in FIG. **24**, analysis tools **130** and **131** deal with the source domain **1500**, while analysis tools **132** and **133** deal with the G-Tech domain **1510**. Analysis tools **134, 135, 136,** and **137** deal with the gate domain **1520**, while analysis tool **138** interacts with the layout domain.

18

In general terms, analysis tools communicate with the database **125** by messages. The database provides the analysis tool with one or more objects, and the analysis tool responds by setting one or more characteristics of those objects or returning a summary of the characteristics of those objects, or both.

Using the Architecture for Debugging with Reference to the Source Domain

This section explains how a designer uses the CAD system architecture to relate characteristics of the design found in one domain to aspects of the design found in another domain. FIG. **25** shows a simplified view of the architecture of FIG. **24** involving only one display tool and one analysis tool. For this example, the design in question is assumed to be complete to the gate domain **1520**.

The designer **520** of FIG. **25** begins the pursuit of design insight by first obtaining a display that engages in the debugging process. Next, he obtains a visual representation of an aspect of the design stored, for example, in the source domain **1500** using display tool **109**. At the time the display tool **109** begins executing, the database **125** provides the display tool **109** with a list of analysis requests that the designer **520** can request. The display tool **109** could display the text of an HDL source file. The HDL text is an object in the source domain **1500**. The processing example described in this section corresponds to the example used in FIG. **12** through FIG. **19**.

The designer **520** then selects an object to evaluate by selecting some text, such as the decode: process statement in the text of FIG. **16**, and allowing the database **125** to identify the parse tree nodes corresponding to the selected text. Alternatively, to improve performance, the database **125** could transfer data to the display tool to allow the display tool to identify the parse tree node. A good technique for relating particular pieces of text with corresponding parts of a parse tree is described in a co-pending application by Gregory entitled "Method and Apparatus for Context Sensitive Displays", filed on Jun. 3, 1994 with express mail certificate TB596163183US, which is hereby incorporated by reference. The parse nodes are also objects in the source domain.

The designer **520** also selects a type of analysis to be performed from the available choices. One approach is that the designer **520** selects it from a menu or a push button. Another approach would be to have the designer **520** select it before selecting the text. In this example, assume that the designer **520** asks for an estimate of the area of the decode process.

The parse node and the desired analysis form a query that is sent to the database **125**. Because area requires technology specific information, the database **125** can identify that the required information is in the gate domain **1520**. In essence, the database **125** then needs to compute the area corresponding to the identified parse node. The database does this by identifying the gates in the gate domain **1520** that correspond to that parse node. One way that this can be done is to use the techniques described earlier using hierarchy and probes. In this example, the designer **520** wanted to know what the area of one of the processes is, and the designer **520** used probe points to segregate the design to permit this.

Given that the database **125** has identified the relevant gates, it then needs to compute the total area. In the gate domain **1520**, each gate is an object with an associated area characteristic. In this situation, the database could calculate the total area with a summarizing type of analysis tool **139** that sums up the area of each gate in a list. In other situations, it may be necessary to perform a sequence of

A1146

 SYNOPSYS 1007

6,132,109

**19**

simpler analysis operations on parts of the data structure to deduce the correct result. The analysis request from the display tool could also include a list of such instructions. Analysis tool **139** then produces a number that is handed back to database **125** which then sends to display tool **109** which can display the result directly or use it to modify the display characteristics.

Display Tools

The flexibility of the architecture shown in FIG. **24** permits additional display tools that relate circuit analysis information about parts of the circuit to the source text that generates those parts. FIG. **26** through FIG. **33** show novel display techniques for displaying circuit analysis data. FIGS. **26** through **33** show the display tools displaying an AMD2910A design. The source and circuit is described in Introduction to HDL-Based Design Using VHDL, by Steve Carlson, published in 1991, which is hereby incorporated by reference. This book is available from Synopsys, Inc., 700 East Middlefield Road, Mountain View, Calif. 94043-4033.

Stacked Bar Graph Display

FIG. **26** shows a stacked bar graph displaying information about the relative contributions of parts of the synthesis source. Often a design written in an HDL is described hierarchically, with higher level modules containing lower level modules. At a particular level in the hierarchy, the designer might want to know the characteristics of the modules visible at that level. The stacked bar graph of FIG. **26** shows relative areas associated with different parts of the design. At the highest level of the AMD 2910A, there are five functional sub-blocks: CNTL_BLK, MUX_OUT_BLK, REG_BLK, UPC_BLK, and STACK_BLK. The names of these blocks are shown in the object list area **2610** of window **2600**. The total measured area is displayed at the bottom of the window. The total area of the circuit is shown as 1964.0 gates. In this example, the characteristic is area. However, other characteristics such as power and time can be similarly displayed.

Each of the sub-blocks has a measured characteristic which is shown by text statements **2680** through **2684**. For example, CNTL_BLK uses 74.00 gates, which is 3.8% of the total as shown by statement **2680**. MUX_OUT_BLK occupies 148.00 gates, which is 7.5% of the total as shown by statement **2681**. REG_BLK occupies 225.00 gates, which is 11.5% of the total as shown by statement **2682**. UPC_BLK occupies 237.00 gates, which is 12.1% of the total as shown by statement **2683**. STACK_BLK occupies 1280.00 gates, which is 65.2% of the total as shown by statement **2684**. A stacked bar graph is constructed by drawing a graphical box corresponding to each functional sub-block with the size of the box proportional to the percentage of the sub-block's characteristic to the total characteristic. This is shown with boxes **2630** through **2634**.

Importantly, the stacked bar graph display of FIG. **26** can be constructed without reference to the physical nature of the particular characteristic. Therefore, power or timing can be displayed as easily as area. The database need only transfer the names of objects and the numerical value associated with those objects to the display tool.

Furthermore, each box, such as box **2630** through box **2634**, forming part of the stacked bar graph can also be a selectable button. The user can "push" the button and gain information about the sub-block associated with the box. FIG. **27** shows the result of the user selecting the sub-block MUX_OUT_BLK box by selecting box **2631**. Here, the sub-block MUX_OUT_BLK itself contains two sub-blocks, OUT_BLK and MUX_BLK. The total measured characteristic **2620** changes to 148.00 to reflect the size of

**20**

MUX_OUT_BLK. The sub-block OUT_BLK has 49.00 gates representing 33.1% of the area of MUX_OUT_BLK, as indicated by statement **2780**. This information is also shown graphically by box **2730**. The sub-block MUX_BLK has 99.00 gates representing 66.9% of the area of MUX_OUT_BLK, as indicated by statement **2781**. This information is also shown graphically by box **2731**. In addition, the window also shows the current location in the hierarchy with a path statement **2705**. In addition, statements such as statement **2780** could also act as buttons to change levels.

FIG. **28** shows the information displayed if the designer selects MUX_BLK to see how the 99.00 gates are allocated.

Histogram Display

The histogram display of FIG. **29** can provide a designer with information about the extent of problems currently in the design. For example, one aspect of the performance of a digital circuit is the delay along any path from the output of one flip-flop to the input of another. Once a designer specifies the clock waveforms, a timing verifier can determine arrival and required times throughout the clocked circuit. At any point in the circuit, the arrival time can be determined relative to a clock edge by measuring the longest path from a register affected by the clock to the point within the circuit. Similarly, required times may be computed relative to a clock edge by measuring the longest path from the point in the circuit to a register affected by the clock. Once the relationships between all clocks and all clock waveforms are specified, the timing verifier can determine the worst slack for each point within the circuit by subtracting arrival from required times for each possible combination of relevant clock edges. The smallest, or most negative result can be considered the worst slack for that point in the circuit. The Design Compiler Reference Manual V3.1a from Synopsys contains more information about timing analysis, and is hereby incorporated by reference. If any node has a negative slack time, then the timing goal has not been met. If only a few nodes have negative slacks, or the negative slacks are close to zero, then the designer may merely have a relatively small problem that can be fixed by tuning a small portion of the design. However, if many nodes have negative slacks or the slack times are large in magnitude, then the designer may be facing a substantial design problem. The histogram tool of FIG. **29** can provide guidance on the extent of a problem facing a designer.

A histogram tool provides a mechanism for displaying the distribution of a particular numerical characteristic of the circuit and allowing a designer to use see a list of objects having that characteristic. The example in FIG. **29** displays timing analysis for the AMD 2910. The database uses a timing analyzer and a targeted clock period to compute the slack times on every net. The circuit nodes with similar slack times are grouped into bins, and counted. Histogram-list window **2900** contains two sub-windows: the histogram window **2920** and the list window **2910**. The histogram window **2920** contains bars **2930** through **2937** with one bar per bin. The height of the bars indicates the number of nets that fall into that bin. If the user selects one of the bars, the list window **2910** shows the list of names that identify the nets that are in that bin. Individual items in the list display can be selected, as indicated by selected item **2915**. This allows the designer to use other display tools to gain more information about the selected item.

Text Display

FIG. **30** shows the text display of HDL source code that annotates that source code with additional information. Text display window **3000** contains three smaller windows. Text window **3010** contains the source text. Select window **3040**

**A1147**

6,132,109

## 21

shows circuit information related to text that has been selected. Cursor window **3030** shows circuit information related to text that is under the cursor. Column report **3060** shows circuit information associated with each line of the text. Selecting text can be done with the usual window based text selection mechanisms. For example, the designer could move a cursor to the relevant portion of the screen and push a button. The text window **3010** constructs a text box **3020** around the object that the cursor is pointing at. One fast method of determining the limits of cursor text box **3020** would be to use the parse tree representation described in co-pending application by Gregory entitled "Method and Apparatus for Context Sensitive Displays", filed on Jun. 3, 1994 with express mail certificate TB596163183US.

Here, cursor window **3030** is showing an estimate of the circuit area associated with the object under the cursor. The phrase "gtech Area=6" indicates that the implementation of the comparison function performed by condition "PSH_ PTR>STK_LOW" indicated by cursor text box **3020** requires 6 area units in the generic technology domain in the database. Cursor window **3030** could display other characteristics associated with the text pointed to by the cursor.

Select window **3040** shows information associated with selected text. Here, the size and font of the selected text **1050** is changed. One fast method of determining the limits of selected text **1050** would be to use the parse tree representation described in co-pending application by Gregory entitled "Method and Apparatus for Context Sensitive Displays", filed on Jun. 3, 1994 with express mail certificate TB596163183US. In this example, the select window **3040** shows detailed information about the HDL construct MEM [PSH_PTR] **3050**. Statement **3080** shows the type of HDL construct that the selected object is—in this case, the construct is an array index. Statement **3083** shows the estimated area of the construct in the G-Tech domain **1510**, here 530 area units. Statement **3084** shows the length of the longest path in levels of logic from a register to the gates that implement the construct, here 18 gates. Statement **3081** shows the parse tree node number. Detailed list **3082** shows the netlist components in the G-Tech domain implementing the construct **3050**. For each component in this list, the following information is displayed: the component's netlist instance name **3087**, the type of netlist component **3088** (reference name), its contribution to the total area estimate **3089**, and the class of netlist component **3090** e.g. cell, pin, net, or port. Other information could be displayed at the designer's option.

Column report **3060** shows information associated with each line. Here, the column report is showing the area associated with the HDL constructs on each line.

Virtual Schematic Display

Part of the circuit debugging process involves tracing the drivers and driven or, inputs and outputs of specific circuitry. The virtual schematic display shown in FIG. **31** provides the designer with the ability to find the HDL source that provides inputs to and takes outputs from a particular point in the HDL source. The virtual schematic display has a virtual schematic window **3100** which has three window regions: an input region **3110**, a current region **3120**, and an output region **3130**. The designer uses the cursor to indicate selected text **3150** in the current region. This selected text **3150** corresponds to a circuit object **3151** (not shown) in the database. Circuit object **3151** has inputs and outputs. The

## 22

database then links the input region **3110** to those portions of the text of the synthesis source that show where the inputs of circuit object **3151** originated. Here, the input "DATA" comes from an input to the module MULTIPLEXOR as indicated by input argument **3145**. The database also links the output region **3130** to those portions of the text of the synthesis source that show where the outputs of circuit object **3151** go to. Here, as indicated by output argument **3155**, output "Z" goes to the output of module MULTIPLEXOR.

By clicking in the output region, the designer can trace the output further. FIG. **32** shows the changes that occur in the regions. The text of the output region now moves to the current region **3120**. The text of the output region changes to show synthesis source text corresponding to objects driven by output argument **3155**. Here, output argument **3155** drives another output at the next level module boundary, as shown by output argument **3156**. Input region **3110** changes to show all of the places in the source text that set or define the selected output argument **3155**. Here, there are five text sources for output argument **3155** as shown in windows **3271, 3272, 3273, 3274**, and **3275**. The originally selected statement **3150** is shown again in window **3272**.

An additional input comes from the MULTIPLEXOR input argument SEL as shown in window **3271**. Z is also takes on values at different points in a case statement as shown in windows **3272, 3273, 3274**, and **3275**.

FIG. **33** shows the results of pursuing the output argument **3156**. Here, the high level module definition appears in the current region **3120** while the input region **3110** displays the module interface shown in the current region of FIG. **32**.

What is claimed is:

1. A method, comprising:

translating a synthesis source text file to an initial circuit including one or more parts connected together with nets;

identifying each part of said initial circuit with the portion of said synthesis source text file that created said part of said initial circuit;

optimize said initial circuit to produce a final circuit containing one or more parts connected together with nets;

analyzing said final circuit to determine characteristics associated with said final circuit's parts and with said final circuit's nets;

identifying said final circuit's part's that correspond directly with said initial circuit's initial parts;

identifying said final circuit's nets that correspond directly with said initial circuit's nets; and

displaying said characteristics associated with those said final circuit's nets and parts that correspond directly with said initial circuit's nets and parts near said portions of said synthesis source text file that created said corresponding initial circuit parts and nets.

2. The method of claim **1** wherein said source text file includes directives indicating the location of probes and wherein said translating step include generating initial circuit parts or initial circuit nets that will correspond directly with said final circuit parts or final circuit nets.

\* \* \* \* \*

# CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2014, the foregoing Opening Brief of Petitioner-Appellant Synopsys, Inc. was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the appellate CM/ECF system.  All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.


Dated:  October 3, 2014

/s/ Eric A. Shumsky
Eric A. Shumsky
Orrick, Herrington & Sutcliffe LLP
1152 15th Street, NW
Washington, D.C. 20005-1706
Telephone:  (202) 339-8400
Facsimile:  (202) 339-8500
eshumsky@orrick.com

*Counsel for Appellant Synopsys, Inc.*

## CERTIFICATE OF COMPLIANCE
## UNDER FEDERAL RULES OF APPELLATE PROCEDURE
## 32(a)(7) AND FEDERAL CIRCUIT RULE 32

Counsel for Synopsys, Inc. certifies that the brief contained herein has a proportionally spaced 14-point typeface, and contains 13,878 words, based on the "Word Count" feature of Word 2010, including footnotes and endnotes.  Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this word count does not include the words contained in the Certificate of Interest, Table of Contents, Table of Authorities, Abbreviations, and Statement of Related Cases.

Dated:   October 3, 2014          Respectfully submitted,


/s/ Eric A. Shumsky
Eric A. Shumsky
Orrick, Herrington & Sutcliffe LLP
1152 15th Street, NW
Washington, D.C. 20005-1706
Telephone:  (202) 339-8400
Facsimile:  (202) 339-8500
eshumsky@orrick.com

*Counsel for Appellant Synopsys, Inc.*